Case Nos. 23-13352-D & 24-10191-D

# In the United States Court of Appeals for the Eleventh Circuit

―――――――――――――――――――――――――

DOES 1-205 OHIO ACTION (17-80547), *et al.*,
Plaintiffs-Appellants,

v.

ROBERT W. OLSON, *et al.*,
Defendants-Appellees

(IN RE: CHIQUITA BRANDS INTERNATIONAL, INC., ALIEN TORT STATUTE & SHAREHOLDER DERIVATIVE LITIGATION)

―――――――――――――――――――――――――

JOHN DOES 1-205, *et al.*,
Plaintiffs-Appellants,

v.

ROBERT OLSON, *et al.*,
Defendants-Appellees

(IN RE: CHIQUITA BRANDS INTERNATIONAL, INC., ALIEN TORT STATUTE & SHAREHOLDER DERIVATIVE LITIGATION)

―――――――――――――――――――――――――

On Appeal from the United States District Court
for the Southern District of Florida
No. 08-md-01916
(Nos. 17-80547, 17-80323, 20-82222, 21-60058)
The Honorable Kenneth A. Marra

―――――――――――――――――――――――――

**PLAINTIFFS-APPELLANTS' OPENING BRIEF**

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D

*John Does 1-205 v. Robert Olson*    No. 24-10191-D

Marco Simons
Richard L. Herz
Marissa Vahlsing
Wyatt Gjullin
Gabriela Valentín Díaz
**EarthRights International**
1612 K Street NW #800
Washington, D.C. 20006
Tel: 202-466-5188
Fax: 202-466-5189

Agnieszka M. Fryszman
Benjamin D. Brown **Cohen
Milstein Sellers & Toll PLLC**
1100 New York Ave., N.W. West
Tower, Suite 500 Washington,
D.C. 20005
Tel: 202-408-4600
Fax: 202-408-4634

Theodore J. Leopold
Leslie M. Kroeger
**Cohen Milstein Sellers & Toll
PLLC**
2925 PGA Blvd Ste 200
Palm Beach Gardens, FL 33410
Tel: 561-515-1400
Fax: 561-515-1401

Judith Brown Chomsky
**Law Offices of Judith Brown
Chomsky**
Post Office Box 29726
Elkins Park, PA 19027
Tel: 215-782-8367
Fax: 215-782-8368

Paul L. Hoffman
John Washington **Schonbrun
Seplow Harris Hoffman &
Zeldes LLP**
11543 W. Olympic Blvd
Los Angeles, CA 90064
Tel: 310-396-0731
Fax: 310-399-7040

Arturo Carrillo
**Colombian Institute of
International Law**
5425 Connecticut Ave., N.W.,
#219
Washington, D.C. 20015
Tel: 202-365-7260

*Counsel for Plaintiffs-Appellants*

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 and 27-1(a)(9), counsel for Plaintiffs-Appellants certifies that a list of interested persons, trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations (noted with stock symbol if publicly listed), that have an interest in the outcome of this appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, and other identifiable legal entities related to a party, known to Plaintiffs-Appellants, are as follows:

1. The individual plaintiffs in Southern District of Florida Case Nos. 17-80547-CIV-MARRA, 17-80323-CIV-MARRA, 20-82222-CIV-MARRA, 21-60058-CIV-MARRA:

   Abadia Potes, Antonio Abad

   Acevedo Florez, Alexandra Bibiana

   Acosta Garcia, Maria Julieth

   Agudelo Urango, Jeison Dario

   Agudelo Vargas, Jhonny Andres

   Aguirre de Usuga, Maria Eliud

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

Aguirre Manco, Beatriz Elena

Aguirre Manco, Danny Mauricio

Aguirre Manco, Jhon Fredy

Aguirre Manco, Yaney Gisela

Alandete Duran, Petrona

Alvarez Ospina, Mariela

Amparo Henao Alandete, Gloria

Anaya Jaramillo, Edith Esther

Arbelaez, Maria Magdalena

Arcos Martinez, Carmen Alicia

Areiza Jaramillo, Julia Stella

Arias Cordoba, Carlos Andres

Arias Estrada, Maria Marlene

Arias Martinez, Fanny

Arias Martinez, Jambrinson

Arias Martinez, Rosa Eva

Arias Martinez, Yaqueline

Arroyave Correa, Gloria Patricia

Arroyave Marimon, Henderson Patrick

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

Arroyave Salas, Annalit

Arroyave Salas, Jeferson Andres

Arroyo Plata, Carlina Rosa

Arrubla Martinez, Oscar Dario

Atencio Oquendo, Rubis

Avendano Berrio, Yasmina Antonia

Avila Jimenez, Angela Maria

Avila Lopez, Wilinton

Avila, Manuel Enrique

Barrios Negrete, Gilda

Bautista Oviedo Ramos, Edinson

Bautista Zapata, Juan

Benitez Franco, Landisabal

Benitez Franco, Zulbiana

Benitez,Martha Helena

Berrio Jimenez, Tomas

Berrio Otagri, Carlos Alberto

Berrio Otagri, Erika Andrea

Berrio Otagri, Luz Elena

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

Berrio Ramirez, Albeiro

Berrio Ramirez, Claribel

Berrio Ramirez, Eusebio

Berrio Ramirez, Jhon James

Berrio Ramirez, Juan Carlos

Berrio Ramirez, Nelba Maria

Berrio Ramirez, Sandra

Berrio Sanmartin, Ana Esther

Berrio Sanmartin, Angelica Maria

Berrio Sanmartin, Enorbita

Berrio Sanmartin, Teresa

Blandon Mosquera, Carmen Yadira

Borja Garcia, Juan Pablo

Borja Garcia, Yeny Maryory

Borja Padilla, Hipolita

Buelvas Lemos, Ramon Alberto

Cabria Martinez, Blanca Rosa

Caicedo Valoyes, Dilia Maria

Canas Hernandez, Anatividad

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*                          No. 24-10191-D

Canas Hernandez, Maria Luzcelia

Canas Hernandez, Martha Elvia

Canas Ramirez, Maria Roselia

Candelaria Ceren Morelo, Alisandro

Cano Arbelaez, Luis Carlos

Cano Arbelaez, Sandra

Cano Ortiz, Maria Gladys

Cano Trejos, Johan Alexis

Cardona Areiza, Jose Leonel

Cardona Areiza, Norfi Emilce

Cardona Areiza, Rosa Amelia

Cardona Franco, Luz Dary

Cardona Gutierrez, Jose Leonel

Caro Rengifo, Ana Gilma

Caro Rengifo, Clara Ines

Caro Rengifo, Diana Patricia

Caro, Gloria Maria

Carrascal Huertas, Juan Antonio

Carrascal Huertas, Nellys

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

Carrillo Gonzalez, Denis Margarita

Carvajal, Antonio Dagoberto

Castaneda Montes, German

Castano Ruiz, Beatriz Elena

Castano Ruiz, Gabriel Amado

Castano Ruiz, Luz Angela

Castano Ruiz, Marco Fidel

Castano Ruiz, Mariela

Causil Ortiz, Martha Cecilia

Cedeno Cuadrado, Libardo

Ceren De Lopez, Georgina

Ceren Gonzalez, Leider

Ceren Morelo, Bernardina

Ceren Morelo, Candelaria

Ceren Morelo, Eleida

Ceren Morelo, Emelina

Ceren Morelo, Eneida

Ceren Morelo, Grisedia Maria

Ceren Morelo, Inocencia

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

Ceren Morelo, Jose Isabel

Ceren Morelo, Manuel Tiberio

Ceren Morelos, Eriberto

Ceren Santana, Candelario

Ceren Socarras, Lorena

Chaverra Moreno, Adalberto

Chaverra Moreno, Alexander

Chaverra Moreno, Anderson

Chaverra Salas, Adan

Cielo Arbelaez, Maria

Ciro Castano, Flor Aleida

Coa Licona, Esther Maria

Cogollo, Aida Isabel

Cordoba Moya, Miguelina

Correa Rodriguez, Maria Elva

Cuartas Diez, Blanca Rubiela

Cubides Ramirez, Luis Antonio

Cuesta Diaz, Sonia

Cuesta Florez, Luz Mery

Cuesta, Gilma

Cuesta, Luz Elena

Dario Garcia, Ruben

de Hoyos Viola, Ana Rosmira

De Jesus Aguirre Manco, Elkin

De Jesus Arroyave Correa, Ovidio

De Jesus Bedoya Castaneda, Adrian

de Jesus Berrio Ramirez, Arley

De Jesus Canas Hernandez, Reinerio

De Jesus Cano Arbelaez, Yovany

De Jesus Cano Ortiz, Leonidas

De Jesus Castano Osorio, Adolfo

De Jesus Chaverra Moreno, Alexis

De Jesus Cuartas Diez, Aracely

De Jesus Durango Rengifo, Hermes

de Jesus Ferraro Alvarez, Nidia

De Jesus Flores Plaza, Edilma

De Jesus Garcia, Maria

De Jesus Gomez Zapata, Jeinne

de Jesus Gonzalez Marin, Abdon

De Jesus Hernandez, Omar

De Jesus Meneses Bustamante, Ana

De Jesus Mosquera de Palacios, Ana

de Jesus Roldan Guisao, William

de Jesus Ruiz Diaz, Henry

de Jesus Ruiz Diaz, Josefina

de Jesus Ruiz Diaz, Maria Alciria

de Jesus Ruiz Diaz, Myriam

de Jesus Ruiz Diaz, Nancy Islena

de Jesus Ruiz Diaz, Rubiela

De Jesus Tangarife Tangarife, Lucia

De Jesus Trujillo Giraldo, Fabiola

De Jesus Valencia, Ligia

De La Hoz Hurtado, Lilia Rosa

De Las Mercedes Munoz Garcia, Maria

De Los Angeles Borja Garcia, Maria

De Los Angeles Cuvides Ramirez, Maria

De Los Santos Rengifo Osorio, Jose

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*                          No. 24-10191-D

