**Case Nos. 23-13352-D & 24-10191-D**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

DOES 1-205 OHIO ACTION (17-80547), et al.,
*Plaintiffs-Appellants*
v.
ROBERT W. OLSON, et al.,
*Defendants-Appellees*

---

JOHN DOES 1-205, et al.,
*Plaintiffs-Appellants*
v.
ROBERT OLSON, et al.,
*Defendants-Appellees*

---

On Appeal from the United States District Court
for the Southern District of Florida, The Honorable Kenneth A. Marra
No. 08-MD-01916
(IN RE: CHIQUITA BRANDS INTERNATIONAL, INC. ALIEN TORT
STATUTE & SHAREHOLDER DERIVATIVE LITIGATION)
(Nos. 17-80547, 17-80323, 20-82222, 21-60058)

---

## APPELLEES' ANSWER BRIEF

---

Michael L. Cioffi
Thomas H. Stewart
BLANK ROME LLP
1700 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
(513) 362-8701/04
michael.cioffi@blankrome.com
thomas.stewart@blankrome.com

Frank A. Dante
Melissa F. Murphy
BLANK ROME LLP
One Logan Square
130 N. 18th Street
Philadelphia, PA 19103
(215) 569-5645/5334
frank.dante@blankrome.com
melissa.murphy@blankrome.com

*Liaison Counsel for All Defendants-Appellees*

Elissa J. Preheim
Kaitlin Konkel
Arnold Porter Kaye Scholer LLP
601 Massachusetts Avenue NW
Washington, DC 20001
Tel:  (202) 942-5000
elissa.preheim@arnoldporter.com
kaitlin.konkel@arnoldporter.com

Robert Reeves Anderson
Arnold & Porter Kaye Scholer LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202
Tel:  (303) 863-2325
reeves.anderson@arnoldporter.com

*Counsel for Defendant-Appellee
Robert Olson*

David S. Krakoff
Bradley A. Marcus
Orrick, Herrington & Sutcliffe LLP
2001 M St. NW, Suite 500
Washington, DC 20036
Tel:  202-349-8000
dkrakoff@orrick.com
bmarcus@orrick.com

*Counsel for Defendant-Appellee
Charles Keiser*

Ardith Bronson
DLA Piper LLP (US)
200 South Biscayne Blvd., Suite 2500
Miami, FL 33131-5341
Tel:  (305) 423-8500
Fax: (305) 503-9583
ardith.bronson@dlapiper.com

*Counsel for Defendants-Appellees
Cyrus Freidheim and Robert Kistinger*

Robert J. Meyer
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006-1238
Tel: (202) 303-1123
Fax: (202) 303-2123
rmeyer@willkie.com

*Counsel for Defendant-Appellee John
Ordman*

John B.T. Murray, Jr.
Gunster Yoakley & Stewart, P.A.
777 South Flagler Dr., Suite 500 East
West Palm Beach, Florida 33401
Tel: (561) 650-0600
jbmurray@gunster.com

*Counsel for Defendant-Appellee
William Tsacalis*

Nos. 23-13352-D & 24-10191-D
Does 1-205 Ohio Action (17-80547) v. Robert W. Olson
John Does 1-205 v. Robert Olson

**Certificate of Interested Persons and Corporate Disclosure Statement**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1(a)(1) and 26.1-2(c), counsel for Appellees Robert Olson, Robert Kistinger, William Tsacalis, John Ordman, Cyrus Freidheim, and Charles Keiser ("Appellees"), all natural persons, certify that the following is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations (none of which is publicly listed) known to Appellees that have an interest in the outcome of the particular case on appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, and other identifiable legal entities related to a party:

Arnold & Porter Kaye Scholer LLP

Blank Rome LLP

Bower, Elizabeth

Bronson, Ardith M.

Brown, Benjamin D.

Burton, Preston

Carrillo, Arturo

Chiquita Brands International, Inc.

Chomsky, Judith Brown

Cioffi, Michael L.

Cohen Millstein Sellers & Toll PLLC

Colombian Institute of International Law

Dante, Frank A.

de Leon, John

Diaz, Gabriela Valentin

DLA Piper LLP (US)

EarthRights International

Freeman-McEwan, Joelle

Freidheim, Cyrus

Fryszman, Agnieszka M.

Gjullin, Wyatt

Gopal, Serena S.

Gunster Yoakley & Stewart, P.A.

Hart, Collin D.

Herz, Richard

Hochman, Ian K.

Hoffman, Paul L.

Jacques, Nicholas J.

Keiser, Charles

Kistinger, Robert

Krakoff, David S

Kroeger, Leslie M.

Law Offices of Chavez & De Leon, P.A.

Law Offices of Judith Chomsky

Leopold, Theodore J.

Marcus, Bradley A.

Marra, Kenneth A.

Meyer, Robert J.

Mrachek, Lorin Louis

Mrachek, Fitzgerald, Rose, Konopka, Thomas & Weiss, P.A.

Murphy, Melissa F.

Murray, Jr., John Brian T.

Neiman, Jeffrey A.

Olson, Robert

Orrick, Herrington & Sutcliffe LLP

Powers, Sean

Preheim, Elissa J.

Rose, Alan B.

Schonbrun Seplow Harris Hoffman & Zeldes, LLP

Simons, Marco Benjamin

Stewart, Thomas H.

Stoolman, Michael A.

Tsacalis, William

Vahlsing, Marissa

Washington, John C.

Wayne, Charles B.

Willkie Farr & Gallagher LLP

Individual Plaintiffs in Nos. 17-80547-CIV-MARRA (S.D. Fla.), 17-80323-CIV-MARRA (S.D. Fla.), 20-82222-CIV-MARRA (S.D. Fla.), and 21-60058-CIV-MARRA (S.D. Fla.)*:

Abadia Potes, Antonio Abad

Acevedo Florez, Alexandra Bibiana

Acosta Garcia, Maria Julieth

Agudelo Urango, Jeison Dario

Agudelo Vargas, Jhonny Andres

---

* In the interest of completeness, Defendants-Appellees have included these persons previously identified by Plaintiffs-Appellants as having an interest in this litigation. Defendants-Appellees do not have direct information as to whether any of these persons continue to have such an interest.