de los Torres Gonzalez Padilla, Vinicia

De Rodriguez, Dioselina Arboleda

Del Carmen Beltran Cruz, Margarita

Del Carmen Berrio Sanmartin, Carmela

Del Carmen Herrera Altamiranda, Nohora

del Carmen Morales Miranda, Rosiris

Del Carmen Osorio, Maria

Del Carmen Ramirez, Aracely

Del Rosario Reyes Gonzalez, Yenis

Del Socorro Cuartas Diez, Luz Dary

Del Socorro Garcia Perez, Rosmira

del Socorro Hernandez Gonzalez, Maria

Del Socorro Serna de Lemus, Fabiola

Diaz de Ruiz, Maria Arcenia

Diaz Espitia, Edis Marina

Diaz Pastrana, Blanca

Diez, Ana Solina

Dubian Garcia, Pedro

Duran Jimenez, Olivia

Durango Ayala, Catalina

Durango Gallo, Omaira

Durango Guerra, Emilce

Durango Guisao, Reinaldo Antonio

Echavarria Osorio, Elkin Alfonso

Echavarria Osorio, Flor Elena

Echeverri, Martha Yolanda

Eliecer Restrepo, Jorge

Emilsen Higuita, Gloria

Enelida Ramos, Maria

Esneida Marquez, Maria

Espinosa, Luz Alba

Espitia Canas, Yirley Johana

Espitia Echavarria, Andres David

Ferraro Alvarez, Maria Eudilma

Flores Jaramillo, Luz Alba

Florez Durango, Marta Oliva

Florez Jaramillo, Maria Dionis

Florez Julio, Yamile

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

Fonseca Perea, Emilse

Franco Vasquez, Maria Omaira

Galeano Castellanos, Julieth Andrea

Gallego Osorno, Naydu

Gallego, Gladys

Gamboa Caicedo, Alexander

Gamboa Caicedo, Carlos Andres

Gamboa Caicedo, Disney

Gamboa Caicedo, Kervis Edith

Gamboa Caicedo, Maria Sandra

Gamboa Caicedo, Milton

Garcia Cruz, Martha Lucia

Garcia Marquez, Liliana

Garcia Marquez, Paula Andrea

Gaviria Bolano, Gumercinda

Gilberto Sanchez, Gonzalo

Giraldo, Alexandra Maria

Giraldo, Carlos

Goez Rueda, Rosa Elena

Gomez Canas, Yorledy

Gomez Castro, Juana

Gomez Montoya, Maria Patricia

Gomez Urrego, Elvia Rosa

Gonzalez Espitia, Cristian Ferney

Gonzalez Hernandez, Dilia Isabel

Gonzalez Marin, Eduardo Fredy

Gonzalez Marin, Jorge Asdrubal

Gonzalez Marin, Migdonia

Gonzalez Marin, Rosalba

Gonzalez Rengifo, Faridey

Gonzalez Rengifo, Miguel Estiven

Gonzalez Rivas, Josefina

Gonzalez, Feliciano

Gracia Marquez, Edison Antonio

Graciela Borja, Maria

Guerra Avendano, Joyce Paulin

Guerra Avendano, Lilia Yanellys

Guerra Avendano, Ronal Adal

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

Guerra Avendano, Yulieth Paola

Guerra, Luz Dary

Guerra, Maria Magdalena

Guisao, Leonel Roldan

Guisao, Luis Antonio

Henao Alandete, Juan Guillermo

Henao Alandete, Julio Cesar

Hernandez Correa, Alba Rocio

Hernandez Correa, Luis Emilio

Hernandez Correa, Luz Marllore

Hernandez Correa, Luz Mary

Hernandez Giraldo, Olga Liliana

Hernandez Gonzalez, Neir

Hernandez Gonzalez, Neudis

Hernandez Gonzalez, Odilia

Hernandez Hernandez, Beatriz Elena

Hernandez Hernandez, Claudia Milena

Hernandez Hernandez, Gloria Cristina

Hernandez Hernandez, Margarita Rosa

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

Hernandez Huertas, Hipolita

Hernandez, Eufemia Maria

Higuita Caro, Luz Gladys

Higuita Hurtado, Gabiel Jaime

Higuita Hurtado, Gilberto

Higuita Hurtado, Janeth

Hilda Areiza, Rosa

Holguin De Rincon, Maria Fanny

Huila Bravo, Maria Lely

Hurtado Garcia, Rosa Franquilina

Hurtado Parra, Luis Alfonso

Hurtado Parra, Sandra Yaneth

Jane Doe 80

Jimenez Borja, Andres

Jimenez Borja, Elizabeth Johana

Jimenez Borja, Liliana

Jimenez David, Blanca Rosa

Jimenez David, Leonela

Jimenez Espinosa, Gonzalo

Jimenez Espinosa, Marco Fidel

Jimenez Espinosa, Marlen Cecilia

Jimenez Parra, Antonio

John Doe 122

Lambertino Ferraro, Nilson

Lara Palacio, Gloria Helena

Laverde, Luz Areli

Lemus, Hernando

Leudo Asprilla, Edelmira

Licona Guerra, Fermina

Loaiza Tapasco, Maria Cenelia

Lopez Aguirre, Ingryd Daniris

Lopez Aguirre, Mary Leidys

Lopez Aguirre, Sandra Milena

Lopez Aguirre, William Enrique

Lopez Fernandez, Juan Pablo

Lopez Gonzalez, Arneth Enrique

Lopez Montoya, Maria Edit

Lopez Perez, Ana Sirley

Lopez Perez, Deycis Norbellis

Lopez Perez, Dina Luz

Lopez Perez, Lisenia

Lopez Perez, Marlys

Lopez Perez, Orley Humberto

Luz Teheran, Ada

Luzmila Ortiz, Maria

Manco Meneses, Luz Eneida

Manco Torres, Luz Marina

Maria Esperanza Ferraro Alvarez

Maria Leudo, Rubia

Marin de Gonzalez, Rosalba

Marin, Gloria Patricia

Martinez Ceren, Matilde

Martinez Garcia, Ana Elba

Martinez Martinez, Bertha Luz

Maturana Cordoba, Irma Rosa

Mauricio Garcia, Jose

Mena Mosquera, Claudia Esther

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*                          No. 24-10191-D

Mena Mosquera, Kelly Jhoanna

Mena Mosquera, Paola Andrea

Mestra Gonzalez, Beatriz Elena

Miranda Estrada, Elvira

Miranda Usuga, Jose Dagoberto

Miranda Usuga, Juan Diego

Miranda Usuga, Maria Ofelia

Molina Arevalo, Dilma Maria

Molina Palacios, Jhoan Camilo

Molina Vasquez, Policarpo

Monsalve Loaiza, Yuliana

Monsalve Oquendo, Fabiola

Monterrosa Ramos, Monica Patricia

Montoya Borja, Flor Marina

Montoya Tovar, Juan Manuel

Montoya Tovar, Mariluz

Montoya Tovar, Paula Andrea

Morelo De Ceren, Bernardina

Moreno Cordoba, Guillermo

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

Moreno Cordoba, Luis Angel

Moreno Cordoba, Luisa

Moreno Cordoba, Merys Maria

Moreno Cordoba, Rosa Francisca

Moreno Cordoba, Santos

Moreno Gomez, Yaneth Amparo

Moreno Romana, Nancy Maria

Moreno, Astrid Chaverra

Mosquera, Emilia

Munoz Osorio, Claudia Patricia

Murillo Asprilla, Johan Alexander

Murillo Rengifo, Jair Emir

Murillo Rengifo, Jefferson

Murillo Rengifo, Jhon Alex

Murillo Rengifo, Jose Enrique

Murillo Rengifo, Sandra Milena

Murillo Rengifo, Yoiner Alexander

Murillo Rivas, Ana Delfa

Murillo Rivas, Ingris Patricia

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

Murillo Rivas, Jose Patrocinio

Murillo Rivas, Luis Felipe

Murillo Rivas, Maria Yajaira

Narvaez De Madrid, Celia Modesta

Negrete Cantero, Robinson Antonio

Negrete Soto, Marcela

Norbely Otagri, Maria

Orozco Velez, Ivan Antonio

Ortega Julio, Crister Lourdes

Ortiz Duran, Leidi Paola

Ortiz Molina, Maria Rosaura

Ortiz, Maria Trinidad

Osorio Lopez, Eddy

Osorio Lopez, Herlan

Osorio Lopez, Sandra Milena

Osorio Ramirez, Maria Eduvina

Ospino Vargas, Luis Carlos

Ospino Vargas, Luisa Fernanda

Oviedo Ramos, Arley Fernando

Oviedo Ramos, Diana Maricela

Oviedo Ramos, Hector Jose

Pacheco, Luz Mila

Paez Escobar, Brayan Andres

Paez Villalobo, Elcy Esther

Paez Villalobo, Luis Alberto

Palacio Mendoza, Maria Yulenis

Palacio Renteria, Sonia

Palencia Gomez, Victor

Palencia Medrano, Oswuin Farley

Palencia Medrano, Yasiris Johana

Palencia Negrete, Francisco

Palencia Negrete, Mirledis Celinda

Palencia Negrete, Urbina Janeth

Palencia Negrete, Yudis Patricia

Parra Osorio, Rosa Angelica

Pena Acuna, Martha Irene

Perea Reyes, Vicenta

Perez Giraldo, Dora Alba

Perez Hoyos, Alirio Jose

Perez Medrano, Matilde

Perez Vidal, Francisca

Puentes Avalo, Monica Alexandra

Pulgarin Echavarria, Elcy Mery

Pulgarin Echavarria, Maria Eulalia

Quejada Moreno, Carmen

Quintero, Nelly Orfelia

Quinto Bonilla, Mary Luz

Ramirez de Berrio, Ruth Maria

Ramirez Perea, Lilian Melania

Ramirez Yanez, Elvia Maria

Rengifo Alvarez, Eusmed

Rengifo Borja, Denis Maria

Rengifo De Caro, Maria Fabiola

Rengifo Osorio, Heriberto

Rengifo Palacios, Sol Angel

Rengifo Zapata, Ever Carlos

Rengifo Zapata, Fabian

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

Rengifo Zapata, Ligia Maria

Rengifo Zapata, Soraida

Renteria Murillo, Jose Eliecer

Restrepo Torres, Ameira

Restrepo, Marta Elena

Rincon Holguin, Gloria

Rincon Holguin, Martha Cecilia

Rivas Martinez, Santa Delfa

Rivero, Dilma Esther

Rodriguez De Taborda, Mercedes

Rojas Gutierrez, Alba Maria

Rojas Gutierrez, Carmen Jael

Rojas Gutierrez, Eunice

Rojas Gutierrez, Jorge Enrique

Roldan de Rodriguez, Ana Maria

Roldan Guisao, Ana Teresita

Roldan Guisao, Carlos Enrique

Roldan Guzman, Paola Andrea

Romana Olivera, Gregoria

Romana, Martha Isabel

Ruiz Acevedo, Johan Arley

Ruiz Diaz, Bella Zulima

Ruiz Diaz, Gabriel Angel

Ruiz Diaz, Senobia

Ruiz Diaz, William Whiton

Ruiz Gonzalez, Debora Maria

San Martin Galan, Catalina

San Martin Galan, Glenis

San Martin Galan, Marilis

San Martin Guerra, Neider

Sanchez Diez, Jorge Ivan

Sanchez Diez, Rogelio Antonio

Sanchez Munoz, Lina Beatriz

Sanchez, Juan Manuel

Sanmartin Ruiz, Tarcila Esther

Santero Hernandez, Ledys

Sena De Leon, Raquel Victoria

Silgado, Leonor

Sixta Cledys Pereira Martinez

Socarraz Gaspar, Sielva Rosa

Sosa Sosa, Maria La Luz

Suaza, Maria Eugenia

Tabares Cortez, Yordano

Taborda Rodriguez, Luz Miriam

Tangarife Jaramillo, Tatiana

Tangarife Tangarife, Patricia

Tangarife Tangarife, Rosa Emilia

Tangarife, Francisco Jose

Tapias, Emilse

Tordecilla Gomez, Aida Sofia

Torres Urango, Maria Candelaria

Tovar, Maria Isabel

Tulia Bravo, Bertha

Ubaldo Cuesta, Maria Eugenia

Urango Carrascal, Benilda

Urango Monterrosa, Jader Andres

Urango Monterrosa, James De Jesus

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D

*John Does 1-205 v. Robert Olson*    No. 24-10191-D

Urango Monterrosa, Leidy Patricia

Urango Monterrosa, Leisy Patricia

Urango Valencia, Elvira

Urrego Usuga, Luz Marina

Usuga Aguirre, Luz Marina

Usuga Celada, Luz Dary

Usuga Franco, Arely Yazmin

Usuga Franco, Gledys Omaira

Usuga Franco, Luz Dalia

Usuga Franco, Wilber Hernando

Valencia Berrio, Cristina Maria

Vanegas Henao, Oscar Hernando

Vanegas Ramirez, Carlos Mario

Vanegas Ramirez, Nini Johana

Vanegas Ramirez, Oscar Giovanni

Varelas, Martha Oliva

Vargas Benitez, Margoth

Vargas Martinez, Edinson Giovany

Vargas Martinez, John Humberto

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

Vargas Martinez, Liliana Isabel

Vargas Martinez, Wilson R.

Vargas Patino, Marta Cecilia

Vargas Urrego, Matilde

Vargas Vasquez, Bertha Beatriz

Vasquez Florez, Melany Alejandra

Vasquez Gonzalez, Oscar Dario

Vasquez Marin, Mariela

Velasquez, Diana Patricia

Villalba Paez, Beatriz Maria

Viuda De Echavarria, Rosalia Osorio

Zarza Carrascal, Deisa

Zuluaga Cardona, Yaneth Esmeralda

2.    Additional interested parties are:

*Plaintiffs-Appellants have included persons previously identified by Defendants-Appellees as having a financial interest in this litigation. Plaintiffs do not have direct information as to whether these persons continue to have such an interest.*

Arnold & Porter Kaye Scholer LLP

Bower, Elizabeth

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*                        No. 24-10191-D

Bronson, Ardith M.

Brown, Benjamin D.

Burton, Preston

Carrillo, Arturo

Chomsky, Judith Brown

Cohen Millstein Sellers & Toll PLLC

Colombian Institute of International Law

de Leon, John

Diaz, Gabriela Valentin

DLA Piper LLP (US)

EarthRights International

Freidheim, Cyrus

Fryszman, Agnieszka M.

Gjullin, Wyatt

Gunster Yoakley & Stewart, P.A.

Herz, Richard

Hochman, Ian K.

Hoffman, Paul L.

Jacques, Nicholas J.

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

Keiser, Charles

Kistinger, Robert

Krakoff, David S

Kroeger, Leslie M.

Law Offices of Chavez & De Leon, P.A.

Law Offices of Judith Chomsky

Leopold, Theodore J.

Marcus, Bradley A.

Marra, Kenneth A.

Meyer, Robert J.

Mrachek, Lorin Louis

Mrachek, Fitzgerald, Rose, Konopka, Thomas & Weiss, P.A.

Murray, Jr., John Brian T.

Neiman, Jeffrey A.

Olson, Robert

Orrick, Herrington & Sutcliffe LLP

Powers, Sean

Preheim, Elissa J.

Rose, Alan B.

Schonbrun Seplow Harris Hoffman & Zeldes, LLP

Simons, Marco Benjamin

Tsacalis, William

Vahlsing, Marissa

Washington, John C.

Wayne, Charles B.

Willkie Farr & Gallagher LLP

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1, Plaintiffs-Appellants state: No

Plaintiff-Appellant is a corporation.

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*        No. 23-13352-D
*John Does 1-205 v. Robert Olson*                                    No. 24-10191-D

## **STATEMENT REGARDING ORAL ARGUMENT**

Plaintiffs-Appellants respectfully request oral argument because this appeal presents questions of the application of multiple theories of state action to voluminous factual allegations, which the Court may benefit from discussing with counsel.