Aguirre de Usuga, Maria Eliud

Aguirre Manco, Beatriz Elena

Aguirre Manco, Danny Mauricio

Aguirre Manco, Jhon Fredy

Aguirre Manco, Yaney Gisela

Alandete Duran, Petrona

Alvarez Ospina, Mariela

Amparo Henao Alandete, Gloria

Anaya Jaramillo, Edith Esther

Arbelaez, Maria Magdalena

Arcos Martinez, Carmen Alicia

Areiza Jaramillo, Julia Stella

Arias Cordoba, Carlos Andres

Arias Estrada, Maria Marlene

Arias Martinez, Fanny

Arias Martinez, Jambrinson

Arias Martinez, Rosa Eva

Arias Martinez, Yaqueline

Arroyave Correa, Gloria Patricia

Arroyave Marimon, Henderson Patrick

Arroyave Salas, Annalit

Arroyave Salas, Jeferson Andres

Arroyo Plata, Carlina Rosa

Arrubla Martinez, Oscar Dario

Atencio Oquendo, Rubis

Avendano Berrio, Yasmina Antonia

Avila Jimenez, Angela Maria

Avila Lopez, Wilinton

Avila, Manuel Enrique

Barrios Negrete, Gilda

Bautista Oviedo Ramos, Edinson

Bautista Zapata, Juan

Benitez Franco, Landisabal

Benitez Franco, Zulbiana

Benitez, Martha Helena

Berrio Jimenez, Tomas

Berrio Otagri, Carlos Alberto

Berrio Otagri, Erika Andrea

Berrio Otagri, Luz Elena

Berrio Ramirez, Albeiro

Berrio Ramirez, Claribel

Berrio Ramirez, Eusebio

Berrio Ramirez, Jhon James

Berrio Ramirez, Juan Carlos

Berrio Ramirez, Nelba Maria

Berrio Ramirez, Sandra

Berrio Sanmartin, Ana Esther

Berrio Sanmartin, Angelica Maria

Berrio Sanmartin, Enorbita

Berrio Sanmartin, Teresa

Blandon Mosquera, Carmen Yadira

Borja Garcia, Juan Pablo

Borja Garcia, Yeny Maryory

Borja Padilla, Hipolita

Buelvas Lemos, Ramon Alberto

Cabria Martinez, Blanca Rosa

Caicedo Valoyes, Dilia Maria

Canas Hernandez, Anatividad

Canas Hernandez, Maria Luzcelia

Canas Hernandez, Martha Elvia

Canas Ramirez, Maria Roselia

Candelaria Ceren Morelo, Alisandro

Cano Arbelaez, Luis Carlos

Cano Arbelaez, Sandra

Cano Ortiz, Maria Gladys

Cano Trejos, Johan Alexis

Cardona Areiza, Jose Leonel

Cardona Areiza, Norfi Emilce

Cardona Areiza, Rosa Amelia

Cardona Franco, Luz Dary

Cardona Gutierrez, Jose Leonel

Caro Rengifo, Ana Gilma

Caro Rengifo, Clara Ines

Caro Rengifo, Diana Patricia

Caro, Gloria Maria

Carrascal Huertas, Juan Antonio

Carrascal Huertas, Nellys

Carrillo Gonzalez, Denis Margarita

Carvajal, Antonio Dagoberto

Castaneda Montes, German

Castano Ruiz, Beatriz Elena

Castano Ruiz, Gabriel Amado

Castano Ruiz, Luz Angela

Castano Ruiz, Marco Fidel

Castano Ruiz, Mariela

Causil Ortiz, Martha Cecilia

Cedeno Cuadrado, Libardo

Ceren De Lopez, Georgina

Ceren Gonzalez, Leider

Ceren Morelo, Bernardina

Ceren Morelo, Candelaria

Ceren Morelo, Eleida

Ceren Morelo, Emelina

Ceren Morelo, Eneida

Ceren Morelo, Grisedia Maria

Ceren Morelo, Inocencia

Ceren Morelo, Jose Isabel

Ceren Morelo, Manuel Tiberio

Ceren Morelos, Eriberto

Ceren Santana, Candelario

Ceren Socarras, Lorena

Chaverra Moreno, Adalberto

Chaverra Moreno, Alexander

Chaverra Moreno, Anderson

Chaverra Salas, Adan

Cielo Arbelaez, Maria

Ciro Castano, Flor Aleida

Coa Licona, Esther Maria

Cogollo, Aida Isabel

Cordoba Moya, Miguelina

Correa Rodriguez, Maria Elva

Cuartas Diez, Blanca Rubiela

Cubides Ramirez, Luis Antonio

Cuesta Diaz, Sonia

Cuesta Florez, Luz Mery

Cuesta, Gilma

Cuesta, Luz Elena

Dario Garcia, Ruben

De Hoyos Viola, Ana Rosmira

De Jesus Aguirre Manco, Elkin

De Jesus Arroyave Correa, Ovidio

De Jesus Bedoya Castaneda, Adrian

De Jesus Berrio Ramirez, Arley

De Jesus Canas Hernandez, Reinerio

De Jesus Cano Arbelaez, Yovany

De Jesus Cano Ortiz, Leonidas

De Jesus Castano Osorio, Adolfo

De Jesus Chaverra Moreno, Alexis

De Jesus Cuartas Diez, Aracely

De Jesus Durango Rengifo, Hermes

De Jesus Ferraro Alvarez, Nidia

De Jesus Flores Plaza, Edilma

De Jesus Garcia, Maria

De Jesus Gomez Zapata, Jeinne

De Jesus Gonzalez Marin, Abdon

De Jesus Hernandez, Omar

De Jesus Meneses Bustamante, Ana

De Jesus Mosquera de Palacios, Ana

De Jesus Roldan Guisao, William

de Jesus Ruiz Diaz, Henry

de Jesus Ruiz Diaz, Josefina

de Jesus Ruiz Diaz, Maria Alciria

de Jesus Ruiz Diaz, Myriam

de Jesus Ruiz Diaz, Nancy Islena

de Jesus Ruiz Diaz, Rubiela

De Jesus Tangarife Tangarife, Lucia

De Jesus Trujillo Giraldo, Fabiola

De Jesus Valencia, Ligia

De La Hoz Hurtado, Lilia Rosa

De Las Mercedes Munoz Garcia, Maria

De Los Angeles Borja Garcia, Maria

De Los Angeles Cuvides Ramirez, Maria

De Los Santos Rengifo Osorio, Jose

De Los Torres Gonzalez Padilla, Vinicia

De Rodriguez, Dioselina Arboleda

Del Carmen Beltran Cruz, Margarita

Del Carmen Berrio Sanmartin, Carmela

Del Carmen Herrera Altamiranda, Nohora

Del Carmen Morales Miranda, Rosiris

Del Carmen Osorio, Maria

Del Carmen Ramirez, Aracely

Del Rosario Reyes Gonzalez, Yenis

Del Socorro Cuartas Diez, Luz Dary

Del Socorro Garcia Perez, Rosmira

Del Socorro Hernandez Gonzalez, Maria

Del Socorro Serna de Lemus, Fabiola

Diaz de Ruiz, Maria Arcenia

Diaz Espitia, Edis Marina

Diaz Pastrana, Blanca

Diez, Ana Solina

Dubian Garcia, Pedro

Duran Jimenez, Olivia

Durango Ayala, Catalina

Durango Gallo, Omaira

Durango Guerra, Emilce

Durango Guisao, Reinaldo Antonio

Echavarria Osorio, Elkin Alfonso

Echavarria Osorio, Flor Elena

Echeverri, Martha Yolanda

Eliecer Restrepo, Jorge

Emilsen Higuita, Gloria

Enelida Ramos, Maria

Esneida Marquez, Maria

Espinosa, Luz Alba

Espitia Canas, Yirley Johana

Espitia Echavarria, Andres David

Ferraro Alvarez, Maria Eudilma

Flores Jaramillo, Luz Alba

Florez Durango, Marta Oliva

Florez Jaramillo, Maria Dionis

Florez Julio, Yamile

Fonseca Perea, Emilse

Franco Vasquez, Maria Omaira

Galeano Castellanos, Julieth Andrea

Gallego Osorno, Naydu

Gallego, Gladys

Gamboa Caicedo, Alexander

Gamboa Caicedo, Carlos Andres

Gamboa Caicedo, Disney

Gamboa Caicedo, Kervis Edith

Gamboa Caicedo, Maria Sandra

Gamboa Caicedo, Milton

Garcia Cruz, Martha Lucia

Garcia Marquez, Liliana

Garcia Marquez, Paula Andrea

Gaviria Bolano, Gumercinda

Gilberto Sanchez, Gonzalo

Giraldo, Alexandra Maria

Giraldo, Carlos

Goez Rueda, Rosa Elena

Gomez Canas, Yorledy

Gomez Castro, Juana

Gomez Montoya, Maria Patricia

Gomez Urrego, Elvia Rosa

Gonzalez Espitia, Cristian Ferney

Gonzalez Hernandez, Dilia Isabel

Gonzalez Marin, Eduardo Fredy

Gonzalez Marin, Jorge Asdrubal

Gonzalez Marin, Migdonia

Gonzalez Marin, Rosalba

Gonzalez Rengifo, Faridey

Gonzalez Rengifo, Miguel Estiven

Gonzalez Rivas, Josefina

Gonzalez, Feliciano

Gracia Marquez, Edison Antonio

Graciela Borja, Maria

Guerra Avendano, Joyce Paulin

Guerra Avendano, Lilia Yanellys

Guerra Avendano, Ronal Adal

Guerra Avendano, Yulieth Paola

Guerra, Luz Dary

Guerra, Maria Magdalena

Guisao, Leonel Roldan

Guisao, Luis Antonio

Henao Alandete, Juan Guillermo

Henao Alandete, Julio Cesar

Hernandez Correa, Alba Rocio

Hernandez Correa, Luis Emilio

Hernandez Correa, Luz Marllore

Hernandez Correa, Luz Mary

Hernandez Giraldo, Olga Liliana

Hernandez Gonzalez, Neir

Hernandez Gonzalez, Neudis

Hernandez Gonzalez, Odilia

Hernandez Hernandez, Beatriz Elena

Hernandez Hernandez, Claudia Milena

Hernandez Hernandez, Gloria Cristina

Hernandez Hernandez, Margarita Rosa

Hernandez Huertas, Hipolita

Hernandez, Eufemia Maria

Higuita Caro, Luz Gladys

Higuita Hurtado, Gabiel Jaime

Higuita Hurtado, Gilberto

Higuita Hurtado, Janeth

Hilda Areiza, Rosa

Holguin De Rincon, Maria Fanny

Huila Bravo, Maria Lely

Hurtado Garcia, Rosa Franquilina

Hurtado Parra, Luis Alfonso

Hurtado Parra, Sandra Yaneth

Jane Doe 80

Jimenez Borja, Andres

Jimenez Borja, Elizabeth Johana

Jimenez Borja, Liliana

Jimenez David, Blanca Rosa

Jimenez David, Leonela

Jimenez Espinosa, Gonzalo

Jimenez Espinosa, Marco Fidel

Jimenez Espinosa, Marlen Cecilia

Jimenez Parra, Antonio

John Doe 122

Lambertino Ferraro, Nilson

Lara Palacio, Gloria Helena

Laverde, Luz Areli

Lemus, Hernando

Leudo Asprilla, Edelmira

Licona Guerra, Fermina

Loaiza Tapasco, Maria Cenelia

Lopez Aguirre, Ingryd Daniris

Lopez Aguirre, Mary Leidys

Lopez Aguirre, Sandra Milena

Lopez Aguirre, William Enrique

Lopez Fernandez, Juan Pablo

Lopez Gonzalez, Arneth Enrique

Lopez Montoya, Maria Edit

Lopez Perez, Ana Sirley

Lopez Perez, Deycis Norbellis

Lopez Perez, Dina Luz

Lopez Perez, Lisenia

Lopez Perez, Marlys

Lopez Perez, Orley Humberto

Luz Teheran, Ada

Luzmila Ortiz, Maria

Manco Meneses, Luz Eneida

Manco Torres, Luz Marina

Maria Esperanza Ferraro Alvarez

Maria Leudo, Rubia

Marin de Gonzalez, Rosalba

Marin, Gloria Patricia

Martinez Ceren, Matilde

Martinez Garcia, Ana Elba

Martinez Martinez, Bertha Luz

Maturana Cordoba, Irma Rosa

Mauricio Garcia, Jose

Mena Mosquera, Claudia Esther

Mena Mosquera, Kelly Jhoanna

Mena Mosquera, Paola Andrea

Mestra Gonzalez, Beatriz Elena

Miranda Estrada, Elvira

Miranda Usuga, Jose Dagoberto

Miranda Usuga, Juan Diego

Miranda Usuga, Maria Ofelia

Molina Arevalo, Dilma Maria

Molina Palacios, Jhoan Camilo

Molina Vasquez, Policarpo

Monsalve Loaiza, Yuliana

Monsalve Oquendo, Fabiola

Monterrosa Ramos, Monica Patricia

Montoya Borja, Flor Marina

Montoya Tovar, Juan Manuel

Montoya Tovar, Mariluz

Montoya Tovar, Paula Andrea

Morelo De Ceren, Bernardina

Moreno Cordoba, Guillermo

Moreno Cordoba, Luis Angel

Moreno Cordoba, Luisa

Moreno Cordoba, Merys Maria

Moreno Cordoba, Rosa Francisca

Moreno Cordoba, Santos

Moreno Gomez, Yaneth Amparo

Moreno Romana, Nancy Maria

Moreno, Astrid Chaverra

Mosquera, Emilia

Munoz Osorio, Claudia Patricia

Murillo Asprilla, Johan Alexander

Murillo Rengifo, Jair Emir

Murillo Rengifo, Jefferson

Murillo Rengifo, Jhon Alex

Murillo Rengifo, Jose Enrique

Murillo Rengifo, Sandra Milena

Murillo Rengifo, Yoiner Alexander

Murillo Rivas, Ana Delfa

Murillo Rivas, Ingris Patricia

Murillo Rivas, Jose Patrocinio

Murillo Rivas, Luis Felipe

Murillo Rivas, Maria Yajaira

Narvaez De Madrid, Celia Modesta

Negrete Cantero, Robinson Antonio

Negrete Soto, Marcela

Norbely Otagri, Maria

Orozco Velez, Ivan Antonio

Ortega Julio, Crister Lourdes

Ortiz Duran, Leidi Paola

Ortiz Molina, Maria Rosaura

Ortiz, Maria Trinidad

Osorio Lopez, Eddy

Osorio Lopez, Herlan

Osorio Lopez, Sandra Milena

Osorio Ramirez, Maria Eduvina

Ospino Vargas, Luis Carlos

Ospino Vargas, Luisa Fernanda

Oviedo Ramos, Arley Fernando

Oviedo Ramos, Diana Maricela

Oviedo Ramos, Hector Jose

Pacheco, Luz Mila

Paez Escobar, Brayan Andres

Paez Villalobo, Elcy Esther

Paez Villalobo, Luis Alberto

Palacio Mendoza, Maria Yulenis

Palacio Renteria, Sonia

Palencia Gomez, Victor

Palencia Medrano, Oswuin Farley

Palencia Medrano, Yasiris Johana

Palencia Negrete, Francisco

Palencia Negrete, Mirledis Celinda

Palencia Negrete, Urbina Janeth

Palencia Negrete, Yudis Patricia

Parra Osorio, Rosa Angelica

Pena Acuna, Martha Irene

Perea Reyes, Vicenta

Perez Giraldo, Dora Alba

Perez Hoyos, Alirio Jose

Perez Medrano, Matilde

Perez Vidal, Francisca

Puentes Avalo, Monica Alexandra

Pulgarin Echavarria, Elcy Mery

Pulgarin Echavarria, Maria Eulalia

Quejada Moreno, Carmen

Quintero, Nelly Orfelia

Quinto Bonilla, Mary Luz

Ramirez de Berrio, Ruth Maria

Ramirez Perea, Lilian Melania

Ramirez Yanez, Elvia Maria

Rengifo Alvarez, Eusmed

Rengifo Borja, Denis Maria

Rengifo De Caro, Maria Fabiola

Rengifo Osorio, Heriberto

Rengifo Palacios, Sol Angel

Rengifo Zapata, Ever Carlos

Rengifo Zapata, Fabian

Rengifo Zapata, Ligia Maria

Rengifo Zapata, Soraida

Renteria Murillo, Jose Eliecer

Restrepo Torres, Ameira

Restrepo, Marta Elena

Rincon Holguin, Gloria

Rincon Holguin, Martha Cecilia

Rivas Martinez, Santa Delfa

Rivero, Dilma Esther

Rodriguez De Taborda, Mercedes

Rojas Gutierrez, Alba Maria

Rojas Gutierrez, Carmen Jael

Rojas Gutierrez, Eunice

Rojas Gutierrez, Jorge Enrique

Roldan de Rodriguez, Ana Maria

Roldan Guisao, Ana Teresita

Roldan Guisao, Carlos Enrique

Roldan Guzman, Paola Andrea

Romana Olivera, Gregoria

Romana, Martha Isabel

Ruiz Acevedo, Johan Arley

Ruiz Diaz, Bella Zulima

Ruiz Diaz, Gabriel Angel

Ruiz Diaz, Senobia

Ruiz Diaz, William Whiton

Ruiz Gonzalez, Debora Maria

San Martin Galan, Catalina

San Martin Galan, Glenis

San Martin Galan, Marilis

San Martin Guerra, Neider

Sanchez Diez, Jorge Ivan

Sanchez Diez, Rogelio Antonio

Sanchez Munoz, Lina Beatriz

Sanchez, Juan Manuel

Sanmartin Ruiz, Tarcila Esther

Santero Hernandez, Ledys

Sena De Leon, Raquel Victoria

Silgado, Leonor

Sixta Cledys Pereira Martinez

Socarraz Gaspar, Sielva Rosa

Sosa Sosa, Maria La Luz

Suaza, Maria Eugenia

Tabares Cortez, Yordano

Taborda Rodriguez, Luz Miriam

Tangarife Jaramillo, Tatiana

Tangarife Tangarife, Patricia

Tangarife Tangarife, Rosa

Emilia Tangarife, Francisco Jose

Tapias, Emilse

Tordecilla Gomez, Aida Sofia Torres

Urango, Maria Candelaria

Tovar, Maria Isabel

Tulia Bravo, Bertha

Ubaldo Cuesta, Maria Eugenia

Urango Carrascal, Benilda

Urango Monterrosa, Jader Andres

Urango Monterrosa, James De Jesus

Urango Monterrosa, Leidy Patricia

Urango Monterrosa, Leisy Patricia

Urango Valencia, Elvira

Urrego Usuga, Luz Marina

Usuga Aguirre, Luz Marina

Usuga Celada, Luz Dary

Usuga Franco, Arely Yazmin

Usuga Franco, Gledys Omaira

Usuga Franco, Luz Dalia

Usuga Franco, Wilber Hernando

Valencia Berrio, Cristina Maria

Vanegas Henao, Oscar Hernando

Vanegas Ramirez, Carlos Mario

Vanegas Ramirez, Nini Johana

Vanegas Ramirez, Oscar Giovanni

Varelas, Martha Oliva

Vargas Benitez, Margoth

Vargas Martinez, Edinson Giovany

Vargas Martinez, John Humberto

Vargas Martinez, Liliana Isabel

Vargas Martinez, Wilson R.

Vargas Patino, Marta Cecilia

Vargas Urrego, Matilde

Vargas Vasquez, Bertha Beatriz

Vasquez Florez, Melany Alejandra

Vasquez Gonzalez, Oscar Dario

Vasquez Marin, Mariela

Velasquez, Diana Patricia

Villalba Paez, Beatriz Maria

Viuda De Echavarria, Rosalia Osorio

Zarza Carrascal, Deisa

Zuluaga Cardona, Yaneth Esmeralda

Counsel further certifies that no publicly traded company or corporation has

an interest in the outcome of the case or appeal.

Dated:    November 27, 2024    */s/ Michael L. Cioffi*
                                Michael L. Cioffi

**Statement Regarding Oral Argument**

Appellees do not believe oral argument is necessary. The legal issue presented was resolved based upon the face of the Complaint and binding Eleventh Circuit precedent. Defendants stand ready to participate in oral argument if this Court determines it would be helpful. *See* Fed. R. App. P. 34(a)(2)(C); 11th Cir. R. 34-3(b)(3).