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT..............................................i

STATEMENT REGARDING ORAL ARGUMENT.................................ii

TABLE OF CONTENTS ....................................................................iii

TABLE OF CITATIONS ....................................................................v

INTRODUCTION .............................................................................1

STATEMENT OF THE ISSUES.........................................................8

STATEMENT OF THE CASE ............................................................9

    I.     FACTUAL BACKGROUND ......................................................9

          A.   The AUC paramilitaries, in concert with the
              Colombian State, committed countless atrocities. ..... 10

          B.   Multiple court decisions confirm the military-
              paramilitary collaboration............................................ 13

          C.   State authorities made no serious effort to arrest
              or prosecute paramilitaries. ........................................ 16

    II.    PROCEDURAL HISTORY ...................................................17

          A.   The district court initially found that complaints
              in the *Chiquita* MDL adequately alleged state
              action. ............................................................................ 17

          B.   The complaints here alleged state action. ................. 20

          C.   The district court changed its mind regarding the
              state action legal standard, and dismissed
              Plaintiffs' claims. ......................................................... 21

SUMMARY OF THE ARGUMENT .......................................................26

ARGUMENT ......................................................................................30

    I.     As alleged, the AUC paramilitaries acted under color of
        law..........................................................................................30

          A.   The district court failed to consider the
              Colombian State's encouragement of paramilitary
              violence. ....................................................................... 34

iii

1.    Because the district court did not analyze
       "significant encouragement," remand is
       warranted.............................................................. 34

2.    The Colombian government engaged in
       "significant encouragement" of paramilitary
       violence against civilians.................................... 36

B.    The district court misapplied the public function
       test. ........................................................................ 39

C.    The district court erroneously required joint
       action for every individual killing, rather than for
       the paramilitaries' overall strategy and plan............. 45

1.    The symbiotic relationship or entwinement
       test does not require State involvement in
       each act of wrongdoing. ...................................... 49

2.    Plaintiffs adequately pled a conspiracy
       between the AUC and the State that
       encompassed these murders. ............................. 57

a.    The district court's test conflicts with
       well-established conspiracy principles. .... 58

b.    Plaintiffs meet the proper test for
       conspiracy. ................................................. 61

3.    The district court's erroneous joint action
       test would lead to intolerable results. ............... 65

II.    The district court improperly ignored specific
        allegations of State involvement in four killings................. 67

III.    Plaintiffs alleged that each Defendant assisted this
         wrongdoing. ............................................................... 71

CONCLUSION ................................................................ 73

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

## TABLE OF CITATIONS

## Cases

*Adickes v. S. H. Kress & Co.,*
    398 U.S. 144 (1970) ................................................................ 4

*Al-Quraishi v. Nakhla,*
    728 F. Supp. 2d 702 (D. Md. 2010) .................................... 43

*Alamango v. Board of Supervisors of Albany County,*
    32 N. Y. Sup. Ct. 551 (1881) ............................................. 43

*Anderson v. District Board of Trustees of Central Florida Community*
*College,* 77 F.3d 364 (11th Cir.1996) .................................... 72

*Blum v. Yaretsky,*
    457 U.S. 991 (1982) ............................................................ 37

*Brentwood Academy v. Tennessee Secondary School Athletic*
*Association,* 531 U.S. 288 (2001) .............................. 3, 4, 37, 46, 50, 51

*Burton v. Wilmington Parking Authority*,
    365 U.S. 715 (1961) ..............................................................49-50, 55

*Cabello v. Fernandez-Larios,*
    402 F.3d 1148 (11th Cir. 2005) .................................... 39, 59

*Carrizosa v. Chiquita Brands Int'l, Inc.*,
    47 F.4th 1278 (11th Cir. 2022) ................................. 17, 67-68

*Charles v. Johnson*,
    18 F.4th 686 (11th Cir. 2021) ..........................32, 45-46, 55, 56, 58-59

*Cowen v. Ga. Sec'y of State,*
    960 F.3d 1339 (11th Cir. 2020) ......................................... 36

*Dobyns v. E-Systems, Inc.*,
    667 F.2d 1219 (5th Cir. 1982) ........................................................... 42

*Doe v. Drummond Co.*,
    782 F.3d 576 (11th Cir. 2015) ........................................................... 31

*Fabrikant v. French*,
    691 F.3d 193 (2d Cir. 2012) ....................................................... 41, 43

*Flagg Bros., Inc. v. Brooks*,
    436 U.S. 149 (1978) ............................................................................ 42

*Halberstam v. Welch*,
    705 F.2d 427 (D.C Cir. 1983) ................................................ 59, 60, 63

*Horvath v. Westport Library Ass'n*,
    362 F.3d 147 (2d Cir. 2004) ............................................................. 43

*In re Chiquita Brands Int'l, Inc.*,
    536 F. Supp. 2d 1371 (J.P.M.L. 2008 ................................................ 18

*In re Chiquita Brands Int'l, Inc. ("Chiquita I")*,
    792 F. Supp. 2d 1301 (S.D. Fla. 2011) .............. 18, 19, 21-22, 33, 35-36

*In re Chiquita Brands Int'l, Inc., ("Chiquita II")*,
    190 F. Supp. 3d 1100 (S.D. Fla. 2016) ........................................ 20, 33

*In re Chiquita Brands Int'l*, No. 08-01916-MD,
    2012 U.S. Dist. LEXIS 133782 (S.D. Fla. Sep. 17, 2012) .................. 19

*Jackson v. Metropolitan Edison Co.*,
    419 U.S. 345 (1974) ......................................................................... 55

*Jefferson v. Sewon America, Inc.*,
    891 F.3d 911 (11th Cir. 2018) ........................................................... 69

*Lindke v. Freed,*
　　601 U.S. 187 (2024) ................................................................. 40

*Lombard v. Louisiana,*
　　373 U.S. 267 (1963) ............................................................ 37-38

*Lugar v. Edmondson Oil Co., Inc.,*
　　457 U.S. 922 (1982) ................................................................. 32

*Mohamad v. Palestinian Authority,*
　　566 U.S. 449 (2012) ................................................................. 19

*Moose Lodge No. 107 v. Irvis,*
　　407 U.S. 163 (1972) ...................................................... 37, 39, 50

*National Rifle Association of America v. Vullo,*
　　602 U. S. 175 (2024) ................................................................. 66

*NBC v. Communications Workers of America,*
　　860 F.2d 1022 (11th Cir. 1988) .............................................. 32

*Preston v. Secretary, Florida Department of Corrections,*
　　785 F.3d 449 (11th Cir. 2015) ................................................ 70

*Richardson v. McKnight,*
　　521 U.S. 399 (1997) ................................................................. 43

*Romanski v. Detroit Entm't, L.L.C.,*
　　428 F.3d 629 (6th Cir. 2005) ........................................... 41, 43

*Romero v. Drummond Co.,*
　　552 F.3d 1303 (11th Cir. 2008) ............. 19, 21, 22, 28, 46, 47, 51-54, 56

*Sinaltrainal v. Coca-Cola Co.,*
　　578 F.3d 1252 (11th Cir. 2009) ................................... 21, 58, 68

*Skinner v. Railway Labor Executives' Association*,
    489 U.S. 602 (1989) ............................................................... 38

*Terry v. Adams*,
    345 U.S. 461 (1953) ............................................................... 41

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023) ........................................................ 59, 60

*United States v. Classic*,
    313 U.S. 299 (1941) ............................................................... 40

*United States v. Price*,
    383 U.S. 787 (1966) ............................................................... 45

*Vibe Micro, Inc. v. Shabanets*,
    878 F.3d 1291 (11th Cir. 2018) ......................................... 72

**Statutes**

28 U.S.C. § 1291 ............................................................................ 7

28 U.S.C. § 1331 ............................................................................ 6

Torture Victim Protection Act,
    28 U.S.C. § 1350 note ................................... 6, 8, 26, 30-31

42 U.S.C. § 1983 ......................................................................... 26

**Court Rules**

Federal Rule of Civil Procedure 54 ............................................ 7

**Legislative History**

S. Rep. No. 102-249 (1991) ...................................................... 39

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

## <u>INTRODUCTION</u>

In this case, victims of paramilitary atrocities in Colombia sued under the federal Torture Victim Protection Act (TVPA), which borrows the "under color of law" standards from U.S. civil rights law. Despite overwhelming allegations that the paramilitaries committed these murders as part of a joint campaign of terror with the Colombian military, the district court did not recognize the paramilitaries' conduct as occurring under color of law. That decision not only conflicts with Colombia's official understanding of its own history, it was an error of law, because it is at odds with the Supreme Court's and this Court's long-established standards for assessing state action.

In 2022, Colombia's Commission for the Clarification of Truth ("Truth Commission") issued its final report on Colombia's civil war. That report delved extensively into violence by paramilitary groups, especially those known as *autodefensas* (self-defense groups) that united under the umbrella of the *Autodefensas Unidas de Colombia*, the AUC, in 1997. The Truth Commission confirmed what Colombian and international court decisions, human rights reports, U.S. State

1

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*                              No. 24-10191-D

Department cables, and the experience of millions of ordinary

Colombian already showed: The Colombian military and government

extensively supported the AUC paramilitaries as part of a common plan

to target and kill suspected guerrilla sympathizers, unionists, and a

variety of other civilians.

An AUC commander told the Truth Commission that their every

move was "coordinated with the public force." Plaintiffs-Appellants'

Appendix ("App") 1186. A Colombian army officer told the Truth

Commission that "[t]here was a total and absolute conspiracy" between

the military and the paramilitaries, and that "the generals . . . sat down

with the high command of the auto defense forces." App1187. The

military collaborated with the paramilitaries in at least ten massacres

in the 1990s and early 2000s. App1203-1210. The paramilitaries even

took over the role of the state in areas where they controlled territory;

the paramilitary group would "embed itself in the institutions of the

State." App1240.

Colombia's own courts found State responsibility for paramilitary

killings because "t]he promotion, organization and support of the

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

paramilitary groups . . . became a policy drawn up, sponsored and/or permitted and facilitated by the high command of the Armed Forces." App1175. The allegations in this case reflected the abundant evidence that the AUC acted in concert with the State to murder civilians as part of a joint strategy in Colombia's civil war. App1172-79, 1192-98, 1221.

The district court, however, refused to recognize "state action" in the most notorious example of State-paramilitary collaboration in the recent history of the Western Hemisphere. This was error. Views of "state action" under U.S. law are not so crabbed, nor so much in denial of reality, that they fail to recognize the state role in AUC paramilitary violence that Colombia's institutions have acknowledged. Criteria long recognized by the Supreme Court and this Court firmly establish that the allegations here are sufficient to show that the AUC acted under color of law.

The criteria for state action "lack rigid simplicity," *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 295 (2001), but Plaintiffs-Appellants ("Plaintiffs") alleged multiple well-recognized forms of State entanglement. State action exists where the State

3

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

"provides significant encouragement" to a private actor, "or when a
private actor operates as a willful participant in joint activity with the
State or its agents"; where a "nominally private entity . . . has been
delegated a public function by the State [or] when it is entwined with
governmental policies." *Id.* at 296 (cleaned up). All of these are present
here, where the Colombian military engaged in joint operations with
the paramilitaries, outsourced its anti-insurgency strategy to them, and
supported them with weapons and training. Plaintiffs have further
alleged state action because there is "involvement of a state official
in . . . a conspiracy" with otherwise private actors. *Adickes v. S. H. Kress
& Co.*, 398 U.S. 144, 152 (1970).

   In 2011, the district court held that the AUC paramilitaries were
in a "symbiotic relationship" with the Colombian State, and that their
abuses were carried out under color of law regardless of direct State
participation in each individual killing. But the court below reversed
itself on this point, even though there had been no change in controlling
caselaw – and even though the allegations of state action presented
here were far more extensive than those before the court in 2011. It

4

found that a symbiotic relationship between the AUC and the State was insufficient without specific allegations of direct State involvement in each killing.

The district court did not, however, meaningfully address other applicable bases for state action. It found that the "public function" test could not apply because "torturing and killing . . . civilians is . . . not a 'public function.'" App2090. Although it credited Plaintiffs' allegations that "the Colombian government tolerated and even encouraged paramilitary activity," App1126, it failed even to analyze the significant encouragement test. And while it acknowledged Plaintiffs' allegations that the AUC committed all of these killings as "'part of a concerted plan with Colombian State actors,'" App2084, it did not find a conspiracy either.

Fundamentally, this case presents the question of whether injuries arising from a wholesale collaboration between a State and an armed group – or any ostensibly private party – are carried out under color of law, where those injuries arise from activities that the State encouraged, jointly planned, conspired to carry out, and delegated to the

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

group. For if ever there were such a group, it was the AUC. If the Colombian State had marked a single suspected guerrilla sympathizer for assassination by the AUC, nobody would doubt the existence of state action; that it conspired with the AUC to terrorize the **entire** civilian population, while keeping its fingerprints off individual triggers, does not change the outcome.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over federal claims under the Torture Victim Protection Act (TVPA), 28 U.S.C. § 1350 note, pursuant to 28 U.S.C. § 1331.

On September 13, 2023, the district court dismissed Plaintiffs' TVPA claims, App2095, and issued partial final judgment on those claims. App2096-97. Plaintiffs timely filed a notice of appeal on October 10, 2023, DE 3477,[1] resulting in Appeal No. 23-13352-D. On November 16, the district court vacated the September judgment, DE 3518, and

---

[1] References to "DE" are to the docket entries in the district court docket in No. 08-MD-01916 (S.D. Fla.).

issued an amended final judgment on the TVPA claims. App2098-99.

On January 12, 2024, the district court extended the notice of appeal

deadline to January 19. DE 3559. Plaintiffs filed a notice of appeal from

the amended judgment on January 18, DE 3560, resulting in Appeal

No. 24-10191-D. This Court therefore has jurisdiction over this appeal

pursuant to Federal Rule of Civil Procedure 54(b) and 28 U.S.C. § 1291.