## Table of Contents

**Page**

Certificate of Interested Persons and Corporate Disclosure Statement ...............C-1

Statement Regarding Oral Argument....................................................................... i

Table of Contents................................................................................................... ii

Introduction............................................................................................................ 1

Statement of the Issues.......................................................................................... 5

Statement of the Case............................................................................................ 6

    I.       Factual Background...................................................................... 7

    II.      Procedural History.......................................................................11

          A.    Plaintiffs' Second Amended Complaints and the August 2022 Dismissal Order...........................................................................11

          B.    Plaintiffs' Third Amended Complaints and the September 2023 Dismissal Order.......................................................................... 12

Standard of Review............................................................................................... 15

Summary of the Argument................................................................................... 16

Argument .............................................................................................................. 18

    I.       The District Court Applied this Court's State Action Standard for TVPA Cases ................................................................................ 18

          A.    This Court Requires Allegations of a Symbiotic Relationship to Satisfy the State Action Element of a TVPA Claim......................... 18

          B.    The Court Did Not Fail to Apply Alternative Tests Drawn from Other Contexts......................................................................................... 22

    II.      Plaintiffs' Claims Fail Under Any State Action Test Because the Facts Pled Cannot Establish the Required Nexus..................................... 26

A.  Plaintiffs' Allegations Do Not Meet the Required Nexus Under the TVPA State Action Test Articulated in Romero .............................. 31

    1.  After Multiple Opportunities to Amend, Plaintiffs Still Cannot Allege the Nexus Required by the "Symbiotic Relationship" Test ................................................................................32

    2.  Plaintiffs Cannot Meet the Symbiotic Relationship Test by Pleading a Vague Conspiracy ................................................35

    3.  Plaintiffs' "Direct Involvement" Theory Also Fails ..............39

B.  The "Significant Encouragement" Test Does Not Apply, and Plaintiffs' Allegations Do Not Meet the Required Nexus................................ 41

C.  The "Public Function" Test Does Not Apply, and Plaintiffs' Allegations Do Not Meet the Required Nexus................................ 45

III.  The Court Should Also Affirm Dismissal Because Defendants Cannot Be Held Secondarily Liable Under Plaintiffs' Theories................... 50

IV.  Affirming Dismissal Furthers the Policy and Purpose of the TVPA . 54

Conclusion ........................................................................................ 56

Certificate of Compliance With Type-Volume Limit, Typeface Requirements, And Type-Style Requirements .................................................................... 58

Certificate of Service ........................................................................ 59

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adickes v. S H Kress & Co.*,
  398 U.S. 144 (1970)..................................................................37

*Al-Quraishi v. Nakhla*,
  728 F. Supp. 2d 702 (D. Md. 2010)............................................48

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*,
  416 F.3d 1242 (11th Cir. 2005).......................................21, 42, 45

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
  526 U.S. 40 (1999)....................................................................27

*Appel v. Cohen*,
  No. 22-170, 2023 WL 1431691 (2d Cir. Feb. 1, 2023)................35

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................15, 39, 49

*Banco Nacional de Cuba v. Sabbatino*,
  376 U.S. 398 (1964)..................................................................46

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................40

*Blum v. Yaretsky*,
  457 U.S. 991 (1982)........................................................29, 30, 42

*Brentwood Academy v. Tennessee Secondary School Athletic Assoc.*,
  531 U.S. 288 (2001).............................................................23, 26

*Burton v. Wilmington Parking Authority*,
  365 U.S. 715 (1961).............................................................27, 28

*Butler v. Sheriff of Palm Beach Cnty.*,
  685 F.3d 1261 (11th Cir. 2012)..................................................15

*Cabello v. Fernandez-Larios*,
  402 F.3d 1148 (11th Cir. 2005)......................................36, 45, 52

*Cent. Bank, N.A. v. First Interstate Bank, N.A.*,
    511 U.S. 164 (1994)........................................................................51

*Chapman v. Higbee Co.*,
    319 F.3d 825 (6th Cir. 2003).........................................................47

*Charles v. Johnson*,
    18 F.4th 686 (11th Cir. 2021).........................................23, 28, 36

*Dobyns v. E-Systems, Inc.*,
    667 F.2d 1219 (5th Cir. 1982).......................................................48

*Doe v. Drummond Co.*,
    782 F.3d 576 (11th Cir. 2015)........................................................50

*Fabrikant v. French*,
    691 F.3d 193 (2d Cir. 2012)...........................................................48

*Flagg Bros., Inc. v. Brooks*,
    436 U.S. 149 (1978)..........................................................44, 46, 47

*Hadley v. Gutierrez*,
    526 F.3d 1324 (11th Cir. 2008).....................................................37

*Halberstam v. Welch*,
    705 F.2d 427 (D.C. Cir. 1983) .......................................................36

*Harvey v. Harvey*,
    949 F.2d 1127 (11th Cir. 1992)...............................................37, 47

*Kernel Records Oy v. Mosley*,
    694 F.3d 1294 (11th Cir. 2012).....................................................53

*Langston ex rel. Langston v. ACT*,
    890 F.2d 380 (11th Cir. 1989).......................................................42

*Lindke v. Freed*,
    601 U.S. 187 (2024)..........................................................26, 27, 32

*Lombard v. Louisiana*,
    373 U.S. 267 (1963)..............................................................42, 43

*Manhattan Cmty. Access Corp. v. Halleck*,
    139 S. Ct. 1921 (2019) ................................................................46

*Mann v. Palmer*,
    713 F.3d 1306 (11th Cir. 2013)..................................................40

*Moose Lodge No. 107 v. Irvis*,
    407 U.S. 163 (1972)....................................................................42

*Mohamad v. Palestinian Auth.*,
    566 U.S. 449 (2012)............................................................50, 54

*Nat'l Broad. Co. v. Commc'ns Workers of Am., AFL-CIO*,
    860 F.2d 1022 (11th Cir. 1988)..................................................30

*Nestle USA, Inc. v. Doe 1*,
    Nos. 19-416 and 19-453, 2020 WL 2749081 (May 2020)...........51

*Rayburn ex rel. Rayburn v. Hogue*,
    241 F.3d 1341 (11th Cir. 2001)..................................................30

*Richardson v. McKnight*,
    521 U.S. 399 (1997)....................................................................48

*Romanski v. Detroit Ent., L.L.C.*,
    428 F.3d 629 (6th Cir. 2005).......................................................48

*Romero v. Drummond Co.*,
    552 F.3d 1303 (11th Cir. 2008)...........................................*passim*

*San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*,
    483 U.S. 522 (1987)....................................................................30

*Sinaltrainal v. Coca-Cola Co.*,
    578 F.3d 1252 (11th Cir. 2009), *abrogated on other grounds by*
    *Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012)...........*passim*

*Skinner v. Railway Labor Executives' Assn.*,
    489 U.S. 602 (1989)..............................................................42, 43

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023)......................................................36, 51, 52

vi

*United States v. Students Challenging Regulatory Ag. Proc.*,
   412 U.S. 669 (1973) ........................................................................... 39

*Wade v. Byles*,
   83 F.3d 902 (7th Cir. 1996) ............................................................. 47

*Whetstone Candy Co., Inc. v. Kraft Foods, Inc.*,
   351 F.3d 1067 (11th Cir. 2003) ....................................................... 52

**Statutes**

28 U.S.C. § 1350 ................................................................................. *passim*

28 U.S.C. § 1350, note § 2(a) ............................................................... 18

42 U.S.C. § 1983 ................................................................................. *passim*

**Other Authorities**

133 Cong. Rec. 6910 (1987) ......................................................... 55, 56

H.R. Rep. 102-367(I) ............................................................................ 55

Fed. R. Civ. P. 12(b)(6) ................................................................... 6, 15

**Introduction**

The Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 (note), expressly requires "state action" by cabining civil liability to individuals who, "*under actual or apparent authority, or color of law, of any foreign nation*, subject[] an individual to torture . . . [or] extrajudicial killing." 28 U.S.C. § 1350, note § 2(a). The district court correctly applied this Court's precedents to dismiss Plaintiffs' claims for failure to meet the TVPA's state action requirement. In its August 2022 dismissal order, the district court analyzed the applicable standard under this Court's precedent, dismissed the claims without prejudice, and granted Plaintiffs leave to file Third Amended Complaints (the "TACs") to address the TVPA pleading deficiencies described in the order. Plaintiffs' amended allegations again fell short, and the district court dismissed the claims with prejudice in September 2023. This Court should affirm.

Plaintiffs seek damages for the deaths of their relatives during Colombia's decades-long civil war. *See* App1387 ¶1658. Plaintiffs allege that the individuals who perpetrated acts of torture and killing against them and their decedents—all of whom are unknown and/or unidentified—belonged to a paramilitary group called the *Autodefensas Unidas de Colombia* ("AUC") that operated in the Urabá region of Colombia in the late 1990s and early 2000s. *See* App1130-1414. Plaintiffs further allege that Defendants' employer, Chiquita Brands International, Inc.

1

("Chiquita")—which is not a party to the TVPA claims—provided money and other support to the AUC. App1130 ¶1.

Although Plaintiffs claim that members of the AUC murdered the decedents while acting "under color of" Colombian law, they have not sued any AUC member or Colombian official in these actions. Instead, Plaintiffs seek damages from six Americans who worked for Chiquita at various points between the late 1980s and early 2000s, contending that these former employees (the "individual Defendants" or "Defendants") bear legal responsibility under U.S. law for all murders committed by the AUC in Colombia during the relevant time period due to Chiquita's alleged assistance to the AUC. The TACs do not allege, nor could they, that any individual Defendant was acting under actual or apparent authority, or under color of law, of the Colombian State. The TACs also do not allege, nor could they, that any individual Defendant shared the AUC's alleged goal of targeting or terrorizing Colombian civilians. Rather, Defendants were Americans responsible for various business, accounting, and legal functions at a multinational banana company. Nevertheless, Plaintiffs sensationally allege that the Defendants conspired with or assisted the AUC and are therefore liable for the AUC's murder of thousands of civilians during Colombia's civil war.

This highly attenuated theory of TVPA liability warrants dismissal on multiple grounds, but the district court properly rejected it on the threshold issue that

Plaintiffs failed to satisfy the TVPA's state action requirement.  In both the August 2022 and September 2023 orders, the district court concluded that the allegations failed to meet the "symbiotic relationship" test for state action articulated by this Court in *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252 (11th Cir. 2009), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012) and *Romero v. Drummond Co.*, 552 F.3d 1303 (11th Cir. 2008). Both *Romero* and *Sinaltrainal*, as here, involved plaintiffs seeking to hold employees of multinational companies liable under the TVPA for making payments in the late 1990s and early 2000s to Colombian paramilitaries, alleging that the paramilitaries were responsible for the torture and killings of their relatives.  *See Sinatrainal*, 578 F.3d at 1257 (affirming dismissal of TVPA claims for failure to plead state involvement in each act of torture or killing); *Romero*, 552 F.3d at 1309 (affirming summary judgment for defendants on TVPA claims for failure to present evidence of state action tied to specific attacks).  Applying this Court's precedent, the district court concluded that—despite 14 years of proceedings and multiple opportunities to amend these specific complaints—Plaintiffs still failed to allege the required link between state action and the specific torture or killings alleged in the TACs.

On appeal, Plaintiffs ask this Court to negate the state action standard set forth in *Romero* and *Sinaltrainal* and instead accept the TACs' broad allegations of conspiracy or general collaboration between the AUC and the Colombian state. In

3

proposing this new and expansive approach to TVPA liability, Plaintiffs effectively concede that the TACs do not meet this Court's "symbiotic relationship" test with respect to each Plaintiff's case. Alternatively, they urge the Court to set aside the "symbiotic relationship" test in favor of either a "significant encouragement" test or a "public function" test. Courts have recognized these tests in some 42 U.S.C. § 1983 cases, but the TVPA differs from Section 1983 in important respects, and this Court should decline Plaintiffs' invitation to import those principles wholesale into the narrowly tailored TVPA. In any event, Plaintiffs' allegations fail under all of Plaintiffs' proposed tests because Plaintiffs cannot link their allegations of general collaboration to the specific torture or killings alleged in the TACs.

For these reasons, and as set forth below, the Court should affirm the district court's dismissal with prejudice of Plaintiffs' TVPA claims.

## Statement of the Issues

Did the district court correctly dismiss Plaintiffs' claims under the Torture Victim Protection Act, 28 U.S.C. § 1350 (note), on the basis that Plaintiffs did not adequately plead the requisite state action element, despite having multiple opportunities to amend their complaints to address this deficiency?

In the alternative, should dismissal be affirmed on the grounds that Plaintiffs failed to state a claim for secondary liability under the TVPA against each individual Defendant and improperly group-pled their allegations?

## Statement of the Case

These claims are part of a larger multidistrict litigation ("MDL") that arose from the deaths of Colombian nationals in Colombia in the 1990s and early 2000s during the decades-long Colombian civil war fought between narcotrafficking paramilitaries, guerrillas, other violent groups, and the Colombian government. Thousands of Colombian nationals sued Chiquita and its former employees in various district courts in the United States beginning in 2007, accusing Chiquita and its employees of complicity in the murders of their family members. Plaintiffs allege that payments that Chiquita made to third-party groups in Colombia supported members of these warring, third-party groups who allegedly killed Plaintiffs' decedents.[1] The cases in the MDL involve overlapping subject matter, but the specific plaintiffs, decedents, defendants, allegations, and causes of action vary from case to case.

This appeal relates to one subset of claims in the MDL, TVPA claims against six individual Defendants formerly employed by Chiquita: Robert Olson, the former General Counsel; Robert Kistinger, the former President and COO of Chiquita's subsidiary Chiquita Fresh Group; William Tsacalis, the former Controller and Chief

---

[1] While at the Rule 12(b)(6) stage Plaintiffs' well-pleaded allegations must be taken as true, their unwarranted deductions and inferences need not, including the characterization of Chiquita's payments as "voluntary" rather than extortion payments made for the purpose of protecting its Colombian employees' lives.

Accounting Officer; John Ordman, a former regional manager; Cyrus Freidheim, the former CEO; and Charles Keiser, a former manager based in Colombia. App1162-63 ¶¶222-25; App1433-34 ¶¶139-40. Defendants worked for Chiquita at different times, with their collective tenures spanning the late 1980s to the early 2000s. *Id*.