The Court issued jurisdictional questions on January 10, 2024.

The Court's July 18, 2024, order partially resolved those questions,

concluding that Plaintiffs' notice of appeal from the amended judgment

was valid. The Court ordered that other questions regarding claims on

appeal would be carried with the case. In their responses to the

jurisdictional questions, Plaintiffs and Defendants-Appellees

("Defendants") agreed that the appeal was properly limited to the TVPA

claims expressly certified in the district court's partial final judgment.

(Because the parties agree on this point and have already briefed it,

Plaintiffs-Appellants will not revisit the arguments regarding the

jurisdictional scope of this appeal.)

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

## <u>STATEMENT OF THE ISSUES</u>

The district court found that the complaints at issue failed to allege that the killings of Plaintiffs' decedents, and other violent acts carried out by the AUC paramilitaries, were committed "under color of law," as required by the Torture Victim Protection Act, 28 U.S.C. § 1350 note.

The first question presented is whether the AUC's violence against the victims here was carried out under color of law, based on factual allegations that:

- the Colombian State was deeply entwined with the paramilitaries by training, equipping, sharing intelligence with, and directly collaborating with the AUC paramilitaries;

- the State significantly encouraged paramilitary violence;

- the AUC performed an anti-insurgency function, as well as a police function, for the State;

- the State and the AUC adopted a joint plan and strategy to eliminate perceived enemies and terrorize the civilian population..

The second question presented is whether allegations that the

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

AUC carried out four specific killings with direct participation of the

Colombian State were sufficient to show that those killings were done

under color of law.[2]

## STATEMENT OF THE CASE

### I.    FACTUAL BACKGROUND

Plaintiffs are family members of Colombians murdered by the

AUC paramilitaries from the mid-1990s until 2004 in the banana-

growing region of Urabá, suing six former executives of the banana

company Chiquita Brands International, Inc. Chiquita admitted to

financing the AUC during 1997-2004, even after the U.S. Government

formally designated the AUC a terrorist organization. In 2007, Chiquita

pled guilty to a federal crime of engaging in prohibited transactions

with a Specially Designated Global Terrorist. More recently, a federal

jury in Florida held Chiquita liable for eight killings committed by the

---

[2] As noted in the Joint Motion filed on September 18, the parties have agreed that their briefs will only address issues under the TVPA; to the extent the Court finds that other issues are within the scope of this appeal, Plaintiffs should be given a further opportunity to brief them.

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

AUC and awarded their family members $38.3 million. No claims have
been tried against the Individual Defendants who are the Defendants-
Appellees here.

The facts below are drawn from the complaints at issue; although
we cite only one of the four complaints, the other three complaints
contain identical allegations.

## A. The AUC paramilitaries, in concert with the Colombian State, committed countless atrocities.

Colombia's *autodefensas*, united under the umbrella of the AUC in
1997, killed thousands of people in Colombia's banana-growing region of
Urabá. App1375. This campaign of terror was part of Colombia's long-
running civil conflict, in which the State struggled to eradicate a
guerrilla insurgency. With the collaboration of the Colombian military
and government, App1168, the paramilitaries executed a joint plan to
drive the "guerrillas out of Urabá, and to terrorize any people or groups
deemed sympathetic to the guerrillas." App1175. As the Colombian
Ombudsman's Office reported to Colombia's Congress in 1997, the
"paramilitary groups [were] the illegal arm of the armed forces and the

10

police, for whom they do the work that the latter cannot do as authorities subject to the rule of law." App1177.

What would become the AUC began with the demobilization of a guerrilla group known as the EPL in 1991. App1168. When the demobilized guerrillas were themselves targeted by other guerrilla groups, App1169, they were "re-armed by the Colombian Army to fight back against the guerrillas." App1181. The Army "integrated demobilized former EPL fighters into their patrols and used them as guides." App1204. This group was later incorporated into the ACCU, the *autodefensa* that controlled Urabá, led by Carlos Castaño. App1169, 1181. In 1997 Castaño and the ACCU brought paramilitary groups throughout Colombia together to form the AUC, also under Castaño's command, App1169; the ACCU continued to operate as the AUC force in Urabá. App1170-72.

The Army's collaboration with these paramilitaries continued throughout this period. Multiple sources, including AUC commanders and military officials, confirmed that the military trained and armed the paramilitaries. App1174, 1180-82. This training was not simply in

11

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

legitimate military tactics. Instead, Colombian officials specifically instructed paramilitaries on the moral legitimacy of killing civilians, App1192 – explicitly encouraging violence against civilians. And, according to a former AUC commander, the Army "recommended that we arm ourselves illegally, that we import [paramilitary] groups to the Urabá region in the face of the state's inability to keep the guerrillas at bay." App1181.

A U.S. State Department cable similarly acknowledged that the Army fought the guerrillas in Urabá through the "systematic arming and equipping of regional paramilitaries." App1178, 1183. The AUC commander known as "H.H." testified that the Army "began to collaborate with us from the moment we arrived" in Urabá in 1995, and this collaboration continued until the AUC demobilized. App1183. The collaboration ran especially deep with the Army's 17th Brigade, which covered Urabá; the Brigade jointly patrolled with the paramilitaries, shared intelligence, and planned joint operations. App1183-85. A former AUC commander acknowledged that they "coordinated everything" with the military. App1185.

12

Multiple former paramilitary commanders acknowledged that their forces murdered perceived adversaries operating on intelligence received from the State. One said the State "needed an armed group . . . to go into homes at night and take out militias, take out the guerrillas, and murder them." App1177. Another confirmed that "the Public Force gave us lists of people to execute." App1176.

### B. Multiple court decisions confirm the military-paramilitary collaboration.

As alleged, Colombian and international courts have confirmed the relationship between the military and the AUC, documenting the military's close collaboration with the AUC to implement a joint plan under which the AUC would engage in widespread terror and murder:

- A Bogotá criminal court found the general commanding the 17th Brigade criminally responsible for a paramilitary killing, concluding that "a 'conspiracy' emerged between some military forces in the XVII Brigade and self-defense groups in the region." App1184.

- The same court found the general responsible for "designing

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

strategies and the joint operations with paramilitary leaders," and "assigning responsibilities" to commanders including paramilitary leaders, who would transmit those orders to paramilitary members. App1184-85.

- The same court found that the Army gave a "mission" to "the self-defense [paramilitary] group," which included "forced displacement of communities . . . macabre assassinations to terrorize the population . . . detentions, kidnappings, injuries, threats, etc." App1188. The goal of this mission was to suppress guerrilla forces through "acts of intimidation, terrorism, murder, personal injury, etc." directed toward guerrilla "sympathizers and collaborators, and other residents of the region." *Id*.

- Thus, as the court found, the military-paramilitary "conspiracy," whose goal was "to defeat the guerrilla forces," was to engage in "acts of terrorism" against the civilian population with the aim of "provoking or maintaining the population, or a sector of that population, in a state of anxiety." App1188-89.

- A court in Colombia's Justice and Peace transitional justice

14

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

process observed that paramilitary collaboration was State policy:

"The promotion, organization and support of the paramilitary groups was not the conduct of some isolated members of the Armed Forces . . . over time it became a policy drawn up, sponsored and/or permitted and facilitated by the high command of the Armed Forces." App1175. Military-paramilitary collaboration was part of a "policy to combat insurgent groups, political dissidents and certain social movements and leaders." *Id.*

- That court also noted that State authorities would prepare lists of targets, and then "the self-defense groups were in charge of killing the victims" – specifically, "the Military Forces delegated this responsibility to the Self-Defense Forces." App1191-92.

- In addition to targeting perceived guerilla sympathizers, the military used the AUC to target suspected petty criminals. "The authorities gave [the AUC] lists of repeat offenders or people identified as thieves, drug addicts or drug dealers, whom they executed because they violated the new social order." App1235-36.

- The Inter-American Court of Human Rights concluded that the

15

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*   No. 23-13352-D
*John Does 1-205 v. Robert Olson*   No. 24-10191-D

AUC carried out massacres "[w]ith the tolerance and collaboration of law enforcement officials." App1180.

## C. State authorities made no serious effort to arrest or prosecute paramilitaries.

Unsurprisingly, given their direct collaboration, Colombian authorities made no meaningful effort to curtail or prosecute paramilitary crimes. According to the CIA, when the Army did push the AUC out of an area – for public relations reasons – the Army treated them "well," and even "released" captured AUC commanders "along with their weapons." App1214. The U.S. Defense Intelligence Agency concluded that this was because they saw the AUC "as allies in the fight against guerillas." App1211.

State authorities chose to pass up multiple opportunities to rein in paramilitary violence. In 1998, prosecutors discovered the ACCU's financial records in Medellin, but took no action against those financing the paramilitaries. App1214. A former judge and prosecutor explained that the State "could have acted effectively to address the financing structure of the ACCU," but declined to do so. App1213-14. Government

16

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

investigators told Human Rights Watch that "the military knows exactly where the paramilitaries are, but does nothing." App1215. On the rare occasions when paramilitary leaders were arrested, they often simply walked out of prisons. *Id*. And Colombia's Police Intelligence Director admitted to U.S. officials that "the police 'do not act' in the part of Urabá under [Carlos] Castaño's control." App1213.

## II.    PROCEDURAL HISTORY

This appeal concerns one set of claims pled in four complaints in the *In re Chiquita Brands International, Inc.*, multidistrict litigation (the "*Chiquita* MDL"). Other *Chiquita* MDL decisions have been before this Court, most notably in *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1294 (11th Cir. 2022), where the Court reversed a grant of summary judgment on bellwether claims. The procedural history below covers only the parts of the MDL proceedings most relevant to the claims at issue here.

### A. The district court initially found that complaints in the *Chiquita* MDL adequately alleged state action.

Beginning in 2007, family members of decedents murdered by the

17

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

AUC filed multiple lawsuits against Chiquita in several U.S. district courts, invoking the Torture Victim Protection Act among other claims. In early 2008, the Judicial Panel on Multidistrict Litigation ordered these cases consolidated in the Southern District of Florida. *In re Chiquita Brands Int'l, Inc.*, 536 F. Supp. 2d 1371 (J.P.M.L. 2008).

In 2011, the district court largely denied Chiquita's motion to dismiss the plaintiffs' claims, rejecting Chiquita's argument that the plaintiffs had inadequately alleged state action under the TVPA. *In re Chiquita Brands Int'l, Inc.* ("*Chiquita I*"), 792 F. Supp. 2d 1301, 1354-55 & n.95 (S.D. Fla. 2011). The district court relied on the "symbiotic relationship" theory of state action, *id.* at 1325-26, 1330; the court noted that the plaintiffs had also argued other theories of state action, but found no need to consider them. *Id.* at 1330 n.40. In finding that the plaintiffs had adequately pled state action, the district court recited a long list of factual allegations concerning the close relationship between the AUC paramilitaries and the Colombian State. *Id.* at 1326-29.

The district court expressly rejected "Chiquita's argument that to plead state action Plaintiffs must allege government involvement in the

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

specific torture and killings of Plaintiffs' specific relatives." *Id.* at 1325.
Citing this Court's decision in *Romero v. Drummond Co.*, 552 F.3d 1303,
1317 (11th Cir. 2008), the district court held that "to plead state action
at the motion-to-dismiss stage, Plaintiffs must allege a symbiotic
relationship between the Colombian government and the AUC with
respect to the AUC's campaign of torture and killing of civilians in the
banana-growing regions, not specific government involvement with each
individual act of torture and killing of Plaintiffs' relatives." 792 F. Supp.
2d at 1325-26.

Following the Supreme Court's decision in *Mohamad v.
Palestinian Authority*, 566 U.S. 449 (2012), which overturned Eleventh
Circuit precedent and held that corporations cannot be sued under the
TVPA, the *Chiquita* MDL plaintiffs amended their complaints to add
claims, including under the TVPA, against individual former Chiquita
executives. *In re Chiquita Brands Int'l*, No. 08-01916-MD, 2012 U.S.
Dist. LEXIS 133782, at *3-4 (S.D. Fla. Sep. 17, 2012). Those Individual
Defendants moved to dismiss, including challenging the sufficiency of
state action for the TVPA claims. The district court largely denied their

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

motion in 2016; its order "summarily dispose[d] of the challenge to the sufficiency of the 'state action' allegations, noting that allegations in predecessor complaints directed to this issue were parsed and analyzed at length in *Chiquita I*, and found adequate to plead the 'state action' element of TVPA liability." *In re Chiquita Brands Int'l, Inc.,* ("*Chiquita II*"), 190 F. Supp. 3d 1100, 1117 (S.D. Fla. 2016).

### B. The complaints here alleged state action.

Plaintiffs-Appellants here filed their complaints after the initial decisions on motions to dismiss.

In 2017, one set of Plaintiffs filed complaints in Ohio and Florida against former Chiquita executives who were amenable to jurisdiction in those states. The district court lifted its initial stay of these complaints in November 2020. DE 2739. In 2020, counsel sought consent to add additional plaintiffs to these complaints, but defense counsel never responded. *See* DE 2856 at 3-4. The new plaintiffs thus proceeded to file their own complaints in December 2020, again in both Ohio and Florida, intending to consolidate them with the 2017 complaints.