## I.    Factual Background

As alleged by Plaintiffs, during the Colombian civil war in the 1990s and 2000s, the AUC was "deeply involved in the drug trade, which gave them a steady source of income to procure arms." App1168 ¶249. The AUC's leader was Carlos Castaño, "a long-time paramilitary fighter with family ties to the drug trade." App1168 ¶256. The AUC warred with other violent groups that were also active in Urabá. App1167 ¶247. In order to undermine support for guerrilla groups, the AUC "adopted a strategy of terrorism, routinely engaging in death threats, extrajudicial killings, attacks on civilian populations, torture, rape, kidnapping, forced disappearances, and looting." App1170 ¶259. The AUC "purposely used killings and cruelty to terrorize the civilian population[.]" *Id*. According to Plaintiffs, the AUC "targeted anyone considered to share the guerillas' leftist ideology, such as teachers, community leaders and activists, trade unionists, human rights defenders, religious workers, and leftist politicians." App1170-71 ¶262. The AUC also "targeted anyone considered socially undesirable, including indigenous persons, persons with

disabilities, persons with psychological problems, drug addicts, prostitutes, and suspected petty criminals." *Id*.

In 1991, the Colombian State criminalized membership in paramilitary groups, including the AUC. App1167-68 ¶248. According to Plaintiffs, "despite the official criminalization of the paramilitaries," the AUC "collaborated closely" with the Colombian government and were allegedly "used by the government to oppose anti-guerilla groups." App1168 ¶249; *see also* App1172 ¶267. Plaintiffs contend that the Colombian State was "part of a concerted plan to "terrorize" its own citizens and promoted the AUC's "years-long reign of terror in Urabá[.]" App1174-75 ¶¶267-68. Plaintiffs broadly allege that the AUC and Colombian State "carried out many joint operations in Urabá against the guerillas, and many joint operations that involved civilian massacres." App1175 ¶281. Plaintiffs do not allege that any specific *Plaintiff or decedent* was tortured or killed in *any* specific joint operation or massacre. *Compare* App1203-1210 ¶¶462-513 (detailing specific operations and massacres) *with* App1276-1374 ¶¶927-1585 (Plaintiff-specific allegations).

Plaintiffs also contend that the AUC and Colombian State had a two-part "clandestine scheme" to further their alleged "common goal" of "eliminating the guerillas and driving civilians from Urabá[.]" App1175 ¶282. First, "paramilitaries carried out the extrajudicial killings that the State could not," meaning that if the Colombian army or police "arrested someone but were not able to carry on with the

indictment because the information was lacking," they would identify that person to "the AUC or other paramilitary group, which would murder them." App1176 ¶¶284-85. Plaintiffs do not allege that any Plaintiff or decedent was tortured or executed after having been arrested by the Colombian police or military. *See* App1276-1374 ¶¶927-1585. Other times, according to Plaintiffs, the State allegedly gave the AUC "lists of people to execute." App1176 ¶¶286-87. Only one Plaintiff is alleged to have been named on a list—John Doe 37. *See* App1292 ¶¶1025-1026. But there is no allegation that the Colombian State provided his name to the AUC and, in any event, John Doe 37 is not alleged to have been tortured or killed as required under the TVPA. *See* App1232 ¶¶682-685.  No other Plaintiff or decedent is alleged to have been named on a "list" provided by the State to the AUC, let alone tortured or killed as a result of having been named on a list.

The second part of the "clandestine" State-AUC relationship was allegedly a vague mission to "terrorize and drive the civilian population—seen to support the guerillas—out of Urabá." App1176 ¶288. The vast majority of Plaintiffs' allegations contain no facts that support that the State was conceivably involved in the torture or killing of any Plaintiff or decedent, and many allegations lack basic details like specific dates and locations. *See, e.g.* App1283 ¶¶968-969 ("Jane Doe 11's sister, Jane Doe 12, was murdered by the AUC in a public market in March 2002. A member of the AUC confessed to the killing."); App1287 ¶429 ("Jane Doe 23's son,

John Doe 27, and her husband John Doe 28, were killed by paramilitaries in January 1997 in Mutatá. Four paramilitaries entered a cantina and shot and killed John Doe 27 and John Doe 28."); App1288 ¶1002 ("Jane Doe 26's first husband was murdered by the AUC in 1986.").

Of the 487 Plaintiffs and 261 decedents whose cases are pled in the TACs, Plaintiffs attempt to link state action to a subset of 55 cases that they claim have stronger ties to state action. *See* App1219-1238 ¶¶572-733. Those allegations similarly lack basic factual detail and are largely pled "on information and belief." *See, e.g.* App1227-28 ¶¶642-643 (pleading that "[p]aramilitaries targeted John Doe 232 for his political ideology" with no additional supporting facts); *see also* App1228 ¶¶644-645 (pleading only that "[p]aramilitaries targeted and murdered John Doe 168 after he was accused of collaborating with guerillas"); *see, e.g.* App1276 ¶929 ("On information and belief, Chiquita and the Individual Defendants caused, intended, conspired in, and/or aided and abetted the death of [Plaintiff or decedent] through their support of the AUC in Urabá, which at the time of the events was in control of the region.")

With respect to the individual Defendants, Plaintiffs plead:

> Plaintiffs are informed and believe, and on that basis allege, that the Defendants are responsible in some manner for the occurrences herein alleged and that the injuries to Plaintiffs herein alleged were proximately caused by their conduct, in that each caused, conspired to cause, worked in concert to cause, participated in a joint criminal

> enterprise that caused, or aided and abetted the injuries complained of, and/or was the principal, employer, or other legally responsible person for the persons who caused, conspired to cause, worked in concert to cause, participated in a joint criminal enterprise that caused, and/or aided and abetted such injuries.

App1165 ¶237.

## II.    Procedural History

### A.    Plaintiffs' Second Amended Complaints and the August 2022 Dismissal Order

Plaintiffs filed their Second Amended Complaints in 2021. App399-App1077. Defendants moved to dismiss on state action and other grounds. SuppApp2101-2229. In opposing the motions, Plaintiffs relied exclusively on the "symbiotic relationship" test articulated in *Romero* and *Sinaltrainal*. SuppApp2246-47.

In August 2022, the district court granted the motion in relevant part. *See* App1078-1129. Specifically, the district court dismissed the TVPA claims because Plaintiffs "fail[ed] to allege adequately the existence of a symbiotic relationship between the AUC and Colombian government involved in the specific misconduct alleged in the Complaint, i.e., for failure to allege the Colombian military or government officials either actively participated in the assassinations of their decedents, or that the paramilitary assassins enjoyed a symbiotic relationship with the Colombian military for the purpose of those assassinations." App1127-28.

Although Plaintiffs had already amended their complaints twice, the district court gave Plaintiffs a final opportunity to amend, for the limited purpose of

correcting the pleading deficiencies in Plaintiffs' "symbiotic relationship" allegations. App1128.

Plaintiffs moved for reconsideration of the order, but they did not challenge the scope of the authorized repleading or any other aspect of the district court's state action ruling. *See* SuppApp2405-2424.

## B.     Plaintiffs' Third Amended Complaints and the September 2023 Dismissal Order

In November 2022, Plaintiffs filed a TAC in each action. *See* App1130-2050. Defendants again moved to dismiss on state action and other grounds, App2063-65. The district court granted the motion, dismissing the TVPA claims. App2051-2095.

In its September 2023 order, the district court considered and rejected each of the state action theories that Plaintiffs had identified in their TACs. Tracking the TAC headings, the district court grouped these theories into five categories:

- "**First**, Plaintiffs assert the AUC acted under color of authority of the Colombian government 'with respect to all killings' (App1174-1219 ¶¶275-571)."

- "**Second**, Plaintiffs assert 'direct military involvement' as to four decedents (App1219-1221 ¶¶572-584)."

- "**Third**, Plaintiffs posit their conspiracy theory, that '[a]ll of the murders in this case were undertaken by the AUC pursuant to the conspiracy [with the Colombian State] to target suspected guerrilla sympathizers and terrorize civilians' (App1221-1235¶586,¶¶585-714)." This theory related to 45 decedents.

- "**Fourth**, Plaintiffs assert six (6) deaths occurred under the conspiracy penumbra that the 'target and terrorizing' campaign was a result of the

AUC's exercise of an 'exclusive state function - fighting crime' (App1235-1238 ¶¶715-733)."

- "**Fifth**, Plaintiffs claim the AUC acted under color of law 'because it exercised broad state functions and was the 'de facto' state in Urabá (App1238-1240 ¶¶734-742). These allegations are not tied to any particular Plaintiff 'Doe' injuries."

App2084-2090.

With respect to Plaintiffs' general allegations regarding all killings, the district court held that Plaintiffs again failed to allege the requisite symbiotic relationship. App2085.

With respect to Plaintiffs' theory of "direct military involvement" in four alleged killings, the district court concluded that these allegations—predominantly alleged on "information and belief"—were "without sufficient factual support to implicate the Individual Defendants through a 'color of law' connection." App2085-86. These bare allegations were "insufficient to 'nudge their claims across the finish line from conceivable to plausible.'" App2086 (quoting *Sinaltrainal*, 578 F.3d at 1268).

With respect to Plaintiffs' "conspiracy" theory, which applies to 45 cases, the district court observed that "Plaintiffs overwhelmingly fail to specify how the deaths occurred, where or when they occurred and, most critically, they do not link their deaths to state actors, rather they simply conclusively allege that their torture or death occurred 'under color of law.'" App2088. The district court explained that

Plaintiffs sometimes "specifically identify *non*-State actors who either committed or confessed to ordering the murders", "generically claim '[p]aramilitaries killed' or '[p]aramilitaries targeted' their victims", and even that Plaintiffs' allegations sometimes contradict their own theory of the case. App2088-2089.

With respect to Plaintiffs' theory of "exclusive state function - fighting crime," which applies to six cases, the district court noted that these allegations also "lack dates and details." App2089. Additionally, "[s]etting aside the fact that targeting and terrorizing suspected guerillas or sympathizers via torture does not seem to fit traditionally acceptable methods of 'fighting crime,' none of these allegations tie specific state actors to the alleged specific misconduct (not even those actions undertaken 'sometimes at the request of the Colombian military'), thus they fail to provide the state action component the TVPA claim requires." *Id.* (internal citation omitted).

With respect to Plaintiffs' theory that the AUC exercised broad state functions and was the "de facto" state in Urabá, the district court noted that "[t]hese allegations are not tied to any particular Plaintiff 'Doe' injuries." *Id.*

Following its review of the allegations, the district court concluded that the TACs "fail to meet the specific repleading requirements of its August Order, and the governing law[.]" App2094. Accordingly, on September 13, 2023, the district court dismissed the TVPA claims with prejudice. App2094-2095.

## Standard of Review

This Court reviews a Rule 12(b)(6) dismissal de novo. *Butler v. Sheriff of Palm Beach Cnty.*, 685 F.3d 1261, 1265 (11th Cir. 2012). "To survive a motion to dismiss, the plaintiff must plead a 'claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Legal conclusions couched as factual allegations need not be accepted as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). In evaluating the sufficiency of a plaintiff's pleadings, courts may make reasonable inferences in plaintiff's favor, but they are "not required to draw plaintiff's inference." *Sinaltrainal*, 578 F.3d at 1260 (quoting *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005)). Similarly, "unwarranted deductions of fact in a complaint are not admitted as true for the purpose of testing the sufficiency of plaintiff's allegations." *Sinaltrainal*, 578 F.3d at 1260.

## Summary of the Argument

The district court correctly applied this Court's precedents to dismiss Plaintiffs' TVPA claims on state action grounds. Under the applicable standard, "there must be proof of a symbiotic relationship between a private actor and the government that involves the torture or killing alleged in the complaint." *Romero*, 552 F.3d at 1317; *see also Sinaltrainal*, 578 F.3d at 1266 ("We demand allegations of a symbiotic relationship that involves the torture or killing alleged in the complaint to satisfy the requirement of state action."). After providing Plaintiffs with extensive guidance on the pleading requirements and granting Plaintiffs an opportunity to amend, the district court concluded that Plaintiffs did not allege the requisite state action to plead a TVPA claim. This Court should affirm.

Indeed, not only do *Romero* and *Sinaltrainal* set forth the specific legal standard applicable to this appeal, but they involve *the same factual context*— allegations seeking to hold employees of multinational companies liable under the TVPA for making payments in Colombia in the late 1990s and early 2000s to AUC paramilitaries, who allegedly were responsible for the torture and killing of the plaintiffs' relatives in Colombia. *See Sinatrainal*, 578 F.3d at 1257; *Romero*, 552 F.3d at 1309. In both *Sinaltrainal* and *Romero*, this Court affirmed dismissal of the TVPA claims because plaintiffs failed to plausibly plead or prove Colombian State

involvement in the particular deaths alleged in the complaints. *See Sinaltrainal*, 578 F.3d at 1266; *Romero*, 552 F.3d at 1317.

Here, as in *Sinaltrainal*, none of the complaints alleged facts sufficient to plead state action with respect to any of the specific instances of murder and torture alleged in the complaints. Tellingly, Plaintiffs' opening brief chiefly argues *alternative* grounds for finding the state action requirement plausibly pled, rather than arguing that the complaints meet the symbiotic relationship test articulated in *Romero* and *Sinaltrainal*. But Plaintiffs' alternative arguments should be rejected. The test for determining whether state action is plausibly pled under the TVPA is well-settled. And even if one of the other tests articulated by Plaintiffs could apply in the TVPA context, Plaintiffs still fail to plead facts sufficient to meet any of those standards.

Finally, even setting aside the state action requirement, the district court's dismissal order should be affirmed because Plaintiffs failed to state a claim of secondary liability under the TVPA against each individual Defendant. Plaintiffs also improperly group-pled generalized allegations against the individual Defendants collectively, rather than factually plead a plausible and viable theory of liability against each Defendant individually. For all of these reasons, dismissal was warranted.