20

In early 2021, Plaintiffs-Appellants in all four cases filed amended complaints, and then moved to consolidate all of the actions filed in each district. DE 2856. The district court denied consolidation in May 2021, DE 2902, and the Plaintiffs filed a new set of Second Amended Complaints (SACs) in these cases in November 2021. App399-1077. Once again, the SACs included extensive state action allegations, equivalent to those that the district court had found adequate in 2011 and 2016. *See* App424-32.

### C. The district court changed its mind regarding the state action legal standard, and dismissed Plaintiffs' claims.

The Individual Defendants moved to dismiss the SACs, arguing (among other things) that the complaints failed to adequately plead state action under the TVPA, despite *Chiquita I* and *Chiquita II*. Defendants relied heavily on this Court's decision in *Romero* and the prior decision in *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252 (11th Cir. 2009) – both of which the district court had discussed in *Chiquita I*. Although *Chiquita I* held that the plaintiffs did not need to show "specific government involvement with each individual act of torture

and killing of Plaintiffs' relatives," 792 F. Supp. 2d at 1325-26, the

Individual Defendants argued that the Plaintiffs-Appellants here

needed to show that "the AUC coordinated or collaborated with the

Colombian government for the purpose of torturing or killing the

**<u>specific</u>** Plaintiffs' decedents at issue." DE 3040 at 15 (emphasis

added).

Despite the lack of any intervening change in law, and without

either oral argument or giving notice that it might reconsider its prior

order, the district court reversed its earlier decision in *Chiquita I.* In an

August 2022 order, the district court changed its interpretation of

*Romero*, holding "that a tie to the specific misconduct and harm alleged

in the complaint is required to meet the *Romero* symbiotic relationship /

nexus theory of state action." App1125.

Although Plaintiffs presented bases for finding state action other

than the symbiotic relationship test, the district court's August 2022

order did not consider whether the allegations satisfied any other state

action test. For example, the district court found that the Plaintiffs

alleged that "the Colombian government . . . encouraged paramilitary

activity," App1126, but the court did not consider whether this encouragement was sufficient to find state action. Instead, the district court granted leave to amend to allow the Plaintiff-Appellants to plead "facts tying the symbiotic relationship alleged to the specific instances of murder and torture alleged." App1128.

Plaintiffs filed their Third Amended Complaints (TACs) in November 2022, App1130-2050; once again, the Individual Defendants moved to dismiss the TVPA claims for failure to adequately allege that the abuses were carried out under color of law. DE 3295.

The TACs added substantial additional state action allegations to those the district court had originally found sufficient in *Chiquita I*. Each complaint included identical allegations of the collaboration between the AUC paramilitaries and the Colombian government and military – roughly 45 pages of allegations recounting the widely-accepted, and well-documented, ties between the paramilitaries and the State. App1166-1219. Additionally, for four murders, Plaintiffs alleged facts showing specific involvement of state officials. App1219-21.

Plaintiffs further alleged that all of the killings were carried out

23

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

pursuant to a conspiracy with the State in which the paramilitaries'
role in the State's anti-insurgency strategy was to target suspected
guerrilla sympathizers and to generally terrorize the civilian population
of Urabá. App1221-38. Indeed, the paramilitaries essentially acted as
the *de facto* State in Urabá for many purposes; paramilitary
commanders confirmed that the paramilitaries controlled the territory,
controlled roads, collected funds and distributed them to the military,
and even built roads in place of an effectively absent government.
App1238-1240.

The district court rejected these allegations in a September 2023
order. It held that the TACs did not adequately allege state action
under the symbiotic relationship theory that it had accepted in 2011,
because – despite the extensive allegations that the State's
collaboration with the paramilitaries was pervasive – it held that the
Plaintiffs needed to show State participation in each specific act of
violence. App2085.

The district court's order focused almost exclusively on the
symbiotic relationship model; although it acknowledged that Plaintiffs

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

had also argued "joint action [based on conspiracy], encouragement, and public function," App2070, it did not meaningfully apply these theories. Its order did not analyze the "encouragement" test at all. It rejected the public function test in two sentences, concluding that the AUC paramilitaries could not be exercising state functions because "terrorizing civilians is . . . not a 'public function' 'traditionally the exclusive prerogative of the State.'" App2090. It suggested that conspiracy, like symbiosis, would also require Plaintiffs to "tie specific state actors to the alleged specific misconduct," App2089, and that the alleged conspiracy was also based on "vague and conclusory allegations." App2093.

The district court also rejected the allegations of specific State involvement in four killings. The district court largely discounted the allegations in three killings because they were pled on information and belief, apparently ruling that such claims were not plausible. App2086. As to the last killing the court found that even though Plaintiffs alleged that decedent John Doe 301 had received threats from the Colombian Army days before his murder, this was insufficient to allege State

25

involvement in the killing. App2087-88.

Finding that Plaintiffs had "fail[ed] to meet the specific repleading requirements" of the August 2022 order – which only addressed the symbiotic relationship theory – the district court dismissed all of Plaintiffs' TVPA claims with prejudice. App2094-95.

## SUMMARY OF THE ARGUMENT

The district court's dismissal of Plaintiffs-Appellants' claims under the Torture Victim Protection Act on grounds that they did not adequately allege their loved ones were murdered "under color of law," 28 U.S.C. § 1350 note § 2(a), was error, because the court did not apply the proper legal standards.

The evidence showing the Colombian State's collaboration with the AUC paramilitaries, for the purpose of targeting and terrorizing the civilian population of Urabá as part of a joint counter-insurgency strategy, is overwhelming. At this stage, however, Plaintiffs were only required to submit allegations, and the facts alleged firmly show that the AUC paramilitaries acted under color of law in targeting the Plaintiffs and their murdered family members.

26

The TVPA borrows the state action standards used in U.S. civil rights law, primarily 42 U.S.C. § 1983. The Eleventh Circuit recognizes three broad categories in which an otherwise private party may be acting under color of law: where the State has compelled or significantly encouraged the abusive conduct; where the private party is exercising a public function that is the exclusive prerogative of the State; and where the State is a joint participant in the private party's enterprise, such as through its entwinement or symbiotic relationship with the private party, or by engaging in a conspiracy with the private party. The facts alleged here qualify under all three categories.

The district court failed even to consider state action on the basis of significant state encouragement. Although the court recognized that Plaintiffs had alleged that "the Colombian government . . . encouraged paramilitary activity," App2087, its order did not analyze the significant encouragement test. At a minimum, remand is required on this basis alone, to allow the district court to apply this test in the first instance.

In considering the public function test, the district court made a

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

basic error that also requires remand. Rather than asking whether the paramilitaries were engaged in the public functions of exercising police powers and waging war against an insurgency, the district court concluded that the public function test did not apply because AUC's alleged **<u>abuses</u>** were not traditional, exclusive State functions. But abuses are never public functions. Supreme Court caselaw holds that when power is abused, the state action inquiry focuses on whether the power – not the abuse – is an exclusive public function. And both police and warmaking powers are quintessential state functions. The district court should apply the appropriate legal test, or this Court should reverse because the allegations clearly establish state action on this basis.

On the joint action theory, the district court made multiple errors. It correctly accepted that Plaintiffs had pled a symbiotic relationship between the AUC and the Colombian State, but held that this was not enough – instead, it required Plaintiffs to show that the State was involved in each specific killing. But the Supreme Court's and this Court's caselaw, including *Romero v. Drummond Co.*, 552 F.3d at 1316,

28

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

require only that the symbiotic relationship extend to the kind of abuse carried out by the private party; multiple cases have found state action where the State was not involved in each specific abuse. Since this was the sole reason the district court rejected state action based on a symbiotic relationship, reversal is required.

The district court also failed to properly consider Plaintiffs' conspiracy allegations. Its reason for rejecting conspiracy is unclear. If it required the same specific involvement as for the symbiotic relationship test, it erred; conspiracy liability extends to all abuses committed by a co-conspirator according to the common plan of the conspiracy, regardless of whether the other party even knew of the specific abuses. If it concluded that Plaintiffs did not adequately allege conspiracy, it erred here, too; the court recognized that Plaintiffs alleged that the AUC committed these killings as "part of a concerted plan with Colombian State actors," App2084. Plaintiffs' allegations include ample facts showing an agreement between the paramilitaries and the Colombian military, including both a former military officer and a Colombian court that expressly acknowledged a conspiracy

29

between the paramilitaries and the army.

Even if the district court did interpret the symbiotic relationship test correctly, at least four killings met the district court's test, because Plaintiffs alleged direct State involvement. In these cases, the district court improperly discounted circumstantial evidence of State involvement.

Last, the district court commented that Plaintiffs had "improperly group[ed]" allegations against multiple defendants. App2094. This was not a basis for dismissal, but if it were, it would be erroneous; Plaintiffs' complaints were not improper group pleadings, and in any event such pleadings cannot be dismissed without an opportunity to amend.

Reversal or, at a minimum, remand is required.

## **ARGUMENT**

### I.   **As alleged, the AUC paramilitaries acted under color of law.**

The Torture Victim Protection Act, codified as a note to 28 U.S.C. § 1350, provides a cause of action for torture or extrajudicial killing carried out "under actual or apparent authority, or color of law, of any

30

foreign nation." Congress intended that the courts would "apply principles of liability under U.S. civil rights laws, in particular 42 U.S.C. § 1983, in construing under color of law." *Doe v. Drummond Co.*, 782 F.3d 576, 606 (11th Cir. 2015) (cleaned up). The district court below found only this state action element lacking.

The allegations here, which are well-established facts of the history of Colombia's civil conflict, are more than adequate to plausibly assert that the AUC paramilitaries were state actors when they committed the atrocities at issue. The State collaborated in training and equipping the paramilitaries in order to augment its anti-insurgency campaign; military units carried out joint operations with paramilitary forces and allowed the paramilitaries free rein to achieve their shared goals; and the State relied on the paramilitaries to wage a dirty war against the guerrillas and their supporters as well as take care of common crime in the areas, including Urabá, where the paramilitaries had control. And when the AUC committed the campaign of murder and torture of civilians that led the United States to officially designate it as a terrorist organization, it was acting pursuant to a joint plan conceived

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

with and supported by the State. All of the murders in this case were

part of that campaign.

This case perfectly illustrates the convergence of several theories

of state action. Following the Supreme Court, this Court has recognized

three general ways in which otherwise private actors may be considered

to be acting under color of law: where

> (1) the State has coerced or at least significantly encouraged
> the action alleged to violate the Constitution ("State
> compulsion test"); (2) the private parties performed a public
> function that was traditionally the exclusive prerogative of
> the State ("public function test"); or (3) the State had so far
> insinuated itself into a position of interdependence with the
> private parties that it was a joint participant in the
> enterprise ("nexus/joint action test").

*Charles v. Johnson*, 18 F.4th 686, 694 (11th Cir. 2021) (cleaned up).

Meeting any one of these tests is sufficient to show state action. The

inquiry is "'necessarily fact-bound.'" *NBC v. Commc'ns Workers of Am.*,

860 F.2d 1022, 1026 (11th Cir. 1988) (quoting *Lugar v. Edmondson Oil

Co., Inc.*, 457 U.S. 922, 939 (1982)). The fact-bound inquiry here

demonstrates state action under each of the approaches this Circuit has

identified: the Colombian State significantly encouraged the AUC

32

paramilitaries to terrorize the civilian population, delegated the state function of anti-insurgency warmaking to those paramilitaries, and acted jointly in training, equipping, operating together with, and conspiring with the paramilitaries.

The district court's orders never meaningfully considered the range of relevant state action facts and legal tests. When Defendants moved to dismiss Plaintiffs' Second Amended Complaints, the district court had repeatedly – in 2011 and 2016 – affirmed that the state action allegations were sufficient under a "symbiotic relationship" theory of joint action. *See Chiquita I*, 792 F. Supp. 2d at 1354-55; *Chiquita II*, 190 F. Supp. 3d at 1117. Those prior orders did not reject other theories of state action; they found no need to consider them. *Chiquita I*, 792 F. Supp. 2d at 1330 n.40. In its order on the Second Amended Complaints, the district court again did not consider other theories, only revising its view of the symbiotic relationship test.

In its final order dismissing the TVPA claims, the court still did not meaningfully address theories other than joint action – and it applied the wrong standard to the joint action theory. This Court should

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

remand so that the district court can address the encouragement and public function tests in the first instance, and address the joint action test under the correct standards. Alternatively, this Court should reverse because the allegations meet these tests.

### A. The district court failed to consider the Colombian State's encouragement of paramilitary violence.

At no point in the decisions below – or in the entire *Chiquita* MDL – did the district court ever apply the "significant encouragement" test. Plaintiffs pled extensive allegations that the Colombian State significantly encouraged the paramilitaries' terroristic anti-guerrilla tactics, which caused the deaths and other injuries here, and the district court acknowledged these allegations of State encouragement. App1126. But the court never considered whether this sufficed for state action, and therefore remand is warranted to allow the court to apply the standard in the first instance. Otherwise, this Court should reverse.

### 1. Because the district court did not analyze "significant encouragement," remand is warranted.

The district court simply did not analyze the Colombian State's

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

significant encouragement of paramilitary violence. The court

acknowledged that the Plaintiffs had argued "joint action,

encouragement, and public function." App2070, and even accepted that

Plaintiffs had alleged that "the Colombian government . . . encouraged

paramilitary activity." App2087. But it did not analyze or apply the

"significant encouragement" test.