## Argument

## I.    The District Court Applied this Court's State Action Standard for TVPA Cases

### A.    This Court Requires Allegations of a Symbiotic Relationship to Satisfy the State Action Element of a TVPA Claim.

No serious doubt exists that the district court considered and applied the proper standard to determine whether Plaintiffs adequately pled the state action element of their TVPA claims.[2] The district court dutifully and carefully applied this Court's clear prescriptions set forth in *Romero v. Drummond Co.*, 552 F.3d 1303 (11th Cir. 2008) and *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252 (11th Cir. 2009), which requires well-pled allegations of a symbiotic relationship between the Colombian State and the AUC that is tied to each specific instance of torture or killing alleged in the complaints.

This Court has never held that a plaintiff can establish the TVPA's state action element by relying on any theory except the "symbiotic relationship" test. To the contrary, this Court expressly held that "there **must** be proof of a symbiotic relationship between a private actor and the government that involves the torture or killing alleged in the complaint to satisfy the requirement of state action." *Romero*, 552 F.3d at 1317 (emphasis added); *see also Sinaltrainal*, 578 F.3d at 1266 ("We

---

[2] The TVPA's state action requirement limits civil liability to individuals who, "under actual or apparent authority, or color of law, of any foreign nation, subject[] an individual to torture . . . [or] extrajudicial killing." 28 U.S.C. § 1350, note § 2(a).

**demand** allegations of a symbiotic relationship that involves the torture or killing alleged in the complaint to satisfy the requirement of state action.") (emphasis added) (citations and quotations omitted).

In *Romero*, this Court considered U.S. Supreme Court precedent and its own prior decisions on "state action" in the Section 1983 and TVPA contexts, and it read those decisions as standing "to mean two things":

> First, there must be proof of a **symbiotic relationship** between a private actor and the government that **involves the torture or killing alleged in the complaint** to satisfy the requirement of state action under the [TVPA]. Second, a plaintiff may prove that relationship . . . by presenting evidence of the active participation of a single official.

552 F.3d at 1317 (emphasis added). Thus, under the "symbiotic relationship test" as set forth in *Romero*, the alleged relationship must relate to the "conduct at issue" in the complaint, which in *Romero* was "the killing of the union officers." *Id.*

Even though the *Romero* plaintiffs claimed that the AUC and Colombian government had a close and regular relationship, this Court found that such evidence was merely that of a "general relationship" which was insufficient to establish state action under the TVPA. *Id.* at 1317-18. Despite this evidence of a "general relationship" between the AUC and Colombian government, such evidence did not satisfy the state action element of the TVPA because it did not establish "either that state actors were actively involved **in the assassination of the union leaders** or that paramilitary assassins enjoyed a symbiotic relationship with the military **for the**

**purpose of those assassinations**." *Id.* (emphasis added). Because the *Romero* plaintiffs did not present evidence to meet either prong of the standard, the Court affirmed summary judgment in favor of the defendants. *Id.*

In *Sinaltrainal*, the Court applied the standard articulated in *Romero* to affirm dismissal of the plaintiffs' TVPA claims for failure to allege facts establishing a symbiotic relationship between the Colombian government and the AUC for purposes of the specific incidents of torture and extrajudicial killings alleged in the complaint. 578 F.3d at 1266. The plaintiffs there, like Plaintiffs here, alleged that the Colombian government tolerated and permitted the AUC to exist, and that the Colombian government cooperated with, assisted, protected, and worked in concert with the AUC to combat guerrillas. *Id.* The Court concluded that those allegations were insufficient to plead state action because there was no indication that the Colombian government was involved in, much less aware of, the specific acts of violence against plaintiffs or their decedents as alleged in the complaints. *Id.* at 1259, 1266.

Thus, this Court has required well-pled allegations (motion to dismiss stage) or proof (summary judgment stage) of government action in the specific torture or killing. In both *Romero* and *Sinaltrainal*, the Court held that "the conduct at issue" or the "subject of the complaint" was the specific alleged injuries and acts of violence against the plaintiffs' relatives—not some sort of general collaboration,

20

campaign, or shared objective between the state actor and private actor. *See Romero*, 552 F.3d at 1317; *Sinaltrainal*, 578 F.3d at 1266.

In sharp contrast to the allegations here and in *Sinaltrainal*, this Court reversed a district court's dismissal of Guatemalan plaintiffs' TVPA claims because those plaintiffs adequately alleged state action in *Aldana, Inc.*, 416 F.3d at 1249-50. The *Aldana* complaint specifically alleged that a clear state actor—the local mayor—was an active participant in a private group's act of violence against the specific plaintiffs' decedents. *Id.* Because allegations of a state actor's mere presence with or tolerance of a violent private group does **not** establish state action, the Court required allegations of direct participation by the state actor in the specific alleged act of violence. *Id.*

As the district court recognized, *Romero* and *Sinaltrainal* squarely apply. App1120-1124; App2083-2094. Here, as in *Romero* and *Sinaltrainal*, Plaintiffs have sought to characterize AUC murders as state action based on the alleged relationship between the AUC and the Colombian government. Thus, to satisfy the standard for TVPA state action, Plaintiffs must allege a symbiotic relationship between the private actors and the government that involves the **specific torture or killing** alleged in the complaint. This requirement ensures that the specific harms for which plaintiffs seek to recover—and not just events of a similar type or activities in the same geographic region—were committed "under actual or apparent authority, or

color of law," of the foreign nation, as required by the TVPA. 28 U.S.C. § 1350 note; *see* App1123 ("[I]n both *Romero* and *Sinaltrainal*, the Eleventh Circuit Court of Appeals clearly signaled that the required link . . . [is] not a general link to other misconduct of the same genre or other misconduct occurring in the same geographical area.").

## B.    The Court Did Not Fail to Apply Alternative Tests Drawn from Other Contexts

Plaintiffs accuse the district court of ignoring or failing to apply certain state action tests drawn from U.S. civil rights law. That is not the case.

First, Plaintiffs incorrectly contend that they need not meet the "symbiotic relationship" test set forth by this Court because there are "three general ways" to assess whether private actors may be considered to be acting under color of law for purposes of Section 1983. Br. at 32. While courts look to Section 1983 for general guidance in the TVPA context, fact patterns involving American restaurants, prisons, and nursing homes have little relevance to claims involving a foreign paramilitary group operating in the context of a foreign civil war, let alone to secondary-liability claims against U.S. citizens who are not alleged to have acted under "color of law" themselves. Simply because there may be various tests applicable to U.S. civil rights cases does not mean they should be rigidly imported into unanalogous TVPA contexts. Indeed, this Court has acknowledged that state action precedents *within* the Section 1983 context may not even translate well across all Section 1983 cases. *See,*

*e.g. Charles v. Johnson*, 18 F.4th 686, 696 (11th Cir. 2021) ("Because the joint action test applies to a broad array of factual scenarios, some cases nominally interpreting this test have used language that is unhelpful in its application to other scenarios."). In *Romero*, this Court canvassed the broader Section 1983 case law that articulated the very same alternative tests Plaintiffs now predominantly advance on appeal before concluding that the relevant test to be drawn from that precedent and applied in the TVPA context is the "symbiotic relationship" test. *See* 552 F.3d at 1317 (discussing *Brentwood Academy v. Tennessee Secondary School Athletic Assoc.*, 531 U.S. 288, 295-296 (2001)).[3] *Romero* and *Sinaltrainal* analyzed state action under the same factual scenario presented here. There is no principled reason to broadly import a myriad of other inapplicable tests.

Second, Plaintiffs' contention that the district court did not consider Plaintiffs' "significant encouragement" or "public function" theories is incorrect. For one thing, Plaintiffs raised *only* the symbiotic relationship test as the relevant test for pleading state action in response to Defendants' motion to dismiss Plaintiffs' Second

---

[3] In *Brentwood*, the Supreme Court noted that in the Section 1983 context, challenged private activity may be considered "state action" when it "results from the State's exercise of 'coercive power'"; "when the State provides 'significant encouragement, either overt or covert'"; "when a private actor operates as a 'willful participant in joint activity with the State or its agents'"; when a private entity is "controlled by an 'agency of the State'"; "when it has been delegated a public function by the State"; when it is "'entwined with governmental policies' or when government is 'entwined in [its] management or control.'" *See* 531 U.S. at 296 (internal citations omitted).

Amended Complaints. *See* SuppApp2246-47. Plaintiffs did not argue that their allegations were sufficient to meet the "encouragement" or "public function" tests. *Id*. Thus, Plaintiffs' proposed alternative tests fell outside of the narrow scope of repleading authorized in the August 2022 order, which limited any amendments to "facts tying the symbiotic relationship alleged to the specific instances of murder and torture alleged in the Complaints." App1127-1128. Because the district court properly limited amendment by *these* Plaintiffs to the only theory they had raised in the briefing, this Court may affirm on that basis alone, without deciding whether Plaintiffs' proposed alternative tests should apply to TVPA claims.[4]

Regardless, the district court also rejected Plaintiffs' alternative arguments on their merits. In dismissing the Second Amended Complaints, the district court noted that although Plaintiffs alleged "the existence of a mutually beneficial relationship between the Colombian Army and the AUC" and that the Colombian government "tolerated and even *encouraged* paramilitary activity," those facts are not sufficient to plead state action because "Plaintiffs do not allege…that the murders or torture of

---

[4] After 14 years of MDL proceedings, including multiple amendments of these specific complaints, the district court acted well within its discretion in providing one final opportunity to amend, but limiting it to the only state action theory Plaintiffs had raised in the briefing. Plaintiffs complain (Br. at 35) that any restriction on their ability to argue new theories was "obviously error," but they were not entitled to *any* further proceedings after the 2022 motion-to-dismiss briefing. The district court could have dismissed the claims with prejudice in August 2022, without any opportunity to replead.

their decedents were the product of such coordinated attacks, or that Colombian Army personnel or any government official had any direct involvement in the assassination of their decedents." App1126 (emphasis added). In response to Defendants' motions to dismiss Plaintiffs' TACs, Plaintiffs conceded that an "encouragement" theory still requires a "nexus" to each act of torture or killing alleged in the complaints. *See* SuppApp2684. But Plaintiffs then glossed over the "encouragement" test in a mere two, short paragraphs and made no attempt to link any specific compulsion or encouragement by the Colombian government to the killing or torture of any specific Plaintiff or decedent. *See* SuppApp2689. The district court properly concluded that Plaintiffs' allegations of state coordination or encouragement are insufficient where they fail to link that alleged state action to the specific instances of torture or killing alleged in the TACs. *See* App2083, App2085, App2093.

With respect to the public function test, the district court considered Plaintiffs' arguments that the AUC was "fighting crime," and appropriately concluded both that (1) Plaintiffs failed to sufficiently pled that the AUC was delegated the exclusive state function of "fighting crime," and (2) Plaintiffs failed to sufficiently tie the alleged exercise of a public function to the specific instances of murder and torture alleged in the TACs. *See* App2089-90.

In short, the district court correctly concluded that the test articulated by this Court in *Romero* and *Sinaltrainal* is the relevant test applicable to this case. The district court further concluded that the "significant encouragement" or "public function" tests were not applicable and, even if they were, Plaintiffs failed to allege facts sufficient to meet those tests.

## II.    Plaintiffs' Claims Fail Under *Any* State Action Test Because the Facts Pled Cannot Establish the Required Nexus

It is black-letter law that no matter what test is applied, state action may be found "if, though **only if**, there is such a 'close nexus between the State **and the challenged action**' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood*, 531 U.S. at 295 (quoting *Jackson*, 419 U.S. 345, 351 (1974)) (emphasis added). Accordingly, this Court did not misinterpret or misapply Section 1983 Supreme Court cases when it held in *Romero* and confirmed in *Sinaltrainal* that there must be a close relationship between the State and **the particular wrongdoing at issue**. That is the law under both the TVPA and all Section 1983 tests.

Indeed, the Supreme Court confirmed just this year that a nexus between the State and each specific alleged act of wrongdoing is required to show state action. *See Lindke v. Freed*, 601 U.S. 187 (2024). In *Lindke*, the plaintiff claimed that a city manager violated the plaintiff's free-speech rights by deleting comments on the city manager's social media posts. *Id.* at 193. Although the defendant himself was a state

official, not every post he made could be attributed to state action. *Id.* at 196. "[T]he state-action doctrine avoids such broad-brush assumptions—for good reason." *Id.* As the Court explained, "[a]n act is not attributable to a State unless it is traceable to the State's power or authority. Private action—no matter how 'official' it looks—lacks the necessary lineage." *Id.* at 198. The Court accordingly held that "it is crucial for the plaintiff to show that the official is purporting to exercise state authority in specific posts." *Id.* at 200. Plaintiffs here must plead the state's involvement in each specific injury and death alleged in the TACs. The district court applied the appropriate level of scrutiny.

Plaintiffs incorrectly claim that a "*Burton* test" does not require state involvement in each act of wrongdoing, referring to *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961). Br. at 49, 55. Not so. In *Burton*, a private lessee that engaged in racial discrimination leased restaurant space from a state parking authority in a publicly owned building. While the Court held that the state could be considered a joint participant under those unique circumstances, the Court carefully limited its holding "to lessees of public property." *Burton*, 365 U.S. at 726. *Jackson* repeated that limiting principle, cautioning that *Burton* "limit[ed] the actual holding to lessees of public property." *Jackson*, 419 U.S. at 357-58; *see also American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 57 (1999) ("*Burton* was one of our early cases dealing with 'state action' under the Fourteenth Amendment, and later cases have

27

refined the vague 'joint participation' test embodied in that case. *Blum* and *Jackson,* in particular, have established that privately owned enterprises providing services that the State would not necessarily provide, even though they are extensively regulated, do not fall within the ambit of *Burton.*") (citations and quotations omitted). There is no such thing as a "*Burton* test," and because the AUC is not a private lessee of the Colombian government, *Burton* is inapplicable.