There is some indication in the district court's order that it

precluded the Plaintiffs from raising any state action theory other than

the "symbiotic relationship" variety of joint action. For example, the

district court stated that Plaintiffs had a "prescribed path" for alleging

state action: "to correct their 'failure to allege adequately the existence

of a symbiotic relationship between the AUC and Colombian

government.'" App2083. If this were meant to hold that Plaintiffs could

not argue other theories of state action, it was obviously error. As noted

above, this Court has recognized, and Plaintiffs had at all times pled

and alleged, multiple state action theories. And the district court had

found it unnecessary to examine other theories after its initial finding

that the "symbiotic relationship" allegations were sufficient. *See*

35

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

*Chiquita I*, 792 F. Supp. 2d at 1330 n.40. The district court could not

exclude established state action theories without even considering

them.

　　In any event, the fact that the district court did not apply the

significant encouragement test is sufficient cause for remand. Because

the district court did not apply this test "at all," despite acknowledging

that Plaintiffs argued this theory and alleged that the Colombian

government encouraged paramilitary violence, it would be appropriate

for this Court to remand to allow the district court "to apply the

[correct] analysis in the first instance." *Cowen v. Ga. Sec'y of State*, 960

F.3d 1339, 1344, 1346 (11th Cir. 2020).

> **2.    The Colombian government engaged in "significant encouragement" of paramilitary violence against civilians.**

　　If this Court does consider the "significant encouragement" test in

the first instance on appeal, it should reverse, because Plaintiffs'

allegations are more than sufficient to meet this test.

　　The Supreme Court has held that an otherwise private decision

will be considered state action when the State "has exercised coercive

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). This is distinguished from the "[m]ere approval of or acquiescence in the initiatives of a private party," which "is not sufficient to justify holding the State responsible." *Id*. But where the policies of the State "foster or encourage" the wrongful conduct, state action may be present. *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 176-77 (1972); *see also Brentwood Acad.*, 531 U.S. at 303 (noting that state "'encouragement' . . . can justify characterizing an ostensibly private action as public instead").

This "encouragement" test does not depend on encouraging each specific act of wrongdoing. For example, *Lombard v. Louisiana*, 373 U.S. 267 (1963), involved anti-segregation sit-in participants arrested for trespass. Unlike in prior sit-in cases, "no state statute or city ordinance" mandated segregation. *Id.* at 268. Nonetheless, the Court found state action based on "statements" made by city officials, *id.* at 273, that the city would enforce its laws against protestors. *Id.* at 270-71. These statements of encouragement were, however, generalized:

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

they were not made with respect to specific restaurants or patrons, but announced a general policy "that the city would not permit Negroes to seek desegregated service in restaurants." *Id.* at 273.

In *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602 (1989), the Supreme Court considered whether "breath and urine tests required by private railroads" were carried out under color of law. *Id.* at 614. The Court found that even though the Government had not "compelled" private parties' acts, governmental regulations strongly encouraged the tests. *Id.* at 615. By "remov[ing] all legal barriers" to the tests, and indicating "its strong preference for testing," the Government had converted otherwise private action into state action. *Id.*

The facts here go well beyond mere "acquiescence," and show substantially more State encouragement than in *Lombard* or *Skinner*. The Colombian government not only expressly declined to take action against paramilitary violence, it actively collaborated with paramilitaries, shared intelligence for the purpose of targeting individuals for killing, relied on the paramilitaries to carry out a "dirty war" counter-insurgency strategy, encouraged the terrorization and

38

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*     No. 23-13352-D
*John Does 1-205 v. Robert Olson*                            No. 24-10191-D

killing of civilians, trained the paramilitaries, and both directly armed and encouraged the illegal arming of the AUC paramilitaries in order to enable these killings. Colombian officials expressly trained paramilitaries in the legitimacy of killing civilians, and formulated a common anti-insurgency plan that relied on killing civilians. Under the framework of *Moose Lodge*, there is no question that the State's conduct "foster[ed] or encourage[d]" the violence at issue here. 407 U.S. at 176-77.

Moreover, this Court has indicated that in the TVPA context, liability extends to state officials who are in a position to prevent abuse and "fail[] to do so." *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157 (11th Cir. 2005) (quoting S. Rep. No. 102-249, at 9 n.16 (1991)). While that is true here, Plaintiffs allege far more.  If liability extends to Colombian officials who merely failed to prevent these killings, there is certainly state responsibility, and thus state action, on these facts.

Reversal is therefore warranted.

**B. The district court misapplied the public function test.**

The district court's two-sentence application of the "public

39

function" test also warrants remand or reversal, because it fundamentally misapprehended the doctrine. The district court rejected the argument on grounds that the **abuse itself** must be an exclusive state function. That is obviously incorrect.

The district court's public function analysis reads, in its entirety:

> The Court agrees with Movants that the public function test is not the path upon which Plaintiffs' allegations could successfully travel. Targeting, torturing and killing suspected guerrilla, union, or leftist sympathizers, and terrorizing civilians is, simply put, not a "public function" "traditionally the exclusive prerogative of the State"; nor was it addressed in the Court's August Order.

App2090 (citations omitted). These two sentences embody an equal number of errors.

**First**, the public function doctrine does not ask whether the alleged abuses are exclusive state functions. As the Supreme Court stated earlier this year, "the '*[m]isuse* of power, possessed by virtue of state law,' constitutes state action." *Lindke v. Freed*, 601 U.S. 187, 199-200 (2024) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941) (emphasis and alteration added by *Lindke*)). Thus, the public function test focuses on whether the **power** abusively exercised is one

40

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*     No. 23-13352-D
*John Does 1-205 v. Robert Olson*     No. 24-10191-D

traditionally reserved to the State – not whether the **<u>abuse</u>** of that power is a proper state function.

Multiple courts of appeal have recognized, for example, that "where private actors perform powers traditionally reserved for police officers, the private actors can be considered state actors." *Fabrikant v. French*, 691 F.3d 193, 210 n.13 (2d Cir. 2012). Thus *Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629 (6th Cir. 2005), held that a casino security guard who had "the authority to make arrests at one's discretion and for any offenses" and wrongfully detained a patron was a "state actor as a matter of law," because she was exercising the State's exclusive "police power." *Id.* at 637-38. Such cases arise precisely because there is an alleged abuse of power, but it is the authority, not the abuse, that is the subject of the public-function inquiry.

The seminal line of public function cases involving discriminatory primary elections cases further proves the point. In *Terry v. Adams*, 345 U.S. 461 (1953), a private organization conducted its own primary, excluding Black residents, which invariably determined the outcome of the official Democratic primary. The Court did not ask whether racial

41

discrimination was an exclusive state function; instead, as the Court later characterized it, the issue was that the private organization "effectively performed the entire public function of selecting public officials." *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158 (1978).

The district court did not perform the required analysis of whether the allegations sufficiently plead that the AUC paramilitaries were performing the exclusive state functions of waging war, counter-insurgency, and punishing (suspected) crime. Remand is therefore warranted to allow the district court to examine the correct question in the first instance.

If this Court wishes to decide the issue itself, however, it must reverse the district court; while the set of public functions exclusively reserved to the State is limited, the AUC's counter-insurgency and police powers are both among them. In *Dobyns v. E-Systems, Inc.*, 667 F.2d 1219 (5th Cir. 1982), for example, the Fifth Circuit held that a contractor performing "peacekeeping" and "[m]ilitary surveillance" for the U.S. military was "undoubtedly" performing a public function for state action purposes. *Id.* at 1225-26. Similarly, a Maryland district

held that "[o]peration of a military force" is an exclusive public function; it "is one of the most basic governmental functions, and one for which there is no privatized equivalent." *Al-Quraishi v. Nakhla*, 728 F. Supp. 2d 702, 749 (D. Md. 2010). The same is true generally for exercise of the "police power," *see, e.g.*, *Romanski*, 428 F.3d at 637; *Fabrikant*, 691 F.3d at 209; and more specifically for the punishment of crime. *See Horvath v. Westport Library Ass'n*, 362 F.3d 147, 151 (2d Cir. 2004) ("[O]nly the State may legitimately imprison individuals as punishment for the commission of crimes . . . ."); *see also Richardson v. McKnight*, 521 U.S. 399, 417 (1997) (Scalia, J., dissenting) ("'The duty of punishing criminals is inherent in the Sovereign power.'" (quoting *Alamango v. Board of Supervisors of Albany Cty.*, 32 N. Y. Sup. Ct. 551, 552 (1881))).

Plaintiffs' complaints adequately set forth how the Colombian State both relied on the AUC paramilitaries to conduct a counter-insurgency strategy – training them, providing them weapons, closely collaborating with them on anti-guerrilla operations – and relied on them to punish crime. App1174-92, 1235-36. Indeed, the State provided the AUC with lists of both suspected guerrilla sympathizers and

43

suspected criminals to kill. App1170, 1176, 1191-92, 1235-36. Public officials acknowledged that they did not act where the paramilitaries operated, App1213, and former paramilitary commanders acknowledged that they were "acting as a de facto state in" areas under their control. App1238.

**Second**, the district court's September 2023 order also erred to the extent it suggested that it would not consider the public function doctrine – despite its brief language rejecting its application – because it did not mention that doctrine in its prior, August 2022 order. As noted, *infra* Part I(A)(1), the district court could not simply exclude applicable state action theories. Plaintiffs raised the public function doctrine as soon as the district court indicated that it was abandoning its prior "symbiotic relationship" holding. *See* DE 3325 at 15-18.

There was no basis for the district court to refuse to consider whether the facts alleged establish that the paramilitaries were exercising an exclusive state function. This, too, at a minimum requires remand so that the district court may properly consider the issue.

## C. The district court erroneously required joint action for every individual killing, rather than for the paramilitaries' overall strategy and plan.

While the district court failed to meaningfully apply the significant encouragement and public function tests, it spent most of its analysis on the joint action test – the test that the court previously found, in its 2011 and 2016 rulings, that Plaintiffs met under a "symbiotic relationship" theory. There are multiple ways to satisfy the joint action test, but the district court continued to focus almost exclusively on the "symbiotic relationship" theory. Because the district court's 2011 order found the symbiotic relationship allegations sufficient, that order did not consider other models of state action. But even after the court reversed course and found that the requirements of the symbiotic relationship model of joint action were not met, its September 2023 order still failed to meaningfully consider other theories of joint action, such as conspiracy. That was error.

The "joint action" test is satisfied where a private party is a "'willful participant in joint activity with the State.'" *Charles*, 18 F.4th at 696 (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)). This

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

test encompasses several different theories or fact patterns. Joint action is satisfied where a private party "conspires with a state actor to deprive the plaintiff of his . . . rights." *Charles*, 18 F.4th at 696. Joint action is also present where there is a "symbiotic relationship" between a private actor and the government that "involves" or "had anything to do with" the abuse alleged in the complaint. *Romero*, 552 F.3d at 1317 (emphasis added). Most recently, the Supreme Court found joint action where there was "pervasive entwinement" of public officials in otherwise private conduct. *Brentwood Acad.,* 531 U.S. at 290. As discussed more fully below, these modes of satisfying the joint action test do not require direct State participation in the specific abuse.

The district court recognized that Plaintiffs had established the factual predicate for joint action, but failed to apply the correct legal standard. The court acknowledged that Plaintiffs alleged – through hundreds of paragraphs of specific, non-conclusory allegations – that the AUC committed all of these killings as "'part of a concerted plan with Colombian State actors'" to drive the guerrillas from Urabá and terrorize anyone "'deemed sympathetic to the[m].'" App2084. Acting

pursuant to a "concerted plan" with the State makes the AUC a "willful participant in joint activity with the State." And the allegation that the AUC committed all of these killings as "part of [that] concerted plan," App2084, with the State plainly establishes "a symbiotic relationship . . . that involves the torture or killing." *Romero*, 552 F.3d at 1317. A faithful application of the standard would have led the district court to conclude, based on its own description of the allegations, that Plaintiffs had alleged joint action.

But the district court ruled Plaintiffs did not meet the joint action test, erroneously adding requirements to the test that conflict with this Court's and the Supreme Court's precedent. First, the district court misread *Romero* to conclude that joint action requires that state actors must participate in each specific act of violence at issue and that Plaintiffs must identify those specific state actors. It found the TAC allegations inadequate because "they only assert a general relationship between the AUC and the Colombian military." App2085. The district court required Plaintiffs to "tie specific state actors to the specific injuries alleged in the [complaint]," *id.*, (emphasis added), or to link

47

"specific . . . killings alleged in the TACs to specific Colombian state actors," App2089. Plaintiffs did, of course, identify specific state actors – including multiple Colombian Army officers, App1187 – who collaborated with the AUC paramilitaries in conceiving or executing a common plan. But the district court apparently wanted Plaintiffs to identify Colombian state actors involved with each specific killing, rather than the overall plan of paramilitary violence; as discussed more fully below, this is not required.

Second, the district court also appeared to require Plaintiffs to show that the State controlled the AUC paramilitaries. The court faulted Plaintiffs for not "alleg[ing] the State had any **control** over the paramilitaries['] actions" in committing the specific abuses. App2093 (emphasis added). But control is not an element of joint action; indeed, the "State compulsion" test addresses situations where the State controls otherwise private actors.