Plaintiffs also mischaracterize *Charles v. Johnson*, 18 F. 4th 686 (11th Cir. 2021) as allegedly endorsing the idea that "private liability will attach where the state 'so far insinuated itself into a position of interdependence with the [private entity] that it was a joint participant in the **enterprise**." Br. 55. This Court did no such thing. Rather, in *Charles*, the Court was quoting *Jackson*, 419 U.S. at 357-58, and noted that this language "cited by the parties suffers from a lack of context." *Charles*, 18 F. 4th at 697 (finding no state action on the part of a private party). *Jackson*, also cited by Plaintiffs, considered the "public function" test in a Section 1983 action wherein a woman sued a utility company for disconnecting service. *Jackson*, 419 U.S. at 352. Although the Supreme Court recognized that state action can be found in rare circumstances where a private entity exercises "powers traditionally exclusively reserved to the state," the Court held that the required nexus is **not** between a private entity and the State generally, but between the **specific, challenged action** of the private entity and the State. *Id*. at 350-51. As the Court

explained, although the actions of a "heavily regulated" utility company with a "governmentally protected monopoly" may more readily be found to be state acts than other private companies, "the inquiry must be whether there is a sufficiently close **nexus** between the State **and the challenged action** of the regulated entity so that **the action** of the latter may be fairly treated as that of the State itself." *Id*. at 351 (emphasis added). Thus, on *Jackson*'s facts, the Court concluded that Pennsylvania was "**not** sufficiently connected **with respondent's action in terminating petitioner's service** so as to make respondent's conduct in so doing attributable to the State[.]" *Id*. at 358-59 (emphasis added).

Eight years after *Jackson*, the Supreme Court once again emphasized that the required nexus for state action is between the State and the specific challenged conduct, not the private entity generally. *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). In *Blum*, Medicaid nursing home residents challenged involuntary discharges by their nursing homes. *Id.* at 993-94. They named as defendants state officials responsible for administering the Medicaid program and regulating nursing homes in New York. *Id.* at 995-96. Even though the nursing homes were state subsidized, the state paid for the medical expenses of more than 90% of the patients in the facilities, the facilities were licensed by the state, and the state had a fiscal interest in and benefitted from the challenged decisions, the Court still found no state action. *Id.* at 1010-11. The state's "degree of involvement [was] too slim a basis on

which to predicate a finding of state action **in the decision itself**." *Id*. at 1010 (emphasis added); *see also San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 546 (1987) (finding no state action under "significant encouragement" test where defendant's challenged action "simply [was] not a governmental decision" and there was "no evidence that the Federal Government coerced or encouraged the [defendant] *in the exercise of its right*.") (emphasis added).

As this Court has observed in surveying the various state action tests for Section 1983 cases, "[i]f a thread of commonality is to be drawn from the various forms in which state action can manifest itself through the conduct of private parties, it is that attribution is not fair when bottomed solely on a generalized relation with the state." *Nat'l Broad. Co. v. Commc'ns Workers of Am., AFL-CIO*, 860 F.2d 1022, 1025 (11th Cir. 1988) (citations and quotations omitted). Rather, "private conduct is fairly attributable only when the state has some affirmative role…*in the particular conduct underlying a claimant's civil rights grievance*." *Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1348 (11th Cir. 2001) (quoting *Nat'l Broad. Co.*, 860 F.2d at 1026 (emphasis in original)).

All of Plaintiffs' proposed theories—not just the TVPA-specific "symbiotic relationship" test—require Plaintiffs to link the alleged state action to the specific

torture or killing alleged in the complaints, which the TACs confirm they are unable to do.

### A.    Plaintiffs' Allegations Do Not Meet the Required Nexus Under the TVPA State Action Test Articulated in *Romero*

Under *Romero*, there are two ways to plead state action for purposes of the TVPA: (1) allege "a symbiotic relationship between a private actor and the government that involves the torture or killing alleged in the complaint"; or (2) allege direct, "active participation" of a state actor in the torture or killing alleged in the complaint. *Romero*, 552 F.3d at 1317. Plaintiffs attempt both avenues with respect to all claims in the TACs but ultimately cannot satisfy either standard.

More specifically, of the 487 Plaintiffs and 251 decedents across all four complaints, Plaintiffs only attempted to link state action to a subset of just 55 cases in the TACs. For 45 of those cases, Plaintiffs attempted to meet the symbiotic relationship test by pleading a vague "conspiracy." And for an additional four cases, through alleged "direct" involvement of state officials. Those claims also failed under scrutiny.[5]

---

[5] The remaining six claims are pled under an alleged "exclusive state function" theory, addressed in Section II(C).

### 1. After Multiple Opportunities to Amend, Plaintiffs Still Cannot Allege the Nexus Required by the "Symbiotic Relationship" Test

Plaintiffs' failure to articulate the required nexus between the alleged symbiotic relationship and each of the specific instances of torture or killing alleged in the TACs is not just a drafting deficiency, but a symptom of a larger defect that cannot be remedied by repleading. While Plaintiffs allege generally that the AUC and Colombian state had overlapping interests and common enemies, they do not allege (nor could they) that the state was involved in every violent action taken by the AUC. For example, Plaintiffs acknowledge that not every massacre committed by the AUC was carried out with state involvement. *See, e.g.* App1186 ¶345. Plaintiffs also acknowledge that not every killing was a result of "collusion" with the State or at the State's behest or knowledge.  App1194 ¶390; *see also* App1235 ¶717 (alleging that the AUC killed sex workers, drug dealers, criminals and participants in private disputes "*sometimes* at the request of the Colombian military") (emphasis added). This context underscores why allegations of a general relationship between the state and private actor are not enough. Indeed, not even every act of a government official constitutes "state action." *See Lindke*, 601 U.S. at 196 (requiring plaintiff to parse each act of city official to determine which can be attributed to state power and which cannot). Even greater caution is warranted when a plaintiff asks a U.S. court to attribute every act of unknown, unidentified members

of a violent, illegal, narcotrafficking terrorist group to the Colombian State, which would be tantamount to declaring that a long-standing United States ally acted as a state sponsor of narcoterrorism against its own citizens.

Indeed, as the TACs acknowledge, the AUC was an illegal, non-state paramilitary group whose activities were outlawed by the Colombian government. *See* App1167-68 ¶248 ("By 1991 . . . the Colombian government adopted a new law criminalizing membership in and provision of support to the paramilitary groups."); App1172 ¶267 ("[P]aramilitarism had been declared illegal in Colombia"). In fact, while Plaintiffs allege that the AUC targeted academics and trade unionists, among others, they also allege that instances of rogue military collaboration were *prosecuted* by the State. *See, e.g.* App1188 ¶ 356 (General Del Rio of the 17th Brigade was "convicted" for conspiring with the AUC); App1192 ¶381 (Colombian intelligence official was "convicted of conspiring with the AUC to murder an academic"); App1195 ¶399 (intelligence official convicted of aggravated homicide and conspiracy to commit crime for "facilitat[ing] the participation of the AUC in the murders of trade unionists"); *see also* App1218 ¶¶563-65 (prosecutors "took action against 25 political leaders in Urabá" for conspiracy to commit crimes). Thus, the proper starting presumption is that the alleged unknown perpetrators were acting *in violation of* Colombian law, not under color of it. To the extent the facts of a particular case suggest otherwise, Plaintiffs had every opportunity to plead that

specific link. Despite three chances to amend their complaints, they were unable to do so, and the district court correctly dismissed the claims.

Notably, the few allegations in any of the complaints that do refer to state actors committing acts of violence are unrelated to any of Plaintiffs' claims. By way of example, Plaintiffs plead that the Colombian State "work[ed] with the AUC" to commit the "Honduras and La Negra Farms Massacre" in 1988 (App1203-1204 ¶¶462-470)—long before any of the Plaintiffs were injured or decedents killed, and before Chiquita made any payments to the AUC. Elsewhere, Plaintiffs plead that the *AUC* did not even exist in 1988. *See* App1169 ¶¶254-257. Similarly, no Plaintiff or decedent is alleged to have been injured or killed in *any* of the massacres pled in Plaintiffs' complaint. *Compare* App1203-1210 ¶¶462-513 (detailing specific operations and massacres) *with id*. at App1276-1374 ¶¶927-1585 (Plaintiff-specific allegations).

The TACs once again make generalized allegations related to "all killings," App1174-1219 ¶¶275-571, which the district court appropriately rejected as insufficient to plead state action under *Romero*, App2085. The district court correctly looked beyond Plaintiffs' bare allegations that their decedents were killed by "paramilitaries" or by "the AUC," and instead asked whether Plaintiffs had alleged a sufficient nexus between state action and the specific torture or killings alleged in the complaint. They did not, and the TACs were properly dismissed.

### 2. Plaintiffs Cannot Meet the Symbiotic Relationship Test by Pleading a Vague Conspiracy

Failing to plead the requisite nexus, Plaintiffs attempt to skirt the symbiotic relationship requirement by pleading a vague "conspiracy." Br. at 57-65. But this Court's requirement of a symbiotic relationship tied to each instance of wrongdoing would have little meaning if Plaintiffs could merely substitute vague and conclusory conspiracy allegations. Indeed, this Court has already rejected that contention. *See Sinaltrainal*, 578 F.3d at 1270 (finding plaintiffs' "vague and conclusory allegations of a conspiracy" did not state a claim for relief that was "plausible on its face" because they "fail[ed] to detail any factual allegations to raise a right to relief above the speculative level" with respect to the specific instances of murder and torture alleged) (quotation omitted) (citing *Twombly*, 550 U.S. at 555). So, too, has the Second Circuit. *See Appel v. Cohen*, No. 22-170, 2023 WL 1431691, at *1 (2d Cir. Feb. 1, 2023) ("[A] litigant cannot simply allege the existence of a conspiracy to skirt the TVPA's state action requirement") (citing *Arar v. Ashcroft*, 585 F.3d 559, 568 (2d Cir. 2009) (en banc)).

Moreover, the rationale for maintaining a stringent state action requirement is especially strong here, where Plaintiffs seek to hold Defendants liable on an attenuated chain of secondary-liability theories. Plaintiffs effectively attempt to link one alleged conspiracy—a conspiracy between the AUC and Colombian state for the purpose of targeting and terrorizing civilians, App1221-35 ¶¶585-714—to an

entirely different alleged conspiracy, with different goals, involving Defendants and the AUC, App1272-75 ¶¶911-19; *see also* App1252-53 ¶808 (alleging that Defendants "prioritize[d] profit over safety and . . . accept[ed] the probability of making payments to armed groups as a 'cost of doing business'"). Under this cobbled chain of attenuated theories, Plaintiffs seek to hold the individual Defendants liable for "state action" without alleging that they ever joined the relevant AUC-state conspiracy.

The cases Plaintiffs rely on are inapposite. *See* Br. at 57-61. First, neither *Halberstam v. Welch*, 705 F.2d 427 (D.C. Cir. 1983) nor *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) are TVPA cases or even Section 1983 cases. Neither case discusses "state action" at all, let alone supports the contention that pleading a conspiracy would be sufficient to meet the state action requirement under the TVPA. Indeed, if anything, *Twitter* supports Defendants' contention that "the focus must remain on the tort itself. *See* 598 U.S. at 494-95. *Charles v. Johnson* is also not a TVPA case, nor does it support Plaintiffs' contention that there are "well-established conspiracy principles" (Br. at 58) to import from the Section 1983 context. *See Charles*, 18 F.4th at 697 (noting that state action test "suffers from a lack of clarity when it comes to a conspiracy requirement," and declining to determine what the specifics of the conspiracy must be in the Section 1983 context). While *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1159 (11th Cir. 2005) is a TVPA case, it also did

not address state action—indeed there, the plaintiff filed suit against a Chilean military officer who allegedly participated in the execution of the decedent carried out by other military officers. Thus, state action was not at issue.

Even assuming that state action in the TVPA context could be established by alleging a conspiracy, Plaintiffs would still be required to plausibly allege a specific nexus to each individual instance of alleged torture or killing, which they have not done. *See Adickes v. S H Kress & Co.*, 398 U.S. 144, 152 (1970) ("[P]etitioner . . . will be entitled to relief under § 1983 if she can prove that a Kress employee, in the course of employment, and a Hattiesburg policeman somehow reached an understanding to deny Miss Adickes service in the Kress store[.]"); *Hadley v. Gutierrez*, 526 F.3d 1324, (11th Cir. 2008) ("[T]he plaintiff must prove that the defendants reached an understanding *to deny the plaintiff's rights*.") (emphasis added); *Harvey v. Harvey*, 949 F.2d 1127, 1133 (11th Cir. 1992) (in Section 1983 context "plaintiff must plead in detail, through reference to material facts, the relationship or nature of the conspiracy between the state actor(s) and the private persons" and must plead contacts "that could prove private and alleged state actors had reached an understanding to violate [plaintiff's] rights."). Plaintiffs' vague and conclusory allegations regarding an alleged State-AUC conspiracy do not come close to pleading this level of specificity with respect to any case, let alone do Plaintiffs adequately link each individual Defendant to such conspiracy.