Third, the district court failed to fully consider joint action based on the conspiracy between the State and the paramilitaries. Even if the symbiotic relationship model does not apply here, conspiracy is

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

sufficient to establish joint action. Again, the district court appeared to hold that conspiracy requires specific allegations that specific state officials participated in, or had specifically conspired in, the killing of specific victims. But traditional conspiracy principles require no such thing, and it would rule out the kind of large-scale conspiracy that Colombian authorities recognize occurred here.

> **1.    The symbiotic relationship or entwinement test does not require State involvement in each act of wrongdoing.**

The district court misapprehended the requirements of the symbiotic relationship test, or the more recently described "entwinement" test. This Court and the Supreme Court hold that where the State extensively supports and collaborates with otherwise private actors in a campaign of abuse, abuses committed pursuant to that campaign are committed under color of law, regardless of whether state officials were directly involved in each specific abuse.

The original "symbiotic relationship" case (although that term did not arise until later) was *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961). There, the Court held that a governmental parking

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

authority had "so far insinuated itself into a position of interdependence with" a private restaurant leasing space from the authority, "that it must be recognized as a joint participant in the challenged activity." *Id.* at 725; *see also Moose Lodge*, 407 U.S. at 175 (referring to "the symbiotic relationship between lessor and lessee" in *Burton*).

The state officials in *Burton* did not commit or participate in the restaurant's discrimination. The whole point of the symbiotic relationship test was that the State was so intertwined with the private party's business that the restaurant's discrimination effectively became state discrimination, even though no governmental officials were directly involved in the discriminatory practice – let alone directly involved in each act of discrimination.

In its most recent discussion of joint action, the Supreme Court found that "an ostensibly private organization ought to be charged with a public character" due to its "entwinement" with state officials. *Brentwood Acad.*, 531 U.S. at 302. The Court's conclusion that the organization's decisions were made under color of law was based on the overall "character" of the organization as public, due to "pervasive

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

entwinement" with public officials. *Id.* at 298. State officials'
involvement in specific decision-making was not and could not have
been required, because that was entirely missing from *Burton*.

The district court here relied heavily on *Romero v. Drummond*,
another TVPA case, but *Romero* did not hold that direct governmental
involvement in each killing is required (nor could it, consistent with
Supreme Court caselaw). There, this Court analyzed *Brentwood
Academy*, among other cases, and concluded:

> First, there must be proof of a symbiotic relationship
> between a private actor and the government that involves
> the torture or killing alleged in the complaint to satisfy the
> requirement of state action under the Torture Act. Second, a
> plaintiff may prove that relationship . . . by presenting
> evidence of the active participation of a single official.

*Id.* at 1317. The specific acts of violence at issue in *Romero* were the
killings of union leaders, and the Court ultimately held that "the
plaintiffs failed to offer evidence either that state actors were actively
involved in the assassination of the union leaders or that the
paramilitary assassins enjoyed a symbiotic relationship with the
military for the purpose of those assassinations." *Id.* at 1318.

51

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

The district court misread this holding to mean that the plaintiffs
in *Romero* were required to show direct State involvement in each
killing at issue, but that was not the holding of *Romero*.

First, *Romero* plainly states that the plaintiffs could show **either**
direct involvement – "the active participation of [even] a single official"
– in the assassinations, **or** "a symbiotic relationship with the military
for the purpose of those assassinations." *Id.* The "symbiotic
relationship" theory would be superfluous if it, too, required direct
participation; Supreme Court caselaw establishes that it does not.

Second, what *Romero* found deficient was a lack of evidence that
there was collaboration between the paramilitaries and the State for
the purpose of targeting union leaders for assassination. The district
court read this to mean that the plaintiffs would have had to present
evidence of collaboration specifically directed at the **individual**
murders in the case, but nothing in *Romero* requires such specificity –
nothing in *Romero* rules out state action where the abuses arise out of a
broader collaboration for the purpose of those **kinds** of abuses. Indeed,
that falls well within *Burton*, which did not require any collaboration

52

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*     No. 23-13352-D
*John Does 1-205 v. Robert Olson*     No. 24-10191-D

for the purpose of committing abuses.

A close look at the evidence in *Romero* – a decision issued at the summary judgment stage – demonstrates that the plaintiffs there had not submitted evidence that killings of union leaders were within the evidence of collaboration between the paramilitaries and the State. Of the evidence at issue, this Court excluded some as inadmissible. 552 F.3d at 1317-18. One witness statement did "not even allege" state action. *Id.* at 1318. The defendants' internal security report stated only that "paramilitaries are sometimes supported by the Colombian military." *Id.* at 1317. The most relevant category of evidence was "reports published by the State Department and the United Nations [that] establish that Colombian paramilitaries have a close and regular relationship with the military of the Colombian government," but the Court held that "proof of a general relationship is not enough. The relationship must involve the subject of the complaint." And there, the reports did not suggest that the paramilitaries collaborated with the military to murder union officials. *Id.* at 1317.

Here, Plaintiffs needed to present only allegations, not evidence,

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

and those allegations showed the facts that were missing in *Romero*:
that there was extensive military-paramilitary collaboration for the
agreed purpose of using the paramilitaries to "do the work that the
[military] cannot do," App1177, as part of their shared counter-
insurgency campaign. That collaboration and shared plan called for
widespread attacks on civilians, including the attacks on Plaintiffs'
family members. This satisfies *Romero*'s requirement that the
relationship "involve" the abuse at issue.[3]

Romero is best read as requiring that a private-public symbiotic
relationship extend to the abusive matter or policy alleged – not
necessarily involvement in the specific individual acts. As noted above,
it could not be read otherwise consistent with Supreme Court
precedent. Symbiotic relationship is a model for determining when the
State is responsible for abuses committed by private parties; if it were

-----

[3] *Romero* also involved AUC paramilitaries, but was decided shortly
after the AUC's demobilization, and before most of the evidence cited in
the complaints here came to light – including admissions from
paramilitary commanders, Colombian court decisions, and the Truth
Commission's report.

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*      No. 23-13352-D
*John Does 1-205 v. Robert Olson*      No. 24-10191-D

reduced to simply asking whether there was direct State participation in the abuse, it would have little purpose. *Burton* held that the State was so intertwined with the private actor's business that otherwise private conduct **became** State conduct, even though State officials were not directly involved in that conduct.

In *Charles*, this Circuit's most recent discussion of joint action, the Court noted that "the Supreme Court has said that private liability will attach where the state 'so far insinuated itself into a position of interdependence with the [private entity] that it was a joint participant in the enterprise.'" 18 F.4th at 696. This language is notable for two reasons. First, the Court was quoting the Supreme Court's decision in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 357-58 (1974), which was itself describing *Burton* – demonstrating the ongoing viability of the *Burton* test. Second, this passage refers to State participation in the **enterprise**, not in specific acts of discrimination or abuse.

Here, unlike in *Romero*, Plaintiffs-Appellants have presented ample allegations that the symbiotic relationship between the paramilitaries and the Colombian State encompassed the abuses at

55

issue. Plaintiffs did not, as the district court suggested, merely allege a general relationship between the AUC and the State; they alleged a clear link between the AUC-State relationship and the killings at issue. The symbiotic relationship between the State and the AUC in Urabá was not just that State officials created, trained, armed, coordinated with, shared intelligence, financial resources and even body counts with, recruited for, provided political support to and refused to prosecute the AUC. Rather, the AUC's reign of terror that included these murders was the whole **<u>purpose</u>** of the AUC-State relationship. The State could not openly murder civilian targets; the AUC could. App1191. And that was the objective.

These factual allegations show a sufficient nexus between the symbiotic relationship and the killings at issue, satisfying *Romero*'s requirement that the relationship involves the abuse at issue. *Romero*, 552 F.3d at 1317. Neither *Romero* nor *Charles* – nor the Supreme Court caselaw on which they rely – requires Plaintiffs to "tie specific state actors to the specific injuries" or allege that the State "controlled" the AUC or the specific AUC members who committed each abuse. The

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

district court erred in holding otherwise.

> ### 2.  Plaintiffs adequately pled a conspiracy between the AUC and the State that encompassed these murders.

The district court also failed to meaningfully analyze the allegations of a conspiracy between the State and the AUC paramilitaries.

The district court's discussion of conspiracy is not a model of clarity. Although the court recognized that "Plaintiffs posit their conspiracy theory, that '[a]ll of the murders in this case were undertaken by the AUC pursuant to the conspiracy [with the Colombian State] to target suspected guerrilla sympathizers and terrorize civilians,'" App2088 (quoting from the TACs, alterations added by the district court), the court never really analyzed this theory.

The court suggested that the Plaintiffs needed to link each specific death to specific state actors, *id.*, and then verged back into discussing symbiotic relationship, App2089. Later, the Court seemed to be discussing allegations of conspiracy between the Defendants and the AUC, not a conspiracy between the AUC and the State: "Premising a

conspiracy, even without ties to specific killings – simply being

'responsible in some manner' – based upon either payment of money or

a shared ideology are vague and conclusory allegations which are

'insufficient to state a claim for relief, and "will not do."'" App2093

(quoting *Sinaltrainal*, 578 F.3d at 1268).[4] Because the district court did

not meaningfully apply conspiracy standards, remand may also be

warranted here.

　　To the extent that it considered conspiracy at all, the district court

appeared to reject conspiracy as a mode of state action for the same

reason that it rejected symbiotic relationship: because the court

required the identification of specific state actors who participated in

specific killings and state control over the killers. This was error.

### a. The district court's test conflicts with well-established conspiracy principles.

There is state action where a private party "conspires with a state

_____

[4] The only appearance of the phrase "responsible in some manner" in the TACs refers to the Defendants' responsibility. *See* App1165. The specificity of allegations regarding the Defendants' own responsibility is addressed below, *infra* Part III.

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

actor to deprive the plaintiff of his . . . rights." *Charles*, 18 F.4th at 696.

To be co-conspirators, Colombian officials must only have "agreed to

commit a wrongful act" and have joined the conspiracy knowing one of

its goals and intending to help accomplish it. *Cabello*, 402 F.3d at 1159.

The district court did not dispute that Plaintiffs' allegations met these

elements. And although *Cabello* was discussing liability, if the State is

liable as a co-conspirator, then state action is necessarily present.

Conspiracy does not require the co-conspirator's involvement in

each specific act; thus State officials need not have directly participated

in each murder. All conspiracy members are responsible for their **co-

conspirators' acts** in furtherance of the conspiracy. *Id.* "A conspirator

need not participate actively in or benefit from the wrongful action in

order to be found liable." *Halberstam v. Welch*, 705 F.2d 427, 481 (D.C

Cir. 1983)). Thus, *Halberstam* – the leading case on federal

conspiracy liability, *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 485 n.6

(2023) – affirmed conspiracy liability for "a nonparticipant in a

burglary." 705 F.2d at 489.

Nor must Colombian officials have agreed to each murder.

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

Instead, as here, co-conspirators can agree to a pattern of crimes, and when they do, there need not be agreement as to each specific crime. Co-conspirators are "liable for all reasonably foreseeable acts taken to further the conspiracy." *Twitter, Inc.*, 598 U.S. at 496. If the purpose of the specific crime was to "advance the overall object of the conspiracy," a co-conspirator can be liable "even if he neither planned nor knew about the particular overt act that caused injury." *Halberstam*, 705 F.2d at 487.

Thus *Halberstam* affirmed liability for a defendant who conspired in a pattern of burglaries. The defendant did not participate in or agree to any specific burglary. She just did office work for her co-conspirator's "business." *Id.* at 475. And the defendant was held liable, not for theft, but for a murder her co-conspirator committed during a burglary. It was enough that the defendant "agreed to participate in an unlawful course of action" and that the murder "was a reasonably foreseeable consequence of the scheme." *Id.* at 487.

And because conspiracy is founded on agreement, state officials need not have had control over the paramilitaries' acts, as the district

60

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

court appeared to require.

Since a conspiracy does not require that a co-conspirator participate in or control the injurious conduct or that the conspiracy be directed specifically toward individual actions, the district court erred as a matter of law.

### b. Plaintiffs meet the proper test for conspiracy.

Plaintiffs have adequately alleged that the abuses at issue were part of the conspiracy between the AUC and the Colombian State. The district court's recognition that Plaintiffs allege the AUC committed the killings at bar as "part of a concerted plan with Colombian State actors" to combat the guerillas, App2084 (internal quotation marks omitted), establishes state action for these killings.

The TACs allege that the AUC and Colombian military agreed to suppress the insurgency by having the AUC murder civilians and terrorize a population deemed sympathetic to the guerrillas; indeed, the State-AUC partnership existed for that purpose. *E.g.* App1175 (detailing court findings regarding the dirty war policy among the paramilitaries and State to combat insurgents, political dissidents and

61

certain social movements and leaders; "the promotion, organization and support of the paramilitary groups was . . . a policy drawn up, sponsored and/or permitted and facilitated by the [military's] high command"). As the Colombian Ombudsman concluded, the paramilitaries were "the illegal arm of the armed forces and the police, for whom they do the work that the latter cannot do," *i.e.* targeting, terrorizing and murdering civilians. App1177-78, 1190-91.