While Plaintiffs surmise that certain decedents were supposedly targeted by the paramilitaries for their membership in organizations disfavored by the Colombian government, they do not actually plead "that the Colombian military was involved in [the] crime." *See Romero*, 552 F.3d at 1317; *see also, e.g.* App1282 ¶¶961-63 (pleading only that "a group of three or four men" allegedly "belonging to the AUC" shot and killed John Doe 13). As this Court has already concluded, allegations of a mere "shared ideology" between the AUC and the Colombian government against unions or other groups (taking such allegations as true for purposes of a motion to dismiss) are insufficient to state a claim for relief. *See Sinaltrainal*, 578 F.3d at 1268 (rejecting "the basis for the conspiracy" that the officers "had a shared purpose with Aponte to unlawfully arrest and detain Plaintiffs because they were union officials and had been branded by Panamco officials as leftist guerillas" as too "vague and conclusory").

Indeed, all of the 45 cases pled under this conspiracy theory fail for the same reason: Plaintiffs at most point to characteristics of the decedent that, in their view, could have led to AUC targeting, but nothing more. *See* App2088 ("Plaintiffs overwhelmingly fail to specify how the deaths occurred, where or when they occurred and, most critically, they do not link their deaths to state actors, rather they simply conclusively allege that their torture or death occurred 'under color of law'.

. . . ").[6] Just as in *Sinaltrainal*, "[t]he vague and conclusory nature of these allegations is insufficient to state a claim for relief, and 'will not do.'" *Sinaltrainal*, 578 F.3d at 1268 (citing *Twombly*, 550 U.S. at 555). "[P]leadings must be something more than an ingenious academic exercise in the conceivable." *United States v. Students Challenging Regulatory Ag. Proc.*, 412 U.S. 669 (1973); *Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'") (quoting in part *Twombly*, 550 U.S. at 557). This Court should reject Plaintiffs' invitation to dramatically dilute the TVPA's state action requirement, which is necessary to limit the TVPA to its proper scope.

### 3.    Plaintiffs' "Direct Involvement" Theory Also Fails

The district court likewise reached the correct result in rejecting Plaintiffs' conclusory allegations that the Colombian military directly "collaborated and coordinated with the AUC" in the deaths of four Plaintiffs. *See* App1219-1220 ¶¶574 (John Doe 64), 577 (John Doe 322), 579 (John Doe 104), 582 (John Doe 301).

First, while Plaintiffs claim that there was "direct military involvement" in these four killings (*see* App1219), Plaintiffs "fail to identify any specific member of the Colombian military or other government official who was 'directly involved' in

---

[6] As the district court correctly noted, "[i]n some cases Plaintiffs specifically identify *non*-state actors who either committed or confessed to ordering the murders" and sometimes their allegations contradict that a state actor was involved. App2088-89.

any of these claims." App2087. In addition, for three of the four decedents, the critical allegations upon which Plaintiffs' theory relies are "cast 'on information and belief,' without sufficient factual support to implicate the Individual Defendants through a 'color of law' connection." App2086; *see* App1219-1220 ¶¶ 574, 578, 581. When assessing the plausibility of Plaintiffs' claims, the district court was not required to accept as true conclusory assertions made upon information and belief. *Twombly*, 550 U.S. at 551, 557 (declining to take as true the conclusory allegation "upon information and belief" that the companies had entered a conspiracy without enough facts to make that statement plausible); *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013) ("[W]e do not have to take as true [plaintiff's] allegations "upon information and belief").

Accepting only well-pleaded allegations as true, the district court properly concluded that "Plaintiffs' bare allegations pled 'on information and belief' are insufficient to 'nudge their claims across the line from conceivable to plausible.'" App2086 (quoting *Sinaltrainal*, 578 F.3d at 1268 ("[T]he plaintiffs' allegations of conspiracy are 'based on information and belief,' and fail to provide any factual content that allows us 'to draw the reasonable inference that the defendant is liable for the misconduct alleged.'") (quoting *Iqbal*, 556 U.S. at 678)). The TACs do not set forth any "factual content" or basis for the "belief" to draw a reasonable inference specific to any Plaintiff or decedent.

40

With respect to the fourth decedent, John Doe 301, Plaintiffs plead only that "paramilitaries" and the army targeted John Doe 301 because "his land was located in a strategic transport route," App1221 ¶583, and that "[d]ays before his death, John Doe 301 received threats from the National Army of Colombia for allegedly serving as an informant for the opposition." App1221 ¶584. Plaintiffs then leap to the conclusion that John Doe 301 was killed "under color of law because of the collaboration and coordination between the government and the AUC to target and eliminate perceived threats and opposition." App1220-1221 ¶582. This is not "direct involvement," but rather a mere repackaging of Plaintiffs' vague conspiracy theories that do not state a claim. Moreover, Plaintiffs provide no facts as to where, when or how John Doe 301 was killed other than to say he was "murdered" by "paramilitaries" in "October 2000." *See* App1361 ¶1501. Most importantly, Plaintiffs do not provide any factual allegations to support the inference that the AUC and Colombian military actually coordinated and collaborated to target and kill John Doe 301. Rather, Plaintiffs sought to have the district court simply admit these unwarranted deductions as true. *See* App2086-2087. The district court appropriately declined that invitation. *See Sinaltrainal*, 578 F.3d at 1268.

## B.    The "Significant Encouragement" Test Does Not Apply, and Plaintiffs' Allegations Do Not Meet the Required Nexus

Next, Plaintiffs argue that they sufficiently pled state action because the Colombian government allegedly "significantly encouraged" the AUC to murder

civilians and terrorize the population. *See* Br. at 36-39. The district court properly rejected this theory. *See* App1126.

Plaintiffs cite no authority for applying a state "encouragement" test in the TVPA context. For Section 1983 cases, this test asks "whether the state has exercised coercive power or has provided such significant encouragement, either overt or covert, that the private actor's choice must be deemed to be that of the state." *Langston ex rel. Langston v. ACT*, 890 F.2d 380, 385 (11th Cir. 1989). But general encouragement is not sufficient—there must still be a link to the specific wrongdoing at issue. Plaintiffs cite *Blum v. Yaretsky*, where the Supreme Court found a lack of state action *precisely because* plaintiffs could not tie the state to the nursing homes' *specific decisions* that affected the plaintiffs. 457 U.S. at 1004; *see supra* at 29. Similarly, in *Moose Lodge No. 107 v. Irvis*, the Supreme Court found "nothing approaching the symbiotic relationship" required to plead state action between a private club and a state liquor control board, notwithstanding that the liquor control board regulated the club, because there was no link between the state and the club's discriminatory decisions. 407 U.S. 163, 175 (1972); *see also Aldana*, 416 F.3d at 1248 (relying on *Moose Lodge* and holding that "registration and toleration of private security forces does not transform those forces' acts into state acts").

Plaintiffs also rely on *Lombard v. Louisiana*, 373 U.S. 267 (1963) and *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602 (1989) but those cases are

42

inapposite. *See* Br. at 36-39. Unlike here, the plaintiffs in *Lombard* sued the state of Louisiana directly to overturn criminal convictions obtained under what amounted to an official city ordinance. *See* 373 U.S. at 273 (noting city officials' declarations that they would not permit desegregated service in restaurants could be "treated exactly as if [the city] had an ordinance prohibiting such conduct," rendering the convictions unconstitutional). In fact, the Supreme Court noted that they "need not pursue [the] inquiry" as to whether the private store employees' actions were coerced by the city of New Orleans, and thus the case has no relevance here. *Id.* And in *Skinner*, the Court found that the "search and seizure" clause of the U.S. Constitution's Fourth Amendment applied where a private railroad required breath and urine tests mandated or authorized by regulations promulgated by the Federal Railroad Administration. *See Skinner*, 489 U.S. at 615. Here, there are no allegations that the Colombian State coerced, compelled, or encouraged the AUC to murder civilians through specific ordinances as in *Lombard* or regulations as in *Skinner*. Indeed, Plaintiffs acknowledge in their own complaint that "[p]aramilitarism had been declared illegal in Colombia[.]" *See* App1172 ¶267.

Plaintiffs' allegations that the Colombian State intended and encouraged the murder of innocent civilians generally are conclusory and not well-pled. At most, the complaint alleges that certain members of the Colombian military collaborated with the AUC in its fight *against insurgent guerrilla combatants*, but not in a

conspiracy to murder and terrorize the Colombian State's own civilian population. *See, e.g.* App1172-1177 ¶¶267, 269, 271, 292. And where there were rogue military members that collaborated with paramilitaries for other purposes, they were *prosecuted* by the Colombian State. *See, e.g.* App1192 ¶381 (Colombian intelligence official who "spoke to the paramilitaries on the moral legitimacy of killing leftist civilians" was "later convicted of conspiring with the AUC to murder an academic"); App1195 ¶399 (former director of DAS "was convicted of aggravated homicide and conspiracy to commit a crime because, while director, he facilitated the participation of the AUC in the murders of trade unionists"); *see also* App1204 ¶ 469, App1210 ¶513. Plaintiffs' vague and conclusory allegations of "encouragement" to kill non-combatant civilians need not be credited as true, are implausible, and are not linked to any specific Plaintiff or decedent. The district court properly dismissed them.

Nor is the Colombian State's alleged "fail[ure] to prevent these killings" a basis for implying state action. *See* Br. at 39. The Supreme Court "clearly rejected the notion that [its] prior cases permitted the imposition of Fourteenth Amendment restraints on private action by the simple device of characterizing the State's inaction as 'authorization' or 'encouragement.'" *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149,

164-65 (1978). This Court has also rejected "police inaction" as a basis for TVPA liability. *Aldana*, 416 F.3d at 1248.[7]

### C.    The "Public Function" Test Does Not Apply, and Plaintiffs' Allegations Do Not Meet the Required Nexus

Lastly, Plaintiffs contend that although the AUC generally terrorized the civilian population, it also exercised an "exclusive state function—fighting crime," (*see* App1235-1236 ¶¶715-720), and that when the AUC murdered innocent civilians, it was actually exercising "powers traditionally exclusively reserved to the State." Br. at 42-43. Plaintiffs' sensational and contradictory "public function" theory fails for several reasons.

First, Plaintiffs offer no authority supporting the application of the public function test in the TVPA context. There is no authority and for good reason. While the public function framework has been applied in Section 1983 cases, where U.S. courts examine the traditional and exclusive functions of U.S. states, it does not translate well to the TVPA context where it would require U.S. courts to examine the sovereign functions of foreign governments. To apply the public function test in

---

[7] Plaintiffs cite this Court's decision in *Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005) for the supposed proposition that TVPA liability extends to state officials who fail to "prevent abuse." *See* Br. at 39. But *Cabello* did not find the mere failure of a state official to prevent abuse was sufficient to meet the state action requirement. *See Cabello*, 402 F.3d at 1157. Indeed, the plaintiff there sued a specific military official who was present at and involved in the execution of the decedent. *See id.* at 1158 (finding evidence sufficient to support direct liability).

TVPA cases, then, would require U.S. courts to delve into whether a private defendant performed an activity that is traditionally the exclusive prerogative *of the foreign state*. U.S. courts are not well situated to pass on this issue. To be sure, federal courts confront foreign law issues routinely, but probing the exercise of authority by other sovereigns would raise weighty and challenging issues that are largely the province of the political branches. *Cf. Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964) ("The act of state doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory.").

Furthermore, to qualify as a public function, "the government must have *traditionally* and *exclusively* performed the function" and "[t]he Court has stressed that 'very few' functions fall into that category." *Manhattan Cmty. Access Corp. v. Halleck,* 139 S. Ct. 1921, 1929 (2019); *Flagg Bros., Inc.*, 436 U.S. at 158 ("While many functions have been traditionally performed by governments, very few have been *exclusively* reserved to the state."). Because it defies logic that "terrorizing civilians" could possibly be considered a "traditional" and "exclusive" public function of the Colombian state, Plaintiffs instead attempt to recast the alleged terrorist acts as "counter-insurgency and police powers." Br. at 42. Plaintiffs cite no binding authority that supports that proposition. In fact, the Supreme Court has "never considered the private exercise of traditional police functions." 436 U.S. at

163 n.14 (noting that prior precedent "sheds no light on the constitutional status of private police forces," and expressly leaving open the question of whether and under what circumstances private police officers may be said to perform a public function for purposes of § 1983). Indeed, the majority in *Flagg Bros.* expressly rejected the contention by Justice Stevens in his dissent that "it is clear that the maintenance of a police force is a unique sovereign function, and the delegation of police power to a private party will entail state action." *Id.* (citing Dissent at 172 n.8). So too should this Court reject Plaintiffs' contention here. Indeed, if the Supreme Court does not automatically assume that "police power"—even when exercised *within* the United States—necessarily constitutes the exercise of a traditional, exclusive public function, all the more, this Court should decline to do so with respect to *foreign* paramilitary groups operating in the context of a complex, decades-long foreign civil war.

In addition, this Court has found that "even arrest, detention, and search are not exclusively reserved to the states." *Harvey*, 949 F.2d at 1131 (citing *White v. Scrivner Corp.*, 594 F.2d 140, 142 (5th Cir. 1979)). Other circuits have held similarly. *See, e.g.*, *Wade v. Byles,* 83 F.3d 902, 905–906 (7th Cir. 1996) (private security guard not performing exclusive state function when he shot plaintiff); *Chapman v. Higbee Co.,* 319 F.3d 825, 834 (6th Cir. 2003) (noting that "sister circuits have consistently

47

held" that the performance of private security functions does not necessarily "transform the actions of a private security officer into state action.").

Plaintiffs cite the dissent in *Richardson v. McKnight* for the proposition that "punishing criminals is inherent in the sovereign power," but the majority held the opposite. *See* 521 U.S. 399, 405 (1997) (holding that "correctional functions have never been exclusively public"). Plaintiffs' other cited cases are inapposite because, unlike here, they involve private actors that were explicitly imbued with state authority under the law. *See Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (SPCA was delegated powers of animal control under New York law); *Romanski v. Detroit Ent., L.L.C.*, 428 F.3d 629, 640 (6th Cir. 2005) (casino security guard was licensed under Michigan law to act with plenary arrest power); *Al-Quraishi v. Nakhla*, 728 F. Supp. 2d 702, 751 (D. Md. 2010) (translators for the U.S. military were expressly contracted to perform military task that would have otherwise been performed by the military itself); *Dobyns v. E-Systems, Inc.*, 667 F.2d 1219, 1225 (5th Cir. 1982) (holding that U.S. government expressly delegated its peacekeeping function authorized by Congress to private entity through written contract). In stark contrast, Plaintiffs allege here that the AUC was expressly outlawed under Colombian law.

Finally, even if the Court were to conclude that the AUC's activities were traditional *and* exclusive prerogatives of the Colombian State, Br. 42, Plaintiffs'

claims fail because they do not tie any of those alleged activities to their specific accusations of torture and killing. Indeed, the mere fact or two pled for each Plaintiff or decedent does not establish the involvement of the Colombian military or State in any of the torture or killings alleged in the TACs. *See* App1236 ¶722 ("Paramilitaries targeted and murdered John Doe 115 as punishment for alleged abuse of a girl."). None of these allegations plausibly allege state involvement in the specific torture or killings alleged in the complaints.

Moreover, this theory is pled only with respect to six cases, where Plaintiffs include an identical conclusory statement that each decedent was killed "under the color of law…in the exercise of a traditional state function: law enforcement, maintaining order and the administration of justice." *See* App1236-1238 ¶¶721, 723, 726, 728, 730, 732. But in none of those six cases do Plaintiffs actually plead that the murder was carried out at the request or with the authorization of the Colombian military, let alone sufficiently plead such an allegation with adequate supporting facts. This is not enough. *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'") (quoting in part *Twombly*, 550 U.S. at 557). Accordingly, the Court should reject Plaintiffs' "public function" theory here.

### III.  The Court Should Also Affirm Dismissal Because Defendants Cannot Be Held Secondarily Liable Under Plaintiffs' Theories

The TVPA imposes liability against only natural persons and not organizations. *See Mohamad*, 566 U.S. at 460. Here, Plaintiffs allege no principal violation of the TVPA because Plaintiffs plead (without sufficient supporting facts) that a mere organization or amorphous group—the "AUC" or "paramilitaries"—committed each act of torture or killing alleged in the complaints. Coupled with their bare factual allegations, Plaintiffs' failure to allege a primary violation alone should be grounds to affirm dismissal, which comports with this Court's observation that "TVPA claimants may face significant hurdles in bringing suit" under the TVPA after *Mohamad*, because "'[v]ictims may be unable to identify the men and woman who subjected them to the [the violation], all the while knowing the organization for whom they work.'" *Doe v. Drummond Co.*, 782 F.3d 576, 611 (11th Cir. 2015) (quoting *Mohamad*, 566 U.S. at 460). "Nonetheless," this Court stated, "this is the legislative scheme in which TVPA plaintiffs must operate." *Id*.

Notwithstanding their failure to plead a primary violation, Plaintiffs seek to hold Defendants secondarily liable under aiding and abetting, conspiracy and agency

principles.[8] But Plaintiffs failed to allege that each individual Defendant "consciously, voluntarily and culpably participate[d] in" each act of torture or killing that injured the Plaintiffs and their decedents "in such a way as to help make [each act] succeed." *See Twitter, Inc. v. Taamneh*, 598 U.S. 471, 497 (2023). At best, Plaintiffs plead the individual Defendants' mere general awareness of the AUC's violent nature during the time that Chiquita made extortion payments to the AUC. *See, e.g.* App1245-46 ¶¶771, 776; App1254-55 ¶¶817, 819. But after *Taamneh*, defendants' "general awareness" of their alleged "role" in an "overall scheme" is insufficient for culpability. 598 U.S. at 503-04.

*Taamneh* also requires allegations that the defendant aided and abetted the tort that injured Plaintiffs. Absent a "definable nexus" to specific attacks, plaintiffs must allege assistance so "pervasive, systemic, and culpable" as to aid and abet "each and

---

[8] In 2015, a panel of this Court held in *Drummond* that theories of secondary liability are available for claims brought under the TVPA. Respectfully, several factors warrant reconsideration of this holding. First and foremost, the TVPA's text does not provide for secondary liability, and "an implicit congressional intent to impose . . . aiding and abetting liability" cannot be inferred from "statutory silence." *Cent. Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 185 (1994). Thus, the United States, in a brief to the Supreme Court in May 2020, determined that "[t]he TVPA does not provide for aiding-and-abetting liability." Brief for the United States as Amicus Curiae, *Nestle USA, Inc. v. Doe 1*, Nos. 19-416 and 19-453, 2020 WL 2749081 (May 2020). The Court's holding in *Drummond* further is in tension with the Supreme Court's admonition in *Mohamad* that the TVPA's scope of liability does not extend beyond its text. If the Court finds that Plaintiffs have met their burden to plead secondary liability under the TVPA, Defendants respectfully submit that the Court should grant *en banc* review to decide whether the TVPA provides a cause of action for secondary liability, as well as what standards should apply.

every … terrorist act committed anywhere in the world" by the attackers. 598 U.S. at 496, 502-03. Plaintiffs have not met that demanding standard for any of the individual Defendants let alone all of them.

Plaintiffs' additional "conspiracy" and "agency" theories of liability are also insufficiently pled. Conspiracy liability requires that "(1) two or more persons agree to commit a wrongful act (2) the defendant joined the conspiracy knowing of at least one of the goals of the conspiracy and with intent to help accomplish it, and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy." *Cabello*, 402 F.3d at 1158. Plaintiffs fail to plead an agreement between each of the individual Defendants and the AUC to commit a specific wrongful act, let alone any intention by individual Defendants to "help accomplish it." *See* SuppApp2577-2580. An "agency" relationship requires "(1) the principal to acknowledge that the agent will act for it; (2) the agent manifest an acceptance of the undertaking; and (3) control by the principal over the actions of the agent." *Whetstone Candy Co., Inc. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1077 (11th Cir. 2003). Plaintiffs fail to plead that any of the individual Defendants "acknowledge[d] that the [AUC] will act for [them]", that the AUC ever "manifest[ed] an acceptance of the undertaking," or that any individual Defendants "exercised control" over the AUC. *See* SuppApp2578-79. Indeed,

Plaintiffs allege the exact opposite: that the *AUC* "had complete control over the region." App1238.

Ultimately, Plaintiffs' "diaspora of legal theories" premised on extending liability beyond those actually responsible for the torts fails because they attempt to substitute vague, generalized, group-based allegations for the specific, individualized allegations required under the TVPA. *See* App2094 (noting that Plaintiffs failed to sufficiently distinguish how each individual Defendant is allegedly responsible under a "diaspora of legal theories," holding that "[w]here, as here, there are multiple defendants, the complaint should contain specific allegations with respect to each defendant; generalized allegations 'lumping' multiple defendants together are insufficient").

Thus, even if this Court were to find that Plaintiffs met the state action requirement for some or all of their claims, dismissal should be affirmed for failure to state a claim for secondary liability and improper group pleading. *See Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1309 (11th Cir. 2012) ("[T]his Court may affirm the judgment of the district court on any ground supported by the record, regardless of whether that ground was relied upon or even considered by the district court.").

## IV.    Affirming Dismissal Furthers the Policy and Purpose of the TVPA

In enacting the TVPA, Congress intended to provide a carefully tailored cause of action. *See Mohamad*, 556 U.S. at 460 ("Congress appeared well aware of the limited nature of this cause of action."). Affirming dismissal is in line with Congress' intent that TVPA liability should be prudently cabined.

Indeed, in *Mohamad*, the Supreme Court quoted congressional hearing remarks by Senator Arlen Specter—the primary advocate of the bill—stating: "Let me emphasize that the bill is a limited measure. It is estimated that only a few of these lawsuits will ever be brought." *Id.* at 460-61 (quoting 137 Cong. Rec. 2671 (1991)). The Supreme Court further quoted remarks by Senator Alan Simpson stating: "as a practical matter, this legislation will result in a very small number of cases." *Id.* at 460 (quoting 138 Cong. Rec. 4177 (1992)).

When signing the bill into law, President George H.W. Bush agreed with these sentiments. Without such restraint, he forewarned "ill-founded or politically motivated suits," "serious frictions in international relations," and a "waste of our own limited and already overburdened judicial resources":

> This legislation concerns acts of torture and extrajudicial killing committed overseas by foreign individuals. With rare exceptions, the victims of these acts will be foreign citizens. There is thus a danger that U.S. courts may become embroiled in difficult and sensitive disputes in other countries, and possibly ill-founded or politically motivated suits, which have nothing to do with the United States and which offer little prospect of successful

recovery. Such potential abuse of this statute undoubtedly would give rise to serious frictions in international relations and would also be a waste of our own limited and already overburdened judicial resources. As I have noted in connection with my own Civil Justice Reform Initiative, there is too much litigation at present even by Americans against Americans. The expansion of litigation by aliens against aliens is a matter that must be approached with prudence and restraint. It is to be hoped that U.S. courts will be able to avoid these dangers by sound construction of the statute and the wise application of relevant legal procedures and principles.

Presidential Statement on Signing the Torture Victim Protection Act of 1991, 28 Weekly Comp. of Pres. Doc. 465 (Mar. 16, 1992), 1992 WL 103356.

This Court's standard for state action under the TVPA is exactly the type of "sound construction" and "wise application" of the law that avoids these concerns. Requiring a nexus between a foreign state and specific acts of torture or killing alleged in a complaint (*Romero*, 552 F.3d at 1137) ensures individualized claims. *See* H.R. Rep. 102-367(I) ("The phrase 'under actual or apparent authority, or color of law' makes clear that the plaintiff must establish some governmental involvement in ***the*** torture or killing to prove a claim.") (emphasis added). Individualization of the state action inquiry prevents sweeping, group-based claims like those pled in the TACs. This was especially important to Congress in light of the TVPA's *international* context where the magnitude of generalized claims could overwhelm U.S. courts; indeed, the state action requirement was specifically identified as an "important limitation[] to prevent a flood of lawsuits based on any violent crime

overseas." 133 Cong. Rec. 6910 (1987) (remarks of Sen. Patrick Leahy) ("As Senator Specter has explained, it contains important limitations to prevent a flood of lawsuits based on any crime overseas. Only persons acting 'under actual or apparent State authority' would be liable for damages…."). In sum, this Court's standard for state action under the TVPA is not only legally correct, it is also critical to further the legislative intent and policy purposes underpinning the TVPA.

## Conclusion

For the foregoing reasons, the Court should affirm.

Dated:        November 27, 2024            Respectfully submitted,

*/s/ Michael L. Cioffi*
Michael L. Cioffi
Thomas H. Stewart
BLANK ROME LLP
1700 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
(513) 362-8701/04
michael.cioffi@blankrome.com
thomas.stewart@blankrome.com

Frank A. Dante
Melissa F. Murphy
BLANK ROME LLP
One Logan Square
130 N. 18th Street
Philadelphia, PA 19103
(215) 569-5645/5334
frank.dante@blankrome.com
melissa.murphy@blankrome.com

*Liaison Counsel for All Defendants-Appellees*

/s/ Ardith Bronson

Ardith Bronson
DLA Piper LLP (US)
200 South Biscayne Blvd., Suite 2500
Miami, FL 33131-5341
Tel:   (305) 423-8500
Fax:   (305) 503-9583
ardith.bronson@dlapiper.com

*Counsel for Defendants-Appellees Cyrus Freidheim and Robert Kistinger*

/s/ David S. Krakoff

David S. Krakoff
Bradley A. Marcus
Orrick, Herrington & Sutcliffe LLP
2001 M St. NW, Suite 500
Washington, DC 20036
Tel:  202-349-8000
dkrakoff@orrick.com
bmarcus@orrick.com

*Counsel for Defendant-Appellee Charles Keiser*

/s/ Robert J. Meyer

Robert J. Meyer
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006-1238
Tel: (202) 303-1123
Fax: (202) 303-2123
rmeyer@willkie.com

*Counsel for Defendant-Appellee John Ordman*

/s/ Elissa J. Preheim

Elissa J. Preheim
Kaitlin Konkel
Arnold Porter Kaye Scholer LLP
601 Massachusetts Avenue NW
Washington, DC 20001
Tel:   (202) 942-5000
elissa.preheim@arnoldporter.com
kaitlin.konkel@arnoldporter.com

Robert Reeves Anderson
Arnold & Porter Kaye Scholer LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202
Tel:   (303) 863-2325
reeves.anderson@arnoldporter.com

*Counsel for Defendant-Appellee Robert Olson*

/s/ John B.T. Murray, Jr.

John B.T. Murray, Jr.
Gunster Yoakley & Stewart, P.A.
777 South Flagler Dr., Suite 500 East
West Palm Beach, Florida 33401
Tel: (561) 650-0600
jbmurray@gunster.com

*Counsel for Defendant-Appellee William Tsacalis*

**Certificate of Compliance With Type-Volume Limit, Typeface Requirements, And Type-Style Requirements**

Pursuant to Fed. R. App. P. 32(g)(1), I certify that this document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,988 words according to a word count using Microsoft Word, the word-processing software used to prepare the document. Pursuant to Fed. R. App. P. 27(d)(1)(E), I certify that this document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document was prepared in a proportionally spaced typeface, 14-point Times New Roman font.

Dated:          November 27, 2024          */s/ Michael L. Cioffi*
                                            Michael L. Cioffi

**Certificate of Service**

I hereby certify that I electronically filed this document with the Clerk of the Court using the ECF system on November 27, 2024 which will automatically generate and serve by e-mail a Notice of Docket Activity on Attorney Filers under Fed. R. App. P. 25(c)(2).

/s/ Michael L. Cioffi
Michael L. Cioffi