All of the killings in this case furthered the AUC-State conspiracy's purpose to target suspected guerrilla sympathizers and terrorize civilians. App1221. As a former army officer involved in relations with the AUC summarized, the military and AUC engaged in "a total and absolute conspiracy." App1186. That conspiracy's overarching goal was to defeat the guerrillas. *E.g.*, App1181 (detailing AUC Commander Hasbún's statement that "[i]t was the army itself that recommended that we arm ourselves illegally, that we import [paramilitary] groups to the Urabá region in the face of the state's inability to keep the guerrillas at bay."); App1168, 1175, 1177. To do so, the State and AUC agreed the AUC would commit widespread murder

as part of a campaign of terror. *E.g.* App1188-89 (detailing Colombian court's finding that "the ideal means for reaching the goal proposed by the 'conspiracy' of official and [paramilitary] troops, to defeat the guerrilla forces, [were] . . . acts of terrorism"); App1184-92. The AUC committed all of the murders at issue here in Urabá during the period where the military delegated the task of inflicting violence and terror to the AUC. All of the murders here contributed to the terror, and thus furthered the conspiracy.

Moreover, Plaintiffs allege forty-five decedents were specifically targeted as members of community organizations, unions, or political parties, or as perceived guerillas or guerilla sympathizers: all known targets of the Colombian government. App1221-35.

As noted, it is enough that the State "agreed to participate in an unlawful course of action" and that the murders here were "a reasonably foreseeable consequence of the scheme." *Halberstam*, 705 F.2d at 487. The State knew the AUC would murder civilians, such as all of the decedents here, when it agreed to and assisted the AUC's rampage of terror. App1175, 1188, 1191-92. That suffices.

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

The district court's additional requirement that the State be directly involved in every particular murder not only conflicts with precedent, but makes no sense in this context. The conspiracy here included terrorizing the civilian population, App1188-89; the identity of any particular victim was secondary.

The district court's suggestion that Plaintiffs' allegations of conspiracy were "vague and conclusory," App2093 – if that is referring to the conspiracy between the AUC and the State at all – is erroneous. The district court stated that it would be vague and conclusory to premise a conspiracy, without ties to specific killings, on payment of money or a shared ideology. *Id*. But the complaints here do not rest on such vague and general implications. They provide pages and pages of specific allegations about the close ties and cooperation between the AUC and the State, including findings by Colombian tribunals and an admission of a conspiracy by a Colombian officer. App1184-89. Plaintiffs' complaints provide far more detail than the "short and plain statement of the claim" required. Fed. R. Civ. P. 8(a)(2).

These allegations are more than sufficient to show a conspiracy

64

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

between the State and AUC that extended to the killings at issue, and

to survive a motion to dismiss.

### 3. The district court's erroneous joint action test would lead to intolerable results.

Under the district court's opinion, there is no state action if a

state conspires with a private organization to commit a **pattern** of

abuses, rather than specific abuses. Conspiracies to commit many

abuses would be outside the law's reach. That rule would preclude

TVPA and section 1983 liability where it is needed most: cases where

the state is deeply involved in systemic or pervasive wrongdoing.

Take an example drawn from Section 1983's origins: a sheriff and

the Ku Klux Klan conspire to drive out Black residents. Under the

district court's limited view, state action would only be present if the

sheriff or specifically-identified deputies were involved in each act of

abuse, or specifically agreed with the Klan on each individual family to

be targeted. Absent those showings, the district court's approach would

preclude a finding of state action even if the sheriff provided the torches

and the sheets for the express purpose of terrorizing the entire Black

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

community.

The same is true if a local government conspired at a general level with an otherwise private group to harass practitioners of a particular religion, or intimidate voters, or illegally take private property, or silence free speech. Indeed, just this term, the Supreme Court unanimously held that the First Amendment forbids state officials from coercing or inducing a regulated company to disassociate from a political organization to punish or suppress the organization's political speech. *Nat'l Rifle Assoc. of Am. v. Vullo*, 602 U. S. 175 (2024). Surely a company that conspired with state officials to punish organizations with a particular viewpoint would be a state actor. But if the conspiracy were generally to punish any such organization, under the district court's approach there would be no state action.

The Colombian military supported and conspired in a broad pattern of killings and the terror, which it wanted, but didn't want to commit itself. That ought to be the paradigmatic circumstance justifying a state action finding.

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

## II.    The district court improperly ignored specific allegations of State involvement in four killings.

The district court rejected the plausibility of State involvement in four particular incidents that both greatly buttress the allegations of joint action and conspiracy, and would be enough on their own to show direct State involvement. Plaintiffs made specific allegations of State participation in the killings of four decedents – denominated John Doe 64, John Doe 104, John Doe 301, and John Doe 322 in the district court's September 2023 order – but the district court erroneously discounted them. In each case, the district court improperly ignored circumstantial evidence of state participation that should have been sufficient to conclude that the killings were carried out under color of law.

In *Carrizosa*, this Court reversed the *Chiquita* MDL court with respect to summary judgment on eight killings and vacated the grant of summary judgment on two others, in part because the district court had improperly discounted circumstantial evidence. The Court observed: "In cases such as this one, involving acts of violence allegedly perpetrated

67

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

by a terrorist group and its members, plaintiffs often lack direct evidence and are therefore more likely to rely on circumstantial evidence. . . . We treat circumstantial evidence the same as direct evidence." 47 F.4th at 1329.

The district court made a similar error here. Relying on *Sinaltrainal*, the district court held that several allegations of State involvement were infirm because they were made on "information and belief." App2086-87. But the issue in *Sinaltrainal* was the plausibility of a **<u>conclusory</u>** allegation of conspiracy, where the conclusion was not rationally based on other specifically alleged facts. *See Sinaltrainal*, 578 F.3d at 1268. Here, the specific facts alleged were sufficient to allow the conclusions suggested.

John Doe 64 was killed by paramilitaries who came to his home 90 minutes after members of the Colombian military had come to his house and confiscated his identification documents. App1219. Similarly, Plaintiffs alleged that just "[d]ays before" John Doe 301 was killed, he "received threats from the National Army," before being murdered by paramilitaries. App1220-21. These allegations give rise to the plausible

68

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*      No. 23-13352-D
*John Does 1-205 v. Robert Olson*      No. 24-10191-D

inference that the military passed information to the paramilitaries who committed the murder, in light of the specific allegations of the military's widely acknowledged practice of giving target lists to paramilitary death squads.

In John Doe 301's case, the district court focused on the alleged motive for the killing– that the decedent's land was "located in a strategic transport route" – concluding that it did not adequately explain why he would be targeted, and faulting Plaintiffs for not identifying a "specific state actor" who could provide more "factual context." App2088. But none of this is necessary; the mere fact that his murder, like John Doe 64's, followed closely after he was individually targeted by the military is sufficient for the conclusion that the paramilitaries were acting at the military's request. "Temporal proximity" is a well-recognized form of circumstantial evidence, especially when the events occur "within days." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 926 (11th Cir. 2018). Plaintiffs met their pleading burden.

John Doe 104 and John Doe 322 were both killed by

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

paramilitaries wearing military uniforms. App1220. As noted above, the military had close collaboration with the paramilitaries; in fact, some military members "moonlighted" as paramilitaries. App1185. This was therefore sufficient to conclude that the paramilitaries wearing regular military uniforms were members of the military.

The district court, however, hypothesized that "[c]ivilians wearing any type of military fatigues may have purchased such items from a military surplus store for any variety of reasons." App2087. This was error. First, Plaintiffs allege that the assailants were wearing **military** uniforms, not military-style uniforms. Second, there is no evidence that such uniforms can be acquired by civilians (the putative "military surplus store" in Colombia is pure conjecture). Third, even if the killers **could** have obtained actual military uniforms through other means, this is still circumstantial evidence of military affiliation. Circumstantial evidence need not rule out every other possibility, *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 461 (11th Cir. 2015), and it is not for the district court to reject such an allegation – this was a failure to treat circumstantial evidence as equivalent to direct

70

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

evidence.

The district court also faulted Plaintiffs' failure "to identify any specific member of the Colombian military or other government official who was directly involved in any of these claims," *id.* (cleaned up), but again this is not required. The fact that the victims' families did not record the specific members of the military who murdered the decedents does not undermine their claims.

## III. Plaintiffs alleged that each Defendant assisted this wrongdoing.

At the end of its September 2023 order, the district court stated that in some paragraphs of the complaint, the Plaintiffs "group the 'Individual Defendants' with other Defendants in [a] . . . catch-all legal theory manner." App2094. Plaintiffs do not understand this to be a basis for dismissal, but if it was, it was error.

The district court did not state that what it characterized as "improper[] group[ing]" of allegations, App2094, was a reason for dismissing the TVPA claims. Indeed, Defendants had previously raised this objection to the SACs, characterizing them as "shotgun pleadings,"

71

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

*see* App1084, and the district court's order on those complaints did not
endorse this objection or suggest that Plaintiffs needed to amend their
complaints to address this issue.

    If the district court had found this to be a deficiency risking
dismissal, it would have been required to give Plaintiffs an opportunity
to amend. *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir.
2018). Although the district court did give Plaintiffs leave to amend the
Second Amended Complaints, it clearly prescribed that such
amendments "shall be limited to th[e] narrow issue" of "the TVPA
pleading deficiencies outlined in this Order," App1128. The only TVPA
pleading deficiency identified was on state action. Thus, even if the
complaints here were improper "shotgun pleadings," that could not have
been a basis for dismissal without leave to amend.

    Regardless, there was no improper grouping of allegations. In a
shotgun pleading, it is "virtually impossible to know" which allegations
support which claims. *Anderson v. Dist. Bd. of Trustees of Cent. Fl.
Comm. Coll.*, 77 F.3d 364, 366 (11th Cir.1996). Although the district
court pointed to some catch-all paragraphs in the complaint, each

72

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

complaint contains dozens of specific allegations about the specific acts of each Individual Defendant that give rise to their liability. *See, e.g.*, App1252-66, App1744-58 (specific allegations as to Defendants Olson, Kistinger, Tsacalis, and Ordman); App1523-33, App1951-61 (specific allegations as to Defendants Keiser and Freidheim). These allegations are sufficient to plead each Defendant's individual culpability.

## <u>CONCLUSION</u>

Colombia's own institutions – from its Truth Commission to its Ombudsman to its courts – have repeatedly recognized the State's central role in AUC paramilitary violence. The district court's ruling here effectively denied this reality, and held as a matter of law that a wholesale collaboration between official actors and otherwise private parties to commit a pattern of abuses is insufficient to conclude that the abuses were carried out under color of law.

This divergence was the result not of differences in conceptions of state responsibility between Colombia and the United States; it was the result of the district court's failure to apply this Court's and the Supreme Court's established legal standards. The facts alleged here

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

meet the significant encouragement, public function and joint action

tests precisely because this is one of the most widely-acknowledged,

well-documented examples of State collaboration with a paramilitary

group to carry out a "dirty war." The victims of that war – victims of the

Colombian State's plan to use the paramilitaries to target civilians,

including Plaintiffs here – deserve a proper application of the legal

standards to their horrific injuries.


Dated: September 26, 2024        Respectfully Submitted,

                                */s/ Marco Simons*
                                Marco Simons
                                Richard L. Herz*
                                Marissa Vahlsing
                                Wyatt Gjullin
                                Gabriela Valentín Díaz
                                **EarthRights International**
                                1612 K Street NW #800
                                Washington, D.C. 20006
                                Tel: 202-466-5188
                                Fax: 202-466-5189

---

\* Based in CT; admitted in NY; does not practice in DC's courts.

74

Judith Brown Chomsky
**Law Offices of Judith Brown Chomsky**
Post Office Box 29726
Elkins Park, PA 19027
Tel: 215-782-8367
Fax: 215-782-8368

Agnieszka M. Fryszman
Benjamin D. Brown
Nicholas Jacques
**Cohen Milstein Sellers & Toll PLLC**
1100 New York Ave., N.W.
West Tower, Suite 500
Washington, D.C. 20005
Tel: 202-408-4600
Fax: 202-408-4634

Theodore J. Leopold
Leslie M. Kroeger
**Cohen Milstein Sellers & Toll PLLC**
2925 PGA Blvd Ste 200
Palm Beach Gardens, FL 33410
Tel: 561-515-1400
Fax: 561-515-1401

Paul L. Hoffman
John Washington
**Schonbrun Seplow Harris Hoffman & Zeldes, LLP**
11543 W. Olympic Blvd
Los Angeles, CA 90064
Tel: 310-396-0731

75

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

Fax: 310-399-7040

Arturo Carrillo
**Colombian Institute of
International Law**
5425 Connecticut Ave., N.W., #219
Washington, D.C. 20015
Tel: 202-365-7260

76

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This document complies with the type-volume limit of Fed. R. App.

P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted

by Fed. R. App. P. 32(f) this document contains 12,966 words, according

to Microsoft Word, the word-processing software used to prepare the

document.

Dated: September 26, 2024        */s/ Marco Simons*
                                 Marco Simons
                                 Counsel for Plaintiffs-Appellants

*Does 1-205 Ohio Action (17-80547) v. Robert W. Olson*    No. 23-13352-D
*John Does 1-205 v. Robert Olson*    No. 24-10191-D

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed this document with the Clerk of the Court using the ECF system on September 26, 2024, which will automatically generate and serve by e-mail a Notice of Docket Activity on Attorney Filers under Fed. R. App. P. 25(c)(2).

Dated: September 26, 2024            */s/ Marco Simons*
                                     Marco Simons
                                     Counsel for Plaintiffs-Appellants

